# 24-849

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

MATHEW JAMES,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT
## [REDACTED]

ALEXANDRA A.E. SHAPIRO
JULIAN S. BROD
C. ERIC HINTZ
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
   17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ................................................... 4

ISSUES PRESENTED ...................................................................... 4

STATEMENT OF THE CASE ........................................................... 5

    A. Trial ....................................................................................... 5

    B. Deliberations And Verdict .................................................... 9

    C. Sentencing .......................................................................... 10

SUMMARY OF ARGUMENT ....................................................... 12

STANDARDS OF REVIEW ........................................................... 13

ARGUMENT .................................................................................. 14

I.   THE DISTRICT COURT FAILED TO ADDRESS THE JURY'S
     EXPOSURE TO HIGHLY DAMAGING EXTRINSIC MATERIAL ......... 14

    A. The Exposure And The Court's Response .............................. 15

    B. The District Court's Failure To Address The Jury's Improper
       Exposure To Recordings That Were Not In Evidence Was
       Reversible Error ..................................................................... 19

    C. The Government Cannot Establish Harmless Error ................ 23

    D. The Proper Remedy Is A New Trial ....................................... 25

II.  THE DISTRICT COURT MISCALCULATED THE SENTENCING
     GUIDELINES ................................................................................ 27

A.  Abuse Of Trust Does Not Apply ............................................................ 27

B.  The District Court Failed To Make The Required Specific
Findings In Open Court As To The Leadership Enhancement .............. 32

C.  The Enhancement Errors Require Reversal For Resentencing ............. 37

III.  THE DISTRICT COURT UNLAWFULLY ADDED TWO
YEARS TO THE SENTENCE TO NEGATE THE POSSIBILITY
OF EARLY RELEASE UNDER THE FIRST STEP ACT AND RDAP ..... 38

A.  Background .......................................................................................... 38

B.  The District Court's Reliance On The Possibility James Might
Become Eligible For Early Release Was Contrary To
Congressional Policy And Requires Resentencing ................................ 40

IV.  THE DISTRICT COURT MISCALCULATED FORFEITURE ................ 44

A.  Background .......................................................................................... 44

B.  The Forfeiture Award Did Not Exclude Valid Revenues ..................... 46

V.  THE DISTRICT COURT MISCALCULATED RESTITUTION ............... 50

A.  Background .......................................................................................... 50

B.  The Restitution Award Was Speculative And Unfounded .................... 51

VI.  THE CASE SHOULD BE REMANDED TO A DIFFERENT JUDGE ...... 58

CONCLUSION ...................................................................................................... 59

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Bibbins v. Dalsheim*,
   21 F.3d 13 (2d Cir. 1994) ....................................................................26

*Guerriero v. Miami RRM*,
   2024 WL 2017730 (11th Cir. May 7, 2024)......................................40

*Koon v. United States*,
   518 U.S. 81 (1996) ............................................................................13

*Loliscio v. Goord*,
   263 F.3d 178 (2d Cir. 2001) .............................................................19

*Tapia v. United States*,
   564 U.S. 319 (2011) ..........................................................................42

*United States v. Archer*,
   671 F.3d 149 (2d Cir. 2011) .............................................................49

*United States v. Birkin*,
   366 F.3d 95 (2d Cir. 2004) ...............................................................35

*United States v. Bradshaw*,
   281 F.3d 278 (1st Cir. 2002) ............................................................20

*United States v. Broderson*,
   67 F.3d 452 (2d Cir. 1995) ...............................................................29

*United States v. Broxmeyer*,
   699 F.3d 265 (2d Cir. 2012) .............................................................14

*United States v. Bryan*,
   393 F.2d 90 (2d Cir. 1968) ...............................................................59

*United States v. Calbas*,
   821 F.2d 887 (2d Cir 1987) ..............................................................26

iii

*United States v. Carter,*
   489 F.3d 528 (2d Cir. 2007) ...................................................... 34, 35, 38

*United States v. Chem. & Metal Indus., Inc.,*
   677 F.3d 750 (5th Cir. 2012) ...................................................... 50, 57

*United States v. Contorinis,*
   692 F.3d 136 (2d Cir. 2012) ........................................................46

*United States v. Daugerdas,*
   837 F.3d 212 (2d Cir. 2016) ........................................................14

*United States v. Daugerdas,*
   892 F.3d 545 (2d Cir. 2018) ...................................................... 46, 49

*United States v. Desnoyers,*
   708 F.3d 378 (2d Cir. 2013) ........................................................49

*United States v. Detrich,*
   865 F.2d 17 (2d Cir. 1988) ........................................................25

*United States v. Echevarria,*
   33 F.3d 175 (2d Cir. 1994) ........................................................31

*United States v. Farhane,*
   634 F.3d 127 (2d Cir. 2011) ...................................................... 13, 21, 23

*United States v. Fowler,*
   948 F.3d 663 (4th Cir. 2020) ........................................................40

*United States v. Greer,*
   285 F.3d 158 (2d Cir. 2002) ...................................................... 23, 26

*United States v. Guerrero,*
   910 F.3d 72 (2d Cir. 2018) ........................................................37

*United States v. Gushlak,*
   728 F.3d 184 (2d Cir. 2013) ...................................................... 14, 51

*United States v. Huggins,*
   844 F.3d 118 (2d Cir. 2016) ........................................................29

*United States v. Hussey,*
254 F.3d 428 (2d Cir. 2001) ................................................31

*United States v. Ianniello,*
866 F.2d 540 (2d Cir. 1989) .......................................... 20, 27

*United States v. Jolly,*
102 F.3d 46 (2d Cir. 1996) ..................................................29

*United States v. Liebman,*
40 F.3d 544 (2d Cir. 1994) ..................................................34

*United States v. Litvak,*
808 F.3d 160 (2d Cir. 2015) ................................................24

*United States v. Martin,*
100 F.3d 46 (7th Cir. 1996) ................................................40

*United States v. Ntshona,*
156 F.3d 318 (2d Cir. 1998) ................................................31

*United States v. Olmeda,*
894 F.3d 89 (2d Cir. 2018) ..................................................38

*United States v. Paccione,*
202 F.3d 622 (2d Cir. 2000) ................................................36

*United States v. Padilla,*
186 F.3d 136 (2d Cir. 1999) ................................................58

*United States v. Peterson,*
385 F.3d 127 (2d Cir. 2004) ................................................21

*United States v. Quattrone,*
441 F.3d 153 (2d Cir. 2006) ................................................58

*United States v. Qurashi,*
634 F.3d 699 (2d Cir. 2011) ................................................56

*United States v. Resko,*
3 F.3d 684 (3d Cir. 1993) ..................................................26

*United States v. Roberts*,
 919 F.3d 980 (6th Cir. 2019) ...............................................................40

*United States v. Robin*,
 553 F.2d 8 (2d Cir. 1977) ....................................................................58

*United States v. Rutkoske*,
 506 F.3d 170 (2d Cir. 2007) ...................................................... passim

*United States v. Schwarz*,
 283 F.3d 76 (2d Cir. 2002) ........................................................ passim

*United States v. Singh*,
 877 F.3d 107 (2d Cir. 2017) .................................................................13

*United States v. Thompson*,
 792 F.3d 273 (2d Cir. 2015) ................................................................57

*United States v. Titus*,
 78 F.4th 595 (3d Cir. 2023) ......................................................... 51, 52

*United States v. Torres*,
 703 F.3d 194 (2d Cir. 2012) ................................................................46

*United States v. Treacy*,
 639 F.3d 32 (2d Cir. 2011) ..................................................................46

*United States v. Vitale*,
 459 F.3d 190 (2d Cir. 2006) ................................................................22

*United States v. Walters*,
 910 F.3d 11 (2d Cir. 2018) ..................................................................46

*United States v. Ware*,
 577 F.3d 442 (2d Cir. 2009) ....................................................... passim

*United States v. Zehrung*,
 714 F.3d 628 (1st Cir. 2013) ....................................................... 29, 31

vi

**Statutes, Regulations, And Sentencing Guidelines**

8 U.S.C. § 982 ................................................................46

18 U.S.C. § 1028A ..................................................... 5, 31

18 U.S.C. § 1343 ..............................................................5

18 U.S.C. § 1347 ..............................................................5

18 U.S.C. § 1349 ..............................................................5

18 U.S.C. § 1956 ..............................................................5

18 U.S.C. § 3231 ..............................................................4

18 U.S.C. § 3553 ........................................................ 11, 34

18 U.S.C. § 3624 ............................................................40

18 U.S.C. § 3632 ............................................................41

18 U.S.C. § 3663A ..........................................................57

18 U.S.C. § 3664 ............................................................57

28 U.S.C. § 1291 ..............................................................4

USSG § 3B1.1 ....................................................... passim

USSG § 3B1.3 ....................................................... passim

USSG Ch. 5, Pt. A ..........................................................37

28 C.F.R. § 523.41 ..........................................................41

**INTRODUCTION**

One of the most fundamental principles of the criminal justice system is the constitutional right to be tried by an impartial jury that has not been tainted by "extraneous influence." In the health care fraud trial of Appellant Mathew James, however, the jury was exposed to highly prejudicial extra-record matter—recorded calls that had not been introduced into evidence. Yet the court refused to inquire into the scope of the problem or take appropriate action to mitigate the prejudice.

During jury deliberations, the jury sent out notes indicating they were focused on the transcripts of these recorded calls. These transcripts were likely included in binders given to the jury during trial but removed before the binders were sent back during deliberations.

Although the notes were vague, the district court refused to conduct any inquiry as to *what* jurors had reviewed or *how* it impacted them. The scope of the problem was therefore uncertain at the time, and remains so now. But it was undisputed that the jurors reviewed *something*, and the transcripts the jury notes apparently referred to were highly prejudicial. Two transcripts show James prying into an employee's interactions with the FBI, apparently encouraging her to sugarcoat his conduct, while also suggesting he understood certain of his conduct to be "wrong." A third transcript showed an employee accusing James of fraud and describing him as "disgusting" and the "worst person ever" while saying it

made her "sick" to work for him. The defense was so worried about this call that it declined to ask the employee—one of the government's most important witnesses—a single question for fear of opening the door to the call's admission.

Not only did the court refuse to conduct *any* inquiry of the jurors, its attempt to mitigate the prejudice was woefully inadequate. It told jurors that if they thought they had "seen something" they were "mistaken," that the transcripts were "not in evidence," and that jurors with "any questions" should "write back to me and let me know." What jurors made of this is anyone's guess. But far more is required under this Court's precedents. The district court's failure to conduct any inquiry and failure to mitigate any prejudice (if indeed a remedy was even possible, which is doubtful) deprived James of a fair trial.

James's sentencing was also permeated with errors. For about 10 years, James operated a medical billing business. He submitted bills to insurance companies and was paid a percentage of the fees his doctor-clients recovered from the insurance plans. The government alleged fraud in connection with some of the bills and that James had at times impersonated patients when communicating with insurance companies. In sentencing James to 12 years' imprisonment, the court applied the abuse-of-trust enhancement even though none of James's alleged victims—the insurance companies and patients—had entrusted him with fiduciary-like discretion. The court also applied the leadership enhancement without making

any of the necessary supporting findings. Worst, the court added two years to the sentence because James *might* earn early release by participating in programs under the First Step Act or RDAP. This unlawfully drove James's sentence up because of a speculative concern that James might benefit from programs Congress enacted to reduce sentences and encourage rehabilitation.

The court also ordered forfeiture and restitution that far exceeded any conceivable amounts that could be deemed proceeds for forfeiture, or losses to victims for restitution. Everyone agreed James's *total* business revenues during the relevant period were $63 million. But a substantial percentage of these revenues were plainly untainted. Only James's expert attempted to calculate what could have been fraudulent, and she opined that the total from the alleged fraud did not exceed $12 million. And the district court suggested $30 million may have been legitimate earnings but inexplicably refused to exclude revenues unrelated to the alleged fraud and ordered forfeiture of all James's revenues.

The $337 million imposed in restitution was also manifestly erroneous. The government's calculation was riddled with errors and included amounts indisputably *not* related to any fraud. Yet the court brushed aside the defense's objections and—in essence—wrote the government a blank check.

The judgment should be vacated and the case remanded for a new trial, or at least resentencing. On remand, the case should be assigned to a new judge.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The judgment was entered on March 20, 2024. (A-759). James filed a notice of appeal on April 2, 2024. (A-781). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.  Whether the district court's failure to conduct an inquiry and adequately address the jury's exposure to highly prejudicial extra-record material deprived James of a fair trial.

2.  Whether the district court misapplied the abuse of trust enhancement under USSG § 3B1.3.

3.  Whether the district court failed to make the necessary findings that would justify imposing a leadership enhancement under USSG § 3B1.1.

4.  Whether the district court unlawfully lengthened James's sentence by two years to counteract the possibility that he might be released early if he participated in First Step Act or RDAP programs while incarcerated.

5.  Whether the district court failed to reasonably estimate the gain resulting from James's alleged conduct when imposing forfeiture.

6.  Whether the district court failed to reasonably estimate the loss resulting from James's alleged conduct when imposing restitution.

7.  Whether a new judge should be assigned on remand.

4

## **STATEMENT OF THE CASE**

James appeals from a judgment of conviction and sentence entered by the United States District Court for the Eastern District of New York (Seybert, J.). The nine-count operative indictment charged James with conspiracy to commit health care fraud (18 U.S.C. § 1349), health care fraud (*id*. § 1347), wire fraud (*id.* § 1343), aggravated identity theft (*id.* § 1028A), and money laundering conspiracy (*id.* § 1956(h)). (A-24).

Following a 13-day jury trial, James was convicted on all counts except money laundering conspiracy. (A-412-17). The district court denied his Rule 29 motions (A-272-73; Dkt.240) and imposed a sentence of, as relevant here, 144 months of incarceration, $63,382,049.02 in forfeiture, and $336,996,416.85 in restitution (A-759).

### **A. Trial**

#### *1. The Government's Case*

James is a former nurse who started a third-party medical billing business in his basement. (A-114-15). Through this business, James prepared and submitted medical treatment claims to insurers for his doctor-clients and was paid through commissions. (A-231). Over roughly 15 years, James served nearly 150 physicians and submitted tens of thousands of insurance claims. (A-251).

The fraud charges were based on four types of allegations.

First, the government alleged that when insurance companies declined to pay doctors the full amounts they had billed, James posed as insured patients without their knowledge (or had his employees do so), and claimed the patients were being billed for the balance of the doctor's charges ("balance billed") even though, in fact, the doctors were not billing the patients for the balance. (A-277-98). The government alleged James did this because insurance companies would only pay the balance if the insured personally informed them they had been balance billed. (*Id.*).

Second, the government claimed James "billed for medical procedures that were more complex or totally different than what was performed by doctors." (A-299). It elicited evidence of a few cases where the charges billed to the insurance companies did not match the treatment patients said they received. (A-300-01). The government claimed James worked with doctors to alter the underlying documentation to support higher reimbursements (A-299-301).

Third, the government claimed James sometimes used improper billing codes for the treatments his doctor-clients provided. (A-302-312). The government argued James used a particular modifying code—Modifier 59—so codes that should be bundled and paid together as a single procedure under insurance company policies were paid separately. (A-307-11).

Fourth, the government asserted James "worked with corrupt doctors and directed them to instruct their nonemergency patients to check in through the ER for pre-planned surgeries." (A-312). He allegedly did this because insurers would not dispute expensive charges for ER visits. (A-312-19).

The government called several patients. It also introduced testimony from six of his former employees, who observed James pose as patients, posed as patients themselves at his direction, or were instructed by him to regularly code insurance claims using specific complex codes or modifiers. The government also called insurance company representatives to describe insurance claim coding and processing. And the government presented recorded phone calls, often (though not always) of James or his employees posing as patients.

The government did not call any of James's physician-clients who allegedly participated in the scheme. Nor has it ever charged any of those doctors, even though the government alleged they were co-conspirators and the prime beneficiaries of the fraud.

### 2. *James's Defense*

James's primary defense was good faith. Medical billing is complex and James's formal training was limited. The medical coding manual is "over 700 pages" long and contains "thousands" of codes. (A-64, 80-83, 196-98). Even "the most experienced coder[s]" make mistakes and if a coder misunderstood "how a

7

particular code or modifier works," that confusion would manifest repeatedly (A-83, 197-98).

The evidence showed James often used codes that were not the most lucrative available, and he advised his clients and employees on appropriate billing. (A-87, 107-11, 127-38, 168-82, 266-68, 494-95, 498, 500, 503, 803-06, 812-13, 815-17, 819-20, 889, 909, 913, 915, 921). In one instance, for example, a doctor asked James to use a particular code "[i]f appropriate," but James corrected the doctor and said he would need to use a different, less expensive code to match the medical documentation. (A-909). James also corrected his employees' billing mistakes, and he fired an employee who made too many errors. (A-123-25).

Moreover, while it is unremarkable for billers to advise their doctor clients on billing decisions (A-79, 238-39), James relied on documentation, confirmation, and guidance from doctors to ensure his claims were accurate. (A-110-11, 116-21, 127-32, 144-45, 156-57, 493, 504-06, 784-87, 806-14, 817-18, 820-21, 911-12, 914-20). *Doctors*—not billers—are ultimately responsible for billing decisions. (A-68-71, 84-85, 185-87, 192). Indeed, the standard insurance claim form requires doctors—and only doctors—to certify the accuracy of each claim. (A-73-74, 84-85, 112-13, 163-64, 188-92, 490). And James always submitted the underlying medical records, which were provided to him by the doctors, with his claims, so that the insurance companies would have all the information they might need to

8

approve or deny his claims.  (A-76-78, 121, 165, 146-52, 193-95, 201).

Indeed, much of James's business had nothing to do with the alleged fraud. The defense elicited testimony from the FBI's investigating agent showing that numerous examples of James's billing bore no hallmarks of misconduct.  (A-254-58, 263, 788-98).  For instance, James submitted claims on behalf of a sleep study doctor for years, and nothing about these claims raised any red flags.  (A-254-56, 788-92).  The agent conceded that James's "misused… codes… [were] a subset of [his] total billing."  (A-240-43, 248-50).

### B.    Deliberations And Verdict

The recorded calls the government introduced were accompanied by hard-copy transcripts that the government provided to the jury in binders.  (A-43-44). These binders included transcripts of recordings the court actually admitted as well as recordings the government *might* offer as trial progressed.  (A-393).  Many of those recordings were never admitted into evidence.

During deliberations, the jury sent out several notes inquiring about transcripts that had been in their binders during trial but were removed from the binders sent back to the jury room.  (A-508-10).  The jury asked the court whether "there have been any materials or transcripts removed from the call transcript binders, such as call exhibits 1, 2 and 3, or any others."  (A-509).  But "call exhibits 1, 2, and 3" had not been admitted and were highly prejudicial to James's

defense. Despite James's urging that it conduct an inquiry, the court took essentially no steps to determine the scope of the taint or mitigate the damage. Instead, it gave a muddled and woefully inadequate instruction telling the jurors they were "mistaken." (A-408-09).

The jury found James guilty on all charges except money laundering conspiracy. (A-412-16).

### C.   Sentencing

James was sentenced over the course of hearings on January 23, 2024 (first hearing) and February 2, 2024 (second hearing).

At the first hearing, the district court set James's guidelines range at 168-210 months. (A-615, 621). This draconian guidelines range resulted from the court's finding that the gain amount was $63 million—a sum representing James's total business revenues without excluding funds untainted by the alleged fraud.   On this point, the court told the parties that it would reduce the gain by $30 million when considering James's final sentence to account for "funds that were legitimately put together" but nonetheless would set the gain at the full $63 million for guidelines purposes. (A-611-12). The court also added two points based on the abuse of trust enhancement under USSG § 3B1.3 and four points based on the leadership enhancement under USSG § 3B1.1. The abuse of trust and leadership enhancements are discussed in greater detail *infra*, pp. 27-38.

The court then turned to the 18 U.S.C. § 3553(a) factors. It rejected the government's request for 25 years—citing, for example, "[t]he love and attention [James] gave his parents, his in-laws, all of his neighbors"—and began to impose "a sentence of ten years." (A-691). But the prosecutor interrupted, telling the court that James was eligible for credit against his sentence under the First Step Act. (A-692). The court then decided to add two additional years to James's sentence. (A-699-703). James objected, and the court adjourned the sentencing. (A-702-04).

At the second hearing, the court confirmed its new 12-year sentence but now insisted that the possibility James might earn early release was only one of several factors that led it to increase James's term of incarceration—even though it had considered the other factors before it initially announced that it would impose a 10-year sentence. (A-719-20; *cf.* A-651-55, 674-75, 689-90).

Despite having expressed doubts that James actually gained $63 million from the alleged fraud, the district court also imposed $63 million in forfeiture and $337 million in restitution. (A-749-53). Its calculation of these amounts is discussed in more detail *infra*, pp. 46-58.

11

## SUMMARY OF ARGUMENT

This case involved serious errors that gravely undermined the fairness of James's conviction and sentence. As to the conviction, the district court acknowledged the jury was exposed to highly prejudicial extra-record information. But, instead of conducting any inquiry into the impact of that exposure, it simply told the jury the relevant materials were not in evidence and instructed the jurors to write back with any questions. These steps did nothing to cure the taint. A new trial—or at least an evidentiary hearing—is warranted.

The district court also made several errors in determining James's sentence.

*First*, it included an abuse of trust enhancement under USSG § 3B1.3 in the offense level calculation even though James had no "fiduciary-like" relationship to any potential victim. Indeed, the government conceded below that it could not find a *single case* applying this enhancement to a third-party medical biller.

*Second*, the district court applied a leadership enhancement under USSG § 3B1.1 based only on conclusory findings adopted after the fact. It came nowhere close to making "specific findings" on the record, as the law requires. And it failed in this regard even though the enhancement was disputed and deeply questionable.

*Third*, the district court expressly relied on James's potential eligibility for earned-time credits under the First Step Act and RDAP to add two years to James's sentence. The court's speculation that James might benefit from programs

Congress passed to reduce sentences and encourage rehabilitation undermines Congress's policy goals and was an unlawful reason to increase James's sentence.

*Fourth*, the district court miscalculated forfeiture and restitution. It imposed a forfeiture award that it recognized overstated James's gain. And it adopted the government's proposed restitution award with essentially no reasoning, without accounting for myriad flaws in the government's analysis.

Whether the case is remanded for a new trial or for resentencing, it should be remanded to a different judge. The judge's handling of the jury's exposure to the extra-record material and the sentencing would both cause an objective observer to reasonably question her impartiality, and reassignment is advisable to preserve the appearance of justice.

## STANDARDS OF REVIEW

The district court's handling of jury exposure to extrinsic information is reviewed for abuse of discretion, as is a claim of procedural error at sentencing. *See United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011); *United States v. Singh*, 877 F.3d 107, 114 (2d Cir. 2017). "[A]n error of law" is "by definition" an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).[1]

---

[1] Unless otherwise noted, citations omit citations, internal quotation marks, footnotes, previous alterations, and emphasis in the original source.

13

Guidelines calculations are reviewed "de novo, and…findings of fact relevant to the Guidelines" are reviewed "for clear error." *United States v. Broxmeyer*, 699 F.3d 265, 281 (2d Cir. 2012).

For forfeiture awards, legal conclusions are reviewed de novo and factual findings for clear error. *United States v. Daugerdas*, 837 F.3d 212, 231 (2d Cir. 2016). Restitution awards are reviewed for abuse of discretion, but a "court abuses its discretion when a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013).

## **ARGUMENT**

## I. THE DISTRICT COURT FAILED TO ADDRESS THE JURY'S EXPOSURE TO HIGHLY DAMAGING EXTRINSIC MATERIAL

It is undisputed that the jury received binders containing call transcripts that were never admitted into evidence *and* that jurors reviewed and discussed at least one of these transcripts, and likely more, during the trial. This exposure was brought to the court's attention during jury deliberations, when the court had the ability to identify the scope of the exposure and take prompt corrective action. But the court essentially washed its hands of the matter. It refused to conduct *any* inquiry of the jurors, and its corrective instruction was garbled, confusing, and inadequate. A new trial is required.

14

### A.     The Exposure And The Court's Response

During its case, the government provided the jury with binders containing transcripts of calls it might offer into evidence.  As the court and parties repeatedly noted, the jury had access to the transcripts of unadmitted calls and reviewed them during the trial.  (A-45, 89-90, 94, 393, 403-04).  Indeed, very early on, the defense unsuccessfully asked the court to admonish the jurors to "stick to the exhibit that the government is pointing them to" (A-45) and the court itself became aware that "one or two jurors pick up the books and look at it" (A-403).

During deliberations, the jury was intently focused on the transcripts.  It requested a binder of the transcripts.  (A-507).  Then it asked for "All phone transcripts – not just those presented in the trial."  (A-508).  Then it asked, "Has there been any materials or transcripts removed from the call transcript binders, such as call exhibits 1, 2 and 3, or any others?  Specifically, we are looking for a call between Mat and an employee."  (A-509).  Asked to provide more detail about the "call between Mat and an employee," (A-391) the jury replied that "[t]he call or transcript in question is between Mat (as himself) and an employee, during the FBI raid on [James's home/office]."  (A-510).  "Is it possible," the jury asked, "that said transcript was inadvertently or mistakenly placed in the transcript binder of a juror?"  (Id.).

15

While the district court's refusal to conduct an inquiry makes it impossible to know for sure, it appears that the jury was exposed to the transcripts of unadmitted calls marked as GX1 and GX2 and may have been exposed to the transcript of the unadmitted call marked as GX3.

GX1 and GX2 were recorded by one of James's employees, Jennifer Flanagan, and concern Flanagan's discussions with the FBI. (A-422-57). On the calls, James asked Flanagan about the questions the FBI asked and whether the FBI spoke with other employees. (A-423, 425, 447). He repeatedly asked if Flanagan had "told the truth" and emphasized she had "nothing to worry about" as long as she did so because they ran a "legitimate business": "The doctors gives us claims to bill. We bill, we send out we follow up. So, there is nothing more and that is what all the companies do." (A-426, 429, 431-32, 435-36, 442, 448-49). James assured Flanagan that his attorney would be available to help and that he would "be paying for everything" if "you guys have to come to court." (A-453).

But at the same time, James made admissions suggesting he knew what *he* had done was wrong. He told Flanagan that "one thing I did wrong was impersonating patients." (A-441). And he told her that "since March we haven't done anything wrong." (A-446).

GX3 was particularly harmful to the defense. It involved one of James's former employees, Stephanie Brunner, reporting him to an insurance company for

16

"fraud." Using highly inflammatory language, Brunner explained that "I got out of there in about two months because…I realized what [James] was doing is fraud." (A-459). She described James as "the worst person ever," called his work "disgusting," and said "[y]ou're sick to go and work there every day." (A-462, 465). Brunner characterized James's conduct in ways that mirrored the government's theory and stated she had "recordings" of James "on a number of phone calls coaching patients, coaching doctors, telling them exactly what to do and what process to bring the patient in through the ER." (A-461). Brunner named several doctors and practices purportedly involved in James's scheme. (A-465-68).

Like Flanagan, Brunner testified for the government, but GX3 was vastly more prejudicial than Brunner's in-court testimony, which contained none of the call's incendiary language, named far fewer doctors, and never suggested Brunner had recorded James. (A-202-34). Indeed, the defense viewed the call as so damaging that it declined to cross-examine Brunner *at all* after the district court indicated cross-examination would lead to the call's admission as a prior consistent statement. (A-235-37). And the government took full advantage of this in closing, misleadingly telling the jury that "Stephanie Brunner…is so credible, the defendant did not even cross-examine her. The defendant didn't ask her a single question." (A-317).

17

None of GX1, GX2, or GX3 was in evidence, yet the jury seems to have seen and focused on the transcripts of all three. Both sides agreed GX1a and GX2a had been in the jury's transcript binders and that the jury reviewed them. (A-393, 402-04). And though the government maintained that GX3a was never in the binders (A-401), that is doubtful. GX3a was in the binder the government provided the defense at the start of trial. And the government was often unsure what transcripts were in the jury's binders (*e.g.*, A-115 ("To the extent there's a transcript in your binder for 36, it shouldn't be in your binder…")). The jury, moreover, specifically identified "call exhibits 1, 2, *and* 3" (A-509), and the district court itself apparently understood the jury to have referred to all three exhibits (A-409-10).

James asked the district court to conduct an inquiry into what the jury had seen and whether they could disregard it, and for the jurors to be told they should advise the court "if they can't put it out of their mind." (A-402-04, 409). The court rejected this approach. Instead, it outlined a plan to "tell [the jury] if they looked at transcripts number one and two they are to totally disregard that immediately, and if anyone on the jury thinks they cannot do that, then they should write me a note individually." (A-406, 408). James objected that this proposed instruction was not sufficient. (A-408). The court then called in the jury and gave

an instruction that was even weaker than the instruction it had proposed in conference with the parties:

> I am telling you now that transcripts one and two, which I think you referred to, and three, are not in evidence. If anyone thinks they have seen something, you are mistaken. They are not in evidence. Please continue your deliberations. This is the court's ruling. You will treat this statement as you would any other item of evidence that I have told you is not in evidence, is not for your consideration.

> If you have any questions with regard to this issue, please write back to me and let me know.

(A-409-10). James reiterated his objection. (A-410).

### B. The District Court's Failure To Address The Jury's Improper Exposure To Recordings That Were Not In Evidence Was Reversible Error

The court's response to the extra-record taint was a serious error. A defendant "has a constitutional right to be tried by an impartial jury, unprejudiced by extraneous influence." *United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir. 2002). Evidence must "come from the witness stand" where it may be confronted by counsel and the "defendant's Sixth Amendment rights are implicated when a jury considers incriminating evidence that was not admitted at trial." *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir. 2001). "[W]hen reasonable grounds exist to believe that the jury may have been exposed to…an improper influence, the entire picture should be explored." *Schwarz*, 283 F.3d at 97. "Often, the only way this exploration can be accomplished is by asking the jury about it." *Id.*

19

It is undisputed the jury was exposed to extra-record material.  Even the government conceded that "it appears that a juror has read a transcript or a portion of a transcript of a call…that was not ultimately introduced."  (A-402).  Indeed, the government admitted "[i]t appears that [the jury is] referring to what was in the binder as call one or one and two."  (A-393).  And the district court agreed an improper exposure had occurred, acknowledging that "I saw one or two jurors pick up the [transcript] books and look at it."  (A-403).

This type of exposure demands an inquiry.  This Court has held that even *post-verdict*—when policy concerns with inquiry into juror deliberations are at their apex—an evidentiary hearing is "*mandatory* when a party comes forward with clear, strong, substantial and incontrovertible evidence…that a specific, non-speculative impropriety has occurred."  *Schwarz*, 283 F.3d at 98; *see also United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (post-verdict hearing necessary "where jurors consulted extra-record information").  Thus, a court certainly "has a duty to investigate the allegation promptly" "[w]here, as here, a colorable claim of jury taint surfaces *during jury deliberations*."  *United States v. Bradshaw*, 281 F.3d 278, 289 (1st Cir. 2002) (emphasis added).

The propriety of a limited inquiry into potential taint during deliberations is well established in this Circuit.  In *United States v. Farhane*, for example, a deliberating juror uncovered a codefendant's guilty plea.  634 F.3d 127, 168 (2d

Cir. 2011). The defendant on trial had conceded his codefendant's guilt in summation, minimizing any potential prejudice. *Id.* at 169. Nonetheless, the district court conducted a limited inquiry of the juror concerning the extent of the extrinsic information she had discovered and whether she could remain fair and impartial and decide the case only on the evidence. *Id.* at 169-70. The court then gave express instructions to the whole jury to confine itself to the evidence and not to speculate about individuals not on trial. *Id.* at 170. Finally, the court asked whether there was "any juror who is unable or unwilling to follow those instructions." *Id.*

Similarly, in *United States v. Peterson*, the district court conducted an inquiry during deliberations concerning a juror's belief that she recognized the defendant from college. 385 F.3d 127, 131-37 (2d Cir. 2004). The district court first questioned the juror in chambers and satisfied itself that the juror should be excused. *Id.* at 132-33. Then it addressed the remaining jurors, asked whether they were able to remain fair and impartial, and asked whether there was "any juror that feels the need to talk…privately in chambers about anything that happened here because you think it might have affected your view, your independent view of the evidence." *Id.* at 133-34.

In contrast to *Farhane* and *Peterson*, the district court here conducted no inquiry whatsoever. It simply told the jury the calls "are not in evidence" and that

if any juror thought they had "seen something" they were "mistaken." (A-409-10).

Despite the defense's urging, the court never asked what the jurors had seen or

whether they could disregard it. Nor did the court instruct jurors to inform the

court if they could not put the transcripts they had reviewed out of their minds.

Instead, it merely advised jurors to "write back" if they had "any questions." (A-

410).

The failure to conduct an inquiry on the jury's exposure to extra-record

influence left "too many unanswered questions." *United States v. Vitale*, 459 F.3d

190, 197 (2d Cir. 2006). Which jurors reviewed the transcripts? What transcripts

or portions of transcripts did they review? Could they put the transcripts out of

their minds? Could they remain fair and impartial?

Moreover, the district court's instruction that "transcripts one and two…and

three, are not in evidence" would have done little to cure any impact. (A-409-10

Throughout the trial, the court emphasized that the transcripts of recorded calls

were not evidence, but only to distinguish *the recordings themselves* from *the*

*transcripts*—it never instructed the jurors not to review exhibits in the binder

before being instructed that they could do so, even though the defense requested

such instructions. (A-45-48). For example, the Court explained: "Ladies and

gentlemen, you have a transcript, but that's not what counts. What counts is what

you hear. If you hear something that differs from the transcript then you go with

what you have heard. *The transcript is simply an aid. It is not evidence.*" (A-45-46) (emphasis added). Accordingly, the jury easily could have taken the district court's instruction in response to the jury's exposure to the transcripts the same way: the transcripts are "not evidence," but they may be "an aid" to your understanding.

In short, the jury was exposed to severely harmful extra-record information, and the district court's response was woefully deficient.

### C. The Government Cannot Establish Harmless Error

The district court's error was not harmless. "It is well settled that any extra-record information of which a juror becomes aware is presumed prejudicial." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002); *Farhane*, 634 F.3d at 168. To overcome this presumption, the government must prove "the information is harmless." *Id.* "The necessary inquiry is objective…and focuses on two factors: (1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury." *Id.* at 169.

The government cannot overcome this presumption. Any objective inquiry into the effect of the conceded exposure to extra-record information is hamstrung by the court's refusal to inquire of the jury regarding the identity of that information. Moreover, the extra-record information the jurors suggested they had reviewed was highly damaging. Jurors may well have interpreted James's prying

23

into Flanagan's conversations with the FBI and insistence that his billing practices were above board as attempts to obstruct the investigation by suggesting to Flanagan how she should respond to the FBI's questions. And such an interpretation seems even more probable if the jury mistakenly believed—as the jury notes indicate it did—that these calls occurred "during the FBI raid on" James's office. (A-510). If that was so, the jury might well have viewed these calls as panicked efforts at concealment speaking directly to consciousness of guilt.

Moreover, the exposure of the jury to GX3a despite James's tactical decision not to question Brunner would have placed James "in the worst of all possible worlds." *Schwarz*, 283 F.3d at 99. James's decision not to ask Brunner a single question was intended to ensure that GX3 was not admitted as a prior consistent statement. If the call made it to the jury anyway, not only would it have exposed the jury to far more damaging evidence than was admitted, but it also would mean James was pointlessly deprived of his only chance to question—and contest the credibility of—a key prosecution witness. The prejudice James suffered due to Brunner's unchallenged testimony and falsely inflated credibility would have been for naught.

The damage here was especially acute given that James's defense was based on good faith. "[Good faith] may be only inferentially proven," *United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015), and evidence suggesting James

24

understood his conduct to have been "wrong" or that he strongarmed his employees into concealing his crimes would tend to obliterate an inference of lawful intent. And "[w]hen the government's proof relies primarily on circumstantial evidence"—as it must on issues of intent—"trial errors tend to acquire greater significance." *United States v. Detrich*, 865 F.2d 17, 22 (2d Cir. 1988).

These transcripts evidently carried substantial weight with the jury. The jury's notes indicated they had been "looking for" these calls, having deemed them important enough to review amongst a sea of other evidence. (A-509). Indeed, even before requesting calls 1, 2, or 3, the jury sent the court a note asking to "[p]lease provide All phone transcripts – not just those presented in the trial." (A-508). Clearly, the jury's deliberations were heavily focused on the transcripts, with a special focus on the calls at issue here. The district court's error plainly was not harmless.

### D. The Proper Remedy Is A New Trial

When exposure to extrinsic information has been mismanaged, this Court may either "remand for an evidentiary hearing" or "directly order[] a new trial." *Schwarz*, 283 F.3d at 100. Although this Court should *at least* require a hearing, a new trial is the proper course in this case.

*First*, a hearing at this point would serve little purpose.  District courts may broadly question jurors about the impact of extrinsic information pre-verdict, as in *Farhane*, where the court asked a deliberating juror whether anything would prevent her from being fair and impartial.  However, any such inquiry is essentially foreclosed post-verdict.  For instance, in *Greer*, this Court held that post-verdict questioning "whether the extra-record information impacted [jurors'] ability to be fair and impartial" was impermissible.  285 F.3d at 173.  The same is true of *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (per curiam) and *United States v. Calbas*, 821 F.2d 887, 896-97 (2d Cir 1987).  At this point, then, the court could not meaningfully assess whether James was actually prejudiced by the jury's exposure.

Indeed, it is unlikely such an inquiry would even be possible now.  James's trial ended in July 2022.  At this stage it would be difficult—if not impossible—to reassemble the jury.  And even if every juror could be found and summoned, the passage of time almost certainly precludes any effective inquiry into *what* extrinsic evidence the jury was exposed to and *how much* that evidence was discussed during deliberations.  In these circumstances, a new trial is the only feasible remedy.  *See United States v. Resko*, 3 F.3d 684, 695 (3d Cir. 1993) (ordering new trial where a year had elapsed and attempt to reassemble jury and inquire into deliberations would likely be futile).

26

*Second*, James already meets the standard for a new trial. As this Court has held, "a new trial will be necessary" "[i]f the hypothetical average jury would have been coerced or led astray." *Ianniello*, 866 F.2d at 544. Even putting aside the presumption of prejudice applicable here, exposure to GX1, GX2, or GX3 would unquestionably have "coerced or led astray" any jury. A hearing is unnecessary to show that.

## II.   THE DISTRICT COURT MISCALCULATED THE SENTENCING GUIDELINES

In calculating James's guidelines range, the district court misapplied two sentencing enhancements—abuse of a position of trust under USSG § 3B1.3 and leadership of a criminal activity under USSG § 3B1.1. The combined effect of these errors was to raise James's offense level by six points. Because the sentence was clearly driven by the guidelines calculation, these errors require resentencing.

### A.   Abuse Of Trust Does Not Apply

#### 1.   *Background*

Under USSG § 3B1.3, two offense levels are added "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated" the offense. The government conceded it could not identify any prior case applying the abuse of trust enhancement to a medical biller. (Dkt.245 at 23). The government also conceded it is "the physician" who "signs the form" "submitted for payment" and "the physician" who "certifies that 'the

27

services shown…were medically indicated and necessary[.]'" (*Id.*).  Despite this, the government argued the enhancement applied because James had "discretion… to bill the insurance companies with virtually no oversight," "was trusted to submit accurate and truthful claims on behalf of his doctor-clients," and abused that trust by using his "training and knowledge" to commit and conceal his fraud.  (Dkt.245 at 22-23).

James argued that the enhancement is "reserved for people who occupied a position of power over the alleged victim" or for someone who "abused a position of fiduciary or quasi-fiduciary" duty.  (Dkt.246 at 38-39).  James had no such relationship to any victim, as he "was contracted by his physician clients to submit claims to insurance providers, and it was the physician clients who were ultimately responsible for the coding."  (Dkt.246 at 39).

The district court described the issue as a "close call" but refused to hear argument on the the enhancement at sentencing.  (A-619).  It ruled the enhancement applied because James "had individuals' personal information in terms of their health, their status, all sorts of things."  (*Id.*).  This was not, as the defense pointed out, the government's argument.  (*Id.*).  But the court cut off debate, saying:  "Whatever the Government's position is, I've reviewed it and that's my finding."  (*Id.*).

28

2. *The District Court Committed Legal Error*

The "abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to [him] by the victim." *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996); *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995). Typical examples include "embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." USSG § 3B1.3 cmt. n.1. Each of these involves a defendant who is entrusted with "substantial discretionary judgment that is ordinarily given considerable deference," *id.*, and "occupies a position vis-à-vis the victim that is in the nature of a fiduciary relationship," *Jolly*, 102 F.3d at 48.

In contrast, the enhancement *does not apply* to "[a] purely arm's-length contractual relationship between the defendant and the victims." *United States v. Huggins*, 844 F.3d 118, 125 (2d Cir. 2016). For instance, the enhancement did not apply to a salesman for an investment scheme. *Id.* Nor does it apply to positions that involve *access* to valuable property but no *discretion*. For instance, "bank tellers" who "have access to all kinds of valuable things" but no discretion are not subject to the enhancement. *United States v. Zehrung*, 714 F.3d 628, 630 (1st Cir. 2013); *see also* USSG § 3B1.3 cmt. n.1. Nor does it apply where the defendant's discretion is not entrusted to him by the victim. *Broderson*, 67 F.3d at 456.

29

James comes nowhere close to fitting the paradigm for this enhancement. James had no contractual relationship with the insurance companies or the insured patients—the only conceivable victims—let alone a "fiduciary-like" one. And neither the insurance companies nor the patients "entrusted" discretionary authority to James. Rather, James worked only for his *doctor-clients*. To the extent James possessed discretion, it was his doctor-clients, not his alleged victims, who entrusted it to him. His case is analogous to the high-ranking corporate executive in *Broderson*, who was not subject to the enhancement because any discretion was entrusted to him by his employer, not by the victim.

James was also granted no special *discretion* as a medical biller. *Doctors* are responsible both "for treating patients" and "for the coding and billing of [their] services." (A-183-85, 192; *see also* A-68-69). The standard insurance claim form requires *doctors*—not billers—to certify claim accuracy. (A-490). Had James's doctor-clients been prosecuted and convicted, the enhancement might have applied to them. But it does not apply to James.

It is no surprise, then, that the government failed to identify even a single decision applying the abuse of trust enhancement to a medical biller and was forced to rely instead on cases involving "medical care providers who submit false bills." (Dkt.245 at 22-23). Doctors and similar medical providers may be subject to the enhancement because they are inherently "involved in a fiduciary

30

relationship with [their] patients." *United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998). Third-party medical billers are not similarly situated: They review medical records created by *physicians* to "help *physicians* send in a claim form" that is the *physician's* ultimate responsibility. (A-68-71).

Nor can the enhancement be sustained on the ground that James had access to "individuals' personal information in terms of their health, their status, all sorts of things"—the only ground the district court offered to justify the enhancement. (A-619). Such access alone does not support application of the enhancement. Many jobs give people "access to all kinds of valuable things" they could steal but do not involve the exercise of substantial discretionary judgment entrusted by the victim, and so are not within the enhancement. *Zehrung*, 714 F.3d at 630; USSG § 3B1.3 cmt. n.1. And even if accessing patient information could trigger the enhancement in some cases, doing so here would impermissibly "duplicate the punishment for the underlying offenses of conviction," *United States v. Hussey*, 254 F.3d 428, 432 (2d Cir. 2001) (citing *United States v. Echevarria*, 33 F.3d 175, 181 (2d Cir. 1994)), as James already received a two-year mandatory sentence for that conduct under 18 U.S.C. § 1028A—a 20% increase to his sentence.

The enhancement also cannot be supported by any claim that James employed a "special skill." USSG § 3B1.3 itself bars the enhancement in cases involving "special skill[s]" where the defendant has also received a leadership

31

enhancement under USSG § 3B1.1—as James did. In any event, James used no special skill. A special skill is one "not possessed by members of the general public and usually requiring substantial education, training or licensing," like that of "pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* § 3B1.3 cmt. n.4. Coding doesn't require any special certification (A-166) and—per the government's arguments at trial—only involves "information anyone can look up on the internet." (A-66-67). James took three courses on medical billing—two pass/fail—for about six months, over 15 years ago. (A-485). If the enhancement applied here, it would apply to just about any defendant, however skilled or unskilled.

### B. The District Court Failed To Make The Required Specific Findings In Open Court As To The Leadership Enhancement

The district court also erred in applying a four-level enhancement under USSG § 3B1.1 for James's alleged leadership role in the offense.

#### 1. Background

The leadership guideline adds four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). It adds fewer levels if the defendant was only a "manager or supervisor" or the activity did not "involve[] five or more participants" or was not "otherwise extensive." *Id.* § 3B1.1(b)-(c).

32

The government argued the leadership enhancement applied because James was "the sole owner and operator of his medical billing companies," supervised his employees and their allegedly unlawful behavior in impersonating patients and overbilling, and "instructed numerous doctor-clients…on what to include in operative reports." (Dkt.245 at 19-21). James responded that he did not supervise or manage his doctor-clients, and regardless, his activities did not involve "knowing participants" because there was "no testimony from any of [his] physician-clients at all" and James's employees "did not believe they were participating in a fraudulent scheme." (Dkt.246 at 34-36).

The district court applied the enhancement without any reasoning, telling the defense: "Your objections are noted, as well as the Government's objections…I'm not going to review and repeat those…I don't think there's anything else at this point other than to go into 3553(a) factors." (A-614-15).

The court's only discernable reasoning stems from the Presentence Investigation Report ("PSR") and its Addenda, which the court did not adopt in open court but later adopted in its sealed Statement of Reasons ("SOR"). (A-932). The PSR itself simply noted that "[t]he defendant was the organizer and leader of the instant offense, which involved five or more participants." (PSR at 15). And the Second Addendum to the PSR explained that James "organized and led the fraudulent scheme" and "at least five participants, including the defendant, his

33

employees, and the collusive physicians, were knowingly engaging in the defendant's scheme to defraud insurance companies." (PSR 2d Add. at 10).

2. *The District Court Imposed The Enhancement Without Making The Necessary Findings*

The district court made none of the "specific factual findings [necessary] to support a sentence enhancement under U.S.S.G. § 3B1.1." *United States v. Ware*, 577 F.3d 442, 451-52 (2d Cir. 2009). Under 18 U.S.C. § 3553(c), these findings must be stated in "open court." *United States v. Carter*, 489 F.3d 528, 539-40 (2d Cir. 2007). Here, however, the district court said nothing at sentencing about the enhancement. Because the district court "did not make any specific findings" on this issue at all, "this ruling was erroneous and requires a remand." *United States v. Liebman*, 40 F.3d 544, 548 (2d Cir. 1994).

The district court's decision cannot be saved by its adoption of the PSR in its sealed statement of reasons two months later. (A-932). Under § 3553(c), the PSR still must be adopted in open court, not in a portion of the written judgment that "was not available to the public." *Carter*, 489 F.3d at 539-40. Indeed, one purpose of the statute is "to enable the public to learn why defendant received a particular sentence." *Id*. The court's failure to comply with § 3553(c) is reversible error. Thus, in *Carter*, this Court remanded for resentencing because the district court failed to comply with § 3553(c) when applying role enhancement under USSG § 3B1.1. It should do so here too.

34

The PSR's factual findings were also far from "adequate to support the sentence." *Carter*, 489 F.3d at 540. A district court's findings on USSG § 3B1.1 "must be sufficiently specific to permit meaningful appellate review." *Ware*, 577 F.3d at 452. It cannot "merely…repeat or paraphrase the language of the guideline and say conclusorily that the defendant meets those criteria." *Id*.

But that is exactly what happened here. The district court conducted no analysis whatsoever, and the only analysis of the leadership enhancement appears in the Second Addendum to the PSR, which says in conclusory fashion that James "organized and led the fraudulent scheme," and "at least five participants, including the defendant, his employees, and the collusive physicians, were knowingly engaging in the defendant's scheme to defraud insurance companies." (2d Add. to PSR at 10-11). The PSR offered *no* analysis of *why* James was an organizer or leader (in general or as distinguished from a manager or supervisor). Such conclusory analysis of leadership is insufficient to support the enhancement. *See Carter*, 489 F.3d at 539-40; *United States v. Birkin*, 366 F.3d 95, 102 (2d Cir. 2004).

Likewise, the PSR made no findings—as necessary under USSG § 3B1.1— that five of James's clients or employees were "criminally responsible for the commission of the offense." USSG § 3B1.1 cmt. n.1. And it is unclear who, if anyone, "knowingly engaged" in the scheme. None of James's employees testified

that they knowingly engaged in misconduct. (A-50, 51-52, 53, 54-55, 56-58, 59-61, 88, 116-22, 137-42, 144-45, 154-60). And the only physician-client of James who testified didn't participate in the alleged scheme at all. (A-98-106). *See Ware*, 577 F.3d at 453 (court failed to making sufficiently specific findings as to identity of participants); *United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000) (only knowing participants count towards "five or more participants").

The court also did not consider the other factors relevant to the leadership enhancement, *e.g.*, whether James possessed a "right to a larger share of the fruits of the crime," had broad "decision making authority" or control, or recruited accomplices. USSG § 3B1.1 cmt. n.4. None of these factors applies here. James only received a 10-15% commission (Dkt.245 at 12 (10-15%); *see also* A-231 (10%); PSR at 7 (10-12%)), and the district court found his doctor-clients "got 80 percent…if not more, of [the alleged] ill-gotten gains." (A-689).

James likewise lacked any meaningful authority because his doctor-clients were fully responsible for every claim and procedure billed, and James regularly deferred to their coding decisions. (*Supra*, p. 8). For example, when one of his employees asked James if she should use the codes suggested by a doctor or different codes, James said, "use his codes." (A-496). And James did not affirmatively recruit "accomplices" because his employees did not believe they

were doing anything wrong. James's client list expanded only by "word of mouth." (A-153). Remand is therefore required.

### C.   The Enhancement Errors Require Reversal For Resentencing

1.   Both enhancement errors require resentencing. "[A]n error in calculating the Guidelines range will taint not only a Guidelines sentence…but also a non-Guidelines sentence, which may have been explicitly selected with what was thought to be the applicable Guidelines range as a frame of reference." *United States v. Guerrero*, 910 F.3d 72, 78 (2d Cir. 2018). There was ample "taint" here.

The district court calculated the guidelines range as 168-210 months, based on an offense level of 35. (A-615). James ultimately received 144 months. If even just two offense levels were removed, his sentence would rise from two years *below* the guidelines range to *the middle* of the range (135-168 months). USSG Ch. 5, Pt. A. And if four levels were removed, James's sentence would *exceed* the guidelines range (108-135 months). *Id.* The challenged enhancements cover six offense levels in total.

Nor is this a case where the district court believed its sentence proper *regardless* of the guidelines. Rather, it "look[ed] at the advisory guidelines" in setting an appropriate sentence. (A-735). And the court was initially prepared to impose a 10-year sentence until it learned of James's potential eligibility for good-time credits. This Court does not "lightly assume" "that the district court would

have imposed the same sentence" notwithstanding a guidelines error, *United States v. Olmeda*, 894 F.3d 89, 94 (2d Cir. 2018), and this case offers no support for any such assumption.

2.    A remand is also required based on the district court's flawed factual findings respecting the leadership enhancement under USSG § 3B1.1 alone.  This Court has repeatedly held that the failure to make adequate findings to support a leadership enhancement overcomes *plain error*—let alone harmless error.  *See Ware*, 577 F.3d at 452-54; *Carter*, 489 F.3d at 540.  Again, that is exactly what happened here.

## III.   THE DISTRICT COURT UNLAWFULLY ADDED TWO YEARS TO THE SENTENCE TO NEGATE THE POSSIBILITY OF EARLY RELEASE UNDER THE FIRST STEP ACT AND RDAP

The district court countermanded the legislative policies embodied by the First Step Act and RDAP by adding two years to the sentence it had already found sufficient.  It did so because it was concerned that James might earn early release through participation in these programs while in prison.  This was unlawful and requires resentencing.

### A.    Background

At the first sentencing hearing, the district court was in the act of imposing a sentence of 10 years' imprisonment when the prosecutor interrupted and asserted that James was eligible for credit against his sentence under the First Step Act.  (A-

691-92). This was a theme for the government, which had argued that "[a]s a white-collar criminal" James was "potentially receiving special treatment under the First Step Act" which made him "eligible to acquire credit that could effectively halve the Court's sentence." (Dkt.245 at 34 n.13).

This wasn't true: nothing in the First Step Act would permit James to "effectively halve" a ten-year sentence. Yet the court reversed course. Despite admitting it "can't predict what's going to happen to the defendant when he goes into custody," and was "intending to give him ten years," the court decided to add two additional years to James's sentence. (A-699-703). James objected, and the court adjourned the sentencing. (A-702-04).

At the second hearing, after additional briefing (Dkts. 257, 259), the district court adhered to its new 12-year sentence but retroactively amended its reasoning. (A-719, 733-34). It now claimed not to "base [the increase in sentence] *entirely* on" James's eligibility for First Step Act credits, but instead on "the enormity and the difficulty…this fraud imposes not only on the insurance companies, but on self-funded plans." (A-719) (emphasis added). The court also re-reviewed the impersonation calls it had "heard…before," which it said confirmed its decision. (A-719-20). And it noted James might receive "additional time on RDAP" and there "are a variety of ways that you may come up with half the sentence." (A-724).

**B.** **The District Court's Reliance On The Possibility James Might Become Eligible For Early Release Was Contrary To Congressional Policy And Requires Resentencing**

1.     A sentencing court may not lengthen a sentence to reverse the effect of credits a defendant may earn while incarcerated.  In the case of good time credits under 18 U.S.C. § 3624(b), courts have held it would be impermissible for a court to "consider good-time credit as a stand-alone factor in fashioning the length of the sentence," *United States v. Roberts*, 919 F.3d 980, 992 (6th Cir. 2019), or use such credits as a "vehicle for an enhanced sentence term," *United States v. Fowler*, 948 F.3d 663, 669 (4th Cir. 2020).  Rather, "[b]ecause the good-time-credit system is provided by statute and designed to further legislative policies, the system should be respected by [sentencing] judges, rather than viewed as an obstacle to be overcome in imposing long sentences."  *United States v. Martin*, 100 F.3d 46, 48 (7th Cir. 1996).

Like good-time credits, the earned-time credits available under the First Step Act are "designed to further legislative policies" and should not be preemptively countermanded by sentencing judges. *Id.*  "[T]he obvious purpose of Congress" in providing for earned-time credits "was to provide an incentive for prisoners to attend the recidivism reductions programs…and the obvious incentive was that the time credits would *reduce* a prisoner's incarceration time[.]"  *Guerriero v. Miami RRM*, 2024 WL 2017730, *3 (11th Cir. May 7, 2024) (emphasis added).  It would

be contrary to Congress's objectives if the First Step Act was used to justify an increased sentence.

Moreover, even assuming *good-time credits* may be factored into a sentence, it does not follow that *earned-time credits* under the First Step Act may be considered. The accumulation of good-time credits is essentially automatic for well-behaved inmates. "[P]rovided the defendant is well-behaved, he *will* earn Good Conduct Time on the whole sentence imposed by the Court." (Dkt.259 at 7) (emphasis added)). But the same is not true of earned-time credits under 18 U.SC. § 3632. Under current regulations, an inmate will only earn time credits upon "a determination by [BOP] staff that an eligible inmate has participated in the [Evidence Based Recidivism Reduction] programs or [Productive Activities] that the Bureau has recommended …and has complied with the requirements of each particular…Program of [Productive Activity]." 28 C.F.R. § 523.41(c)(2). And various eventualities beyond an inmate's control may prevent the inmate from participating, including "medical placement in a hospital," "[t]emporary transfer to the custody of another Federal or non-Federal government agency," or "[p]lacement in mental health/psychiatric holds." *Id.* at § 523.41(c)(4). In the case of a lengthy sentence, such as James's, it is entirely possible that unforeseen events or changes in the regulations may deprive the inmate of the ability to earn or use time credits.

41

For all of these reasons, a sentencing court may not consider First Step Act earned-time credits when imposing sentence. At a minimum, a court may not base an enhanced sentence solely on the possibility that a defendant will earn such credits.

2.      Similarly, a court may not use defendant's potential eligibility to participate in RDAP to lengthen a sentence. The purpose of RDAP is to treat and rehabilitate offenders with serious substance abuse problems. Eligibility for RDAP depends in large part on self-disclosure during the pre-sentence interview. Even with respect to an eligible defendant, the district court has no power to order the defendant admitted into RDAP, and the defendant ultimately may be excluded by the Bureau of Prisons, which "has plenary control…over…the treatment programs (if any) in which he may participate." *Tapia v. United States*, 564 U.S. 319, 330 (2011).

Given these considerations, it is manifestly contrary to congressional policy to lengthen the sentence of a defendant who has disclosed a substance abuse problem out of fear that the defendant may participate in RDAP and earn early release.

3.      It is not disputed that the district court relied on the possibility that James might earn time credits under the First Step Act to impose a longer sentence. Nor is it disputed that the court relied on James's potential eligibility to participate

42

in RDAP to lengthen his sentence.  Indeed, despite the court's protestations to the contrary, it is readily apparent that James's potential eligibility for early release was the sole reason the court added two years to its tentative sentence.

At the first sentencing hearing, the district court expressly stated it "was intending to give James ten years, but that was based on [its] misunderstanding of the ability of the defendant to engage in programs and potentially halve his sentence. *That's why I changed my initial determination*." (A-702-03).  At the second sentencing hearing, however, the court said James's potential eligibility for time credits was not its "sole consideration" and that it had also considered statements made by an AETNA representative "as to the enormity and the difficulty of this fraud" as well as the "horrible" calls that would have "moved" "any judge on this bench."  (A-719, 724).

This was a pretext.  The AETNA representative had spoken at the first sentencing hearing—*before* the court decided to impose a ten-year sentence.  (A-651-55).  The government had played the calls that the court referenced at the first sentencing hearing—again, *before* the court decided to sentence James to ten years. (A-674-75).  And, in summing up its reasons for imposing a ten-year sentence, the court specifically relied on the calls and the statement by the AETNA representative.  (A-689-90).  All of this occurred before the court described "a sentence of ten years" as a "a substantial one…both to the concept of having the

43

defendant not commit any future crimes and deterrence for the general public."

(A-691).

But even if the court's concern about early release was not the sole reason

for the extension of James's sentence, the court unquestionably placed *some*

weight on this factor. Because the possibility of early release under the First Step

Act or under RDAP is not a legitimate sentencing consideration, a remand for

resentencing is required.

## IV.   THE DISTRICT COURT MISCALCULATED FORFEITURE

### A.   Background

For the guidelines calculation the government proposed several different

methodologies for calculating the loss amount yielding wildly varying results.

(Dkt.245 at 12-16, 16 n.9). James argued that none of these methods accounted for

his many properly billed claims or the amounts the insurance companies would

have paid but for the alleged fraud. (Dkt.246 at 72-73). James argued that the

guidelines range should be determined by the amount of his gain from the alleged

fraud, rather than the loss to the victims. (*Id.*).

The district court agreed to use gain instead of loss to calculate the

guidelines. (A-612-13). The government contended the correct number was $63

million—a number it acknowledged represented James's total business revenues

without excluding revenues untainted by any alleged misconduct. (Dkt.245 at 12,

16 n.9). James argued the gain amount should be limited to the proportion of James's revenues actually attributable to his allegedly improper billings. (Dkt.246 at 44-45). He submitted an expert report concluding that just under 20% of payments to James—approximately $12 million—resulted from claims tainted by the alleged fraud. (A-538-39).

The district court initially agreed with James. In calculating gain, it recognized that $63 million would be excessive and made an express finding that "not all of the claims were false." (A-590). It concluded, "if I calculate additional funds that were legitimately put together, I think a reduction of 30 million or 33 million loss is accurate." (A-611). Nonetheless, in a strangely Solomonic approach, the court used $63 million to calculate the guidelines but $33 million when it came to imposing sentence. (A-612-13).

When determining the forfeiture amount at the second hearing, however, the court reversed course. Without explanation, the court said it now believed "[t]he gain to [James] was a minimum of 63 million." (A-752). The court ultimately shut down further argument, saying, "[y]ou can take your positions to the Second Circuit," "[b]ut I am signing off on" the $63 million forfeiture amount. (A-753).

45

### B.  The Forfeiture Award Did Not Exclude Valid Revenues

1.  The $63 million forfeiture award was excessive because it encompassed *all* of James's earnings from his business, even though—as the district court itself acknowledged—not "every single dollar was fraudulently obtained."  (A-612).  This error requires reversal.

Under the applicable forfeiture statute, only "gross proceeds traceable to the commission of" a federal healthcare offense may be forfeited.  18 U.S.C. § 982(a)(7).  "[F]orfeiture is gain based," *United States v. Torres*, 703 F.3d 194, 203 (2d Cir. 2012), and a district court "must make a reasonable estimate…given the available information," *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011).  This comports with the core purpose of criminal forfeiture, which "focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012).  Indeed, "Congress's intent [is] that forfeiture proceedings be used to recover all of the defendant's ill-gotten gains but not to seize legitimately acquired property."  *United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018).  To police this boundary, this Court "must determine whether the trial court's method of calculation was legally acceptable."  *United States v. Walters*, 910 F.3d 11, 31 (2d Cir. 2018).

Here, the district court failed to exclude legitimately acquired property from the forfeiture award.  The $63 million represented the total proceeds deposited into

the bank accounts of James's billing businesses between January 2013 and December 2019. (Dkt.245 at 12; PSR at 9). This was not the total proceeds from claims James had allegedly billed improperly; it was just his *total business revenues.* Even taking the government's claims as true, the fraud did not taint all, or even most, of James's revenues. Indeed, the court made an express finding that "not all of the claims were false." (A-590).

The evidence at trial amply demonstrated this. The forensic accountant who calculated the $63 million number did not know "whether one dollar of that $63 million is fraudulent." (A-271). And as noted, the government's investigating FBI agent testified that "misused…codes…was a subset of [his] total billing," and that there were numerous examples of bills that were either not allegedly improper or did not reflect any misconduct. (A-240-42, 248-50). Even as to claims billed incorrectly, the agent conceded insurance companies would simply pay a lower amount rather than deny the claim entirely. (A-801-03; *see also* A-885). And numerous witnesses confirmed that one improper code does not affect the validity or payment of the remainder of a claim. (A-199-200, 265, 783, 801-02).

The evidence at sentencing offered even more proof that James's earnings were mainly legitimate. James's sentencing expert analyzed how much the insurance companies "would have allowed if the coding and billing for [James's claims] were consistent with how the government proposed the billing and coding

47

should have been performed," based on evidence from the eight patients featured at trial whose claims were allegedly coded improperly. (A-512; *see also* A-513-39). She concluded that only about 20% of James's revenues from those patients was attributable to improper coding, and the insurance companies would have paid the remaining 80%. (A-538-39). And like the trial witnesses, she confirmed that "the denial of one procedure code…has no bearing on the coverage/payment of other line items on the claim" and does not authorize a refusal "to pay the remaining valid or approved medical procedure codes." (A-515-16).

    None of this was lost on the district court. At the first sentencing hearing, it criticized the government's claim of $63 million in gain as "assuming that every single dollar was fraudulently obtained." (A-612). Indeed, it determined that it would "make a finding that not all of the claims were false, fraudulent, et cetera," and it observed that "[t]here were some [claims], even the Government submits…that were legitimate." (A-590). It further concluded that "a reduction of 30 million or 33 million loss is accurate" for sentencing purposes. (A-611-13).

    Yet when it came time to impose a forfeiture award, the court ignored its own conclusions. Despite no change in the underlying evidence, the court concluded at the second hearing that, now, "[t]he gain to [James] was *a minimum* of 63 million." (A-752) (emphasis added). It nowhere discussed the extensive evidence confirming that only a subset of James's claims—and hence his

revenues—were even arguably improper. And the only reason the court gave for its decision was the parties' "equitable resolution" not to forfeit James's "modest" family home, purchased many years before the alleged fraud for $449,000. (A-686, 751-62; Dkt.253-1 at 4). This obviously has nothing to do with calculating James's gain.

In short, the district court offered no cogent explanation for requiring James to forfeit his full revenues, without any setoff for "legitimately acquired property." *Daugerdas*, 892 F.3d at 548. "The District Court's basic failure at least to approximate the amount of the [gain] caused by the fraud without even considering other factors…requires a remand." *United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007).

2.    Because "the government knew of its obligation to present evidence and failed to do so, it may not enter new evidence on remand." *United States v. Archer*, 671 F.3d 149, 168 (2d Cir. 2011). In *United States v. Desnoyers*, for example, this Court held that the district court properly precluded the government from offering evidence of loss at re-sentencing that it had unjustifiably failed to offer at the defendant's first sentencing. 708 F.3d 378, 386-87 (2d Cir. 2013). Here, the only evidence in the record concerning the proper forfeiture amount is the report submitted by James's expert, which supports, at most, a forfeiture award of $12 million. The government "should not receive a second chance." *United*

*States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750, 753 (5th Cir. 2012) (vacating

restitution award and declining to remand for new sentencing because the "record

contains no evidence" of loss).

## V.   THE DISTRICT COURT MISCALCULATED RESTITUTION

### A.   Background

The court followed a similarly flawed process in setting the restitution

award.  Before the first sentencing hearing, the government proposed a restitution

amount of almost $343 million.  (Dkt.245 at 35).  This amount represented all

payouts by insurance companies based on claims James billed in which he

impersonated patients or used Modifier 59.  (*Id.*).  The government calculated this

number using two hand-typed spreadsheets—with tens of thousands of rows—that

together added up every claim James submitted involving either Modifier 59 or

impersonation.  (A-923, 924).

As with forfeiture, James argued the government's calculation failed to

account for properly billed claims, the actual impact of the alleged fraud on the

insurance companies' payouts, or amounts returned to the insurance companies.

(Dkt.254 at 7-9; A-608-11).  For example, James pointed out that the government

had counted insurance payments made on claims *before* he ever impersonated the

patient.  (Dkt.254 at 8).  And he noted that Modifier 59 has perfectly legitimate

uses and that James's use of the modifier often did not impact insurance payouts at

all. (*Id.*). James also demonstrated that the government had double-counted many claims involving both impersonation *and* the use of Modifier 59. (Dkt.254 at 7).

The district court did not decide restitution at the first hearing. But as with forfeiture, the court emphasized that "[t]here are some legitimate claims in there, and…at this point, I think [the loss is] somewhat less than [what the government is] seeking in [its] papers." (A-605). But as it had done with forfeiture, the court adopted the government's position even though the only change in evidence between the hearings was that the government *reduced* its restitution request by about $6 million—to $337 million—to correct for the double-counting James identified. (A-753; *see also* A-931; Dkt.259 at 13-15).

### B. The Restitution Award Was Speculative And Unfounded

1. A restitution calculation must be "reasonable." *United States v. Gushlak*, 728 F.3d 184, 195-96 (2013). Thus, even in cases "in which an exact dollar amount is inherently incalculable," "a reasonable approximation of losses" must be "supported by a sound methodology." *Id.* "[R]estitution may be awarded only in *the amount* of losses directly and proximately caused by the defendant's conduct." *Id.* at 195-96. And a "failure at least to approximate the amount of the loss caused by the fraud without" excluding amounts unrelated to the fraud requires reversal. *Rutkoske*, 506 F.3d at 180.

Although it involves a guidelines calculation, *United States v. Titus*, 78 F.4th 595 (3d Cir. 2023), is instructive. The doctor-defendant there operated a pill mill, but some of his prescriptions were not illegal. *Id.* at 599-600. The court vacated his sentence, because the government had not offered any reliable evidence of the quantity of prescriptions that were illegal, and the district court failed to explain its calculation, leaving the defendant with "no chance to respond meaningfully." *Id.* at 600.

The district court's approach to restitution here was similar to the court's flawed approach to the guidelines in *Titus*. The district court gave no reason for imposing a $337 million award. Instead, it simply adopted the government's proposed number.

But the government's calculation was deeply flawed. It calculated restitution by using two manually compiled, gargantuan spreadsheets to add up every claim James submitted that involved either impersonation or Modifier 59. (A-923, 931). But this calculation missed a host of issues.

*First*, the government assumed every insurance payment relating to a patient James impersonated resulted from that impersonation. But this was demonstrably untrue. For example, James posed as patient ███████ in materials submitted to United Healthcare in September 2018 (A-824-69), but *every United Healthcare payment* for ██████ that the government included in its calculation predated that

impersonation by nearly a year (A-923). Those payments *could not* have resulted from James's impersonation.

And there are many other examples. For instance, James posed as patient Marcus Smart to Cigna beginning on July 25, 2018 (A-91-92), but all the claims the government counted were paid several weeks beforehand (A-923). He posed as patient Sonia Hawkins's husband in March 2018 (A-471), but several of the counted claims were paid in September 2016 (A-923). An employee of James impersonated patient Patricia Rhodes on January 21, 2019 (A-476), but all her claims were paid earlier, on January 2, 2019 (A-923). James posed as patient ███████████ (A-870), but every single claim with associated date information—over $436,000 worth—was paid in 2017 (A-923). And likewise, James impersonated patient ████████ in May 2018 (A-877), but again, $252,000 of those claims were paid in 2017 (A-923).

The government even included the initial payments by insurance companies that James allegedly tried to increase via impersonation, *i.e.*, the amounts paid before any alleged impropriety occurred. For example, *before* James posed as ███████████, Aetna paid $635.76, $1,271.51, $296.44, $296.44, $177.48, and $177.48 on certain claim line items. (A-870). And *before* James posed as ████████, Aetna did the same in amounts of $1,482.56, $1,482.56, $2,880, and $2,880. (A-877). Yet each of these line items appears in the government's

impersonation spreadsheet. (A-923). Again, these payments could not have been *caused* by the impersonations.

These are just examples to illustrate how unreliable the government's spreadsheet was. These errors alone render the government's restitution calculation speculative and unreasonable. And if so many errors are readily apparent from just this small sampling of claims, it is plain that the 10,590-row spreadsheet covering more than 1,600 unique patients is riddled with error.

*Second*, the government was similarly cavalier in assessing losses related to Modifier 59. Again, the government calculated these losses by adding up *every claim* James billed involving that modifier. (A-931). But this far overstates the impact of his alleged misconduct.

For example, the record makes clear that "sometimes…the use of a modifier 59 is supported." (A-65). Thus, many of James's claims may have been justified. As the district court conceded, "[t]here are some legitimate claims in there." (A-605). Moreover, James used Modifier 59 even where it would have had no impact on payout. Sometimes the insurance companies bundled or unbundled the underlying codes anyway (A-782, 799-801; *see also* A-522-23); or simply ignored modifiers as a matter of policy (A-522); or paid only on a single code, rendering moot any "unbundling" that might otherwise be triggered by Modifier 59 (A-524). And even if misusing Modifier 59 had some impact on payments, improper

modifiers do not affect the validity of the *entire claim*. (A-199-200, 265, 515-16, 783, 801-02, 885). Thus, what the government should have done is calculate the subset of payments actually derived from the misuse of Modifier 59. This number would have been far lower than the one it proffered, since—as the defense sentencing expert explained—Modifier 59 "generally appeared to have had little to no impact on the overall outcome." (A-522).

And this is not even accounting for basic sloppiness in the government's Modifier 59 spreadsheet—which is *even larger* than the impersonation spreadsheet. For instance, the government's Modifier 59 loss calculation includes claims for the treatment of Victoria Motley—a core trial witness—by Dr. Ola Porotin. (A-931). But by the time United Healthcare paid those claims, the company had excluded Modifier 59 entirely. (A-526-27, 907). If this error occurred with one of the main trial witnesses, how many more errors are there?

*Third*, and compounding the first two issues, the government's impersonation and Modifier 59 spreadsheets are accompanied by no underlying source material, or even citations to such material. The government had to reduce its restitution request before the second hearing by $6 million to account for double-counting claims and admitted to making errors in compiling the spreadsheets. (Dkt.259 at 13 & 13 n.29). But the defense—and appellate counsel—have no mechanism of uncovering any of the other likely errors they

contain.  In the words of defense counsel at sentencing:  "We don't know if these spreadsheets are true or not.  They're totally unproven."  (A-609).

*Fourth*, the government's calculation would return more money to the insurance companies than they even asked for.  Under the district court's restitution order, $100 million must be paid to Aetna and $52 million must be paid to Cigna.  (A-771).  But both of these companies estimated their own losses at far less:  Aetna claimed "at least $50 million" and Cigna claimed $33 million.  (Dkt. 245 at 35 n.14).  But somehow—likely due to the errors like those discussed above—the government has roughly doubled these amounts.

And it did so even though the amounts requested by Aetna and Cigna were themselves likely overstated:  like the government, ███████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████.  (A-925-30).  Yet a restitution "award cannot allow a victim to recover more than his due."  *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011).

The district court should not have accepted the government's unproven, flawed loss calculation that made no effort to even "approximate the amount of the loss caused by the fraud."  *Rutkoske*, 506 F.3d at 180.  Vacatur is required.

2.      As with forfeiture, the restitution award should be substantially reduced on remand.  The government offered no evidence of the amount of its loss calculation attributable to fraud, and it should not "receive a second chance," *Chem. & Metal Indus.*, 677 F.3d at 753; *see United States v. Thompson*, 792 F.3d 273, 280-81 (2d Cir. 2015) (limiting restitution award on remand).

As to what the limit should be, the most appropriate number is zero. Without any valid evidence from the government of the losses attributable to the fraud, there is simply no basis for calculating restitution.  *Id.*  The government failed to carry its "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense."  18 U.S.C. § 3664(e).

Moreover, where calculation of restitution is so "complex" that it "would complicate or prolong the sentencing process," no restitution award should be imposed at all.  18 U.S.C. § 3663A(c)(3)(B).  And that is certainly the case here, as underscored by Aetna's own victim-impact statements.  The company's representative explained that "[t]here's no way for us to hit a button in our system and say give us all the claims that were submitted by Mathew James," because "[c]laim forms only come in with the name [and tax identification number] of the provider."  (A-654).  And he emphasized that "[t]here is no possible way that anyone could calculate the amount that would have been paid in this case" absent fraud because "[s]omeone would need to review all of the plan documents for each

individual plan sponsor…to adequately price how much [the claims] would have been paid at." (A-658). Thus, there is no way to even "approximate the amount of the loss caused by the fraud." *Rutkoske*, 506 F.3d at 180.

In short, the government's spreadsheets calculating loss are unreliable, and the insurance companies themselves made clear that losses attributable to the alleged fraud are largely incalculable. No restitution should be permitted.

## VI. THE CASE SHOULD BE REMANDED TO A DIFFERENT JUDGE

Reassignment on remand is appropriate where (1) an objective observer might reasonably "question the judge's impartiality" or (2) "reassignment is advisable to preserve the appearance of justice." *United States v. Quattrone*, 441 F.3d 153, 192 (2d Cir. 2006). Even where remand is solely for resentencing, re-assignment may be warranted where the sentencing judge has relied on improper criteria in imposing sentence, *United States v. Robin*, 553 F.2d 8, 10-11 (2d Cir. 1977), or a judge's comments raise concerns as to the "appearance of fairness," *United States v. Padilla*, 186 F.3d 136, 143 (2d Cir. 1999).

Here, a difficult one-month trial was marred by avoidable exposure of the jury to extrinsic material the district court failed to investigate or attempt to appropriately remedy. Then, over two drawn out and chaotic sentencing proceedings, the judge applied guideline enhancements that clearly did not fit and engaged in a result-oriented end-run around laws intended to encourage

58

rehabilition and substance-abuse recovery. And it imposed clearly erroneous forfeiture and restitution amounts. In doing so, it barely acknowledged defense arguments, repeatedly described James's conduct as "horrific," and observed that "we all suffer" from and "we all pay for" the crimes James was convicted of.

Following such lengthy and difficult proceedings in the district court, reassignment "is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. Bryan*, 393 F.2d 90, 91 (2d Cir. 1968).

## CONCLUSION

For the foregoing reasons, the judgment should be vacated and the case remanded for a new trial on all counts, or at minimum, an evidentiary hearing on the impact of the jury's exposure to extra-record information. At minimum, the case should be remanded for resentencing and a recalculation of forfeiture and restitution. On remand, the case should be assigned to a different district judge.

Dated: July 11, 2024

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Julian S. Brod
C. Eric Hintz
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*
*Mathew James*

59

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENT

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(g) and Local Rule 32.1 because it contains 13,338 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated:   July 11, 2024

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Judgment, dated March 20, 2014 (Dkt. 269) . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-1

18 U.S.C. § 982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-23

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-28

18 U.S.C. § 3624 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-36

18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-46

18 U.S.C. § 3664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-50

28 CFR 523.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-57

USSG § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-61

USSG § 3B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-64

Case 2:19-cr-00382-JS   Document 269   Filed 03/20/24   Page 1 of 22 PageID #: 2922

AO 245B (Rev. 09/19)   Rev. EDNY 2/1/2021 Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| MATHEW JAMES | Case Number:  2:19-cr-0382-001-JS |
| | USM Number:  91801-053 |
| | Paul M. Krieger, Esq. (Retained) |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    1s through 8s of the nine-count Indictment (S-1) filed on 12/12/2019.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| | SEE PAGE 2. | | |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   9s

☐ Count(s) _____ ☐ is   ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAR 20 2024  ★

LONG ISLAND OFFICE

2/2/2024
Date of Imposition of Judgment

Signature of Judge

Joanna Seybert, Senior United States District Court Judge
Name and Title of Judge

3/20/2024
Date

**SPA-2**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

| | Judgment—Page | 2 | of | 8 |

DEFENDANT:  MATHEW JAMES
CASE NUMBER:  2:19-cr-0382-001-JS

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1347 and 1349 | Conspiracy to Commit Health Care Fraud; a Class C Felony | 12/31/2019 | 1s |
| 18 U.S.C. § 1347 | Health Care Fraud; a Class C Felony | 12/31/2019 | 2s |
| 18 U.S.C. § 1343 | Wire Fraud; a Class C Felony | 1/16/2018 | 3s |
| 18 U.S.C. § 1343 | Wire Fraud; a Class C Felony | 4/10/2018 | 4s |
| 18 U.S.C. § 1343 | Wire Fraud; a Class C Felony | 6/13/2018 | 5s |
| 18 U.S.C. §§ 1028A(a)(1), 1028A(b) and 1028A(c)(5) | Aggravated Identity Theft; a Class E Felony | 5/24/2018 | 6s |
| 18 U.S.C. §§ 1028A(a)(1), 1028A(b) and 1028A(c)(5) | Aggravated Identity Theft; a Class E Felony | 4/3/2018 | 7s |
| 18 U.S.C. §§ 1028A(a)(1), 1028A(b) and 1028A(c)(5) | Aggravated Identity Theft; a Class E Felony | 7/25/2018 | 8s |

**SPA-3**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment — Page 3 of 8 |
|---|---|

DEFENDANT:  MATHEW JAMES
CASE NUMBER:  2:19-cr-0382-001-JS

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

ONE HUNDRED AND FORTY-FOUR (144) MONTHS; consisting of one hundred and twenty (120) months as to Counts 1s through 5s, to run concurrently with each other, and twenty-four (24) months as to Counts 6s through 8s, to run concurrently with each other but consecutively with Counts 1s through 5s.

☑ The court makes the following recommendations to the Bureau of Prisons:

The Court recommends to the Bureau of Prisons that the defendant be housed at FCI Danbury for the service of his sentence, and that the defendant participate in any and all substance abuse treatment programs.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☑ before 2 p.m. on   4/19/2024 _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page | 4 | of | 8 |

DEFENDANT:  MATHEW JAMES
CASE NUMBER:  2:19-cr-0382-001-JS

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

TWO (2) YEARS; consisting of two (2) years as to all Counts, to run concurrently to each other.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | Judgment—Page | 5 | of | 8 |

DEFENDANT: MATHEW JAMES
CASE NUMBER: 2:19-cr-0382-001-JS

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature _____     Date _____

SPA-6

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 8 |
|---|---|---|---|---|

DEFENDANT:  MATHEW JAMES
CASE NUMBER:  2:19-cr-0382-001-JS

## SPECIAL CONDITIONS OF SUPERVISION

[1] The defendant shall comply with the Order of Restitution (see attached).

[2] Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of his financial dealings and shall provide truthful monthly statements of your income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to your financial information and records.

[3] The defendant is prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Department. The defendant shall not encumber or liquidate interest in any assets unless it is in direct service of the restitution obligation or otherwise has the express approval of the Court.

[4] The defendant shall not obtain or possess any form of identification in any name other than your true legal name; nor shall the defendant use, for any reason or purpose in any manner, any name other than his true legal name.

[5] The defendant shall cooperate with the U.S. Probation Department in the investigation and approval of any position of self-employment, including any independent, entrepreneurial, or freelance employment or business activity. If approved for self-employment, the defendant shall provide the U.S. Probation Department with full disclosure of his self-employment and other business records, including, but not limited to, all of the records identified in the Probation Form 48F (Request for Self-Employment Records), or as otherwise requested by the U.S. Probation Department.

**SPA-7**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 7 | of | 8 |
|---|---|---|---|---|

DEFENDANT: MATHEW JAMES
CASE NUMBER: 2:19-cr-0382-001-JS

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 800.00 | $ 336,996,416.85 | $ | $ | $ |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Clerk of Court, EDNY | | $336,996,416.85 | |

| TOTALS | $ 0.00 | $ 336,996,416.85 |
|---|---|---|

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☑   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐   the interest requirement is waived for the   ☐ fine   ☑ restitution.

    ☐   the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SPA-8**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

---

DEFENDANT: MATHEW JAMES

CASE NUMBER:  2:19-cr-0382-001-JS

Judgment — Page __8__ of __8__

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  __336,997,216.85__  due immediately, balance due

      ☐   not later than _____ , or

      ☑   in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:
The defendant shall pay the Special Assessment fine in the amount of $800.00 within two (2) weeks of the date of
sentence, and Restitution in the amount of $336,996,416.85 due immediately and payable at a rate of $25.00 per
quarter while in custody and 10% of the defendant's gross monthly income while on Supervised Release. See
attached Order of Restitution.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate
Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
SEE ATTACHED ORDER OF FORFEITURE.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAR 2 0 2024   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

ORDER OF RESTITUTION

– against –

Criminal Docket No. 19-382 (JS)

MATHEW JAMES,

Defendant.

– – – – – – – – – – – – – – – – – – X

WHEREAS, defendant MATHEW JAMES was sentenced on February 2, 2024, in the above-captioned case,

1.   This order of restitution will be incorporated by reference to the Judgment and Commitment Order to be filed in connection with the above-captioned case.

2.   The total restitution amount to be paid is $336,996,416.85 plus interest. See 18 U.S.C. § 3612(f). All payments shall be made to the Clerk of the Court, United States District Court, 225 Cadman Plaza East, Brooklyn, N.Y. 11201. The payment instrument shall reference the case name and number, as set forth above.

3.   Restitution is due immediately, but payable at the rate of $25 per quarter while incarcerated, and for periods of prerelease custody (e.g., the defendant's release from a Federal Bureau of Prisons ("BOP") facility to a Residential Reentry Center ("RRC"), home confinement or any other early release program) and supervised release at a rate of 10% of the defendant's gross monthly income, including income from all sources, in monthly payments. This schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. During any period of incarceration, the defendant will participate in the Bureau of Prisons Inmate Financial Responsibility Program.

4.     The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of the judgment, or the court has waived or modified the requirement to pay interest. See 18 U.S.C. § 3612(f).

5.     The defendant is directed to pay restitution to the victims named, and in the amounts listed in Exhibit A to this order.  Exhibit A shall be kept under seal until further order of this Court except that appropriate personnel of the Clerk's Office and the United States Attorney's Office shall have immediate access to it in order to make the distribution required by this order.

6.     The full amount of the monetary penalties is due immediately and subject to immediate enforcement by the United States as provided for in 18 U.S.C. § 3613, notwithstanding any payment plan set forth herein or in the judgment. See 18 U.S.C. § 3572(d).

7.     The defendant shall not seek the discharge in bankruptcy of any restitution obligation.

8.     The defendant shall make full and accurate disclosure of his financial affairs to the United States, including providing the United States, under penalty of perjury, on a yearly basis, a financial statement which shall, among other things, identify all assets owned or held directly or indirectly by the defendant, including but not limited to a trust, partnership or corporation, and any change in the defendant's economic circumstances, until the fine or restitution is paid in full or liability terminates under 18 U.S.C. § 3613(b). See 18 U.S.C. §§ 3613, 3664(k) & (n).

9.     As part of this disclosure, the defendant shall identify all assets valued at more than $5,000 which have been transferred to third parties since the commencement of the criminal activity and/or the date of arrest, whichever is earlier, including the location of the assets and the identity of the third parties.

10.   The defendant will notify the United States of America before the defendant transfers any interest in property owned directly or indirectly by the defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations.  See 18 U.S.C. § 3664(k) & (n).

11.   Compliance with restitution payments and the financial disclosure requirements set forth above is required at all times including, but not limited to, the periods during: (a) the defendant's commencement and continuation of prerelease custody (e.g., the defendant's release from a BOP facility to a RRC, home confinement or any other early release program); (b) federal supervised release and/or probation; and (c) after termination of any period of supervised release or probation.  Failure to comply with these payments and/or financial disclosure requirements can form the basis for a violation of BOP prerelease conditions and/or supervised release or probation.

12.   The restitution imposed is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986.  The lien arises on the entry of judgment and continues for 20 years or until the liability is satisfied, remitted,[1] set aside, or is terminated under subsection 18 U.S.C. § 3613(b).  See 18 U.S.C. § 3613(c).

13.   The Clerk is directed to distribute restitution payments *pro rata* to the victims at least once per year to the extent funds are available to distribute.  The United States Department of Probation and the United States Attorney's Office are directed to provide to the Clerk whatever assistance is necessary to assure prompt distribution of restitution payments. The Clerk is directed to mail a copy of the instant document and the attachment to the Criminal

---

[1] Remission is applicable to fines only.

Assistant assigned to the instant case and the Financial Litigation Program of the United States

Attorney's Office of the Eastern District of New York.

Dated:   Central Islip, New York
~~February~~ ___, 2024
March 20,

HONORABLE JOANNA SEYBERT
UNITED STATES DISTRICT JUDGE

SPA-13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          Criminal Docket No. 19-382 (JS)

     - against -

MATHEW JAMES,

         Defendant.

- - - - - - - - - - - - - - - - - - - X

## EXHIBIT A TO ORDER OF RESTITUTION[2]

| | VICTIM NAME AND ADDRESS | LOSS AMOUNT |
|---|---|---|
| (1) | UnitedHealthcare<br>9900 Bren Road<br>Minnetonka, MN 55343<br>Attn: Amy Van Duyn<br>amy.vanduyn@uhc.com | $103,811,639.13 |
| (2) | Aetna<br>151 Farmington Avenue<br>Hartford, CT 06156<br>Attn: Daniel Lyons, Esq.<br>lyonsd1@aetna.com | $100,112,143.47 |
| (3) | Anthem / Blue Cross Blue Shield<br>220 Virginia Avenue<br>Indianapolis, IN 46204<br>Attn: Jamelle Magee<br>jamelle.magee@elevancehealth.com | $65,004,668.15 |
| (4) | Cigna<br>900 Cottage Grove Road<br>Bloomfield, CT 06002<br>Attn: Brittany Fritz<br>brittany.fritz@evernorth.com | $52,556,422.97 |

[2] To the extent contact information is not immediately available at the time of judgment and/or contact information changes, the government will provide the Clerk's Office with updated contact information immediately upon receipt.

SPA-14

| (5) | Centene<br>Legal Department<br>(314) 725-4477 | $4,908,805.30 |
|---|---|---|
| (6) | CareConnect Insurance Company, Inc.<br>220 Northern Blvd<br>East Hills, New York 11548 | $3,615,117.32 |
| (7) | Emblem<br>55 Water Street<br>New York, New York<br>Attn: Chris Lupo<br>clupo@emblemhealth.com | $3,049,163.34 |
| (8) | Magnacare<br>1600 Stewart Avenue<br>Westbury, New York 11590 | $1,917,330.19 |
| (9) | Gilsbar<br>2100 Covington Ctr, Suite A<br>Covington, LA 70433<br><br>Mailing Address:<br>P.O. Box 998<br>Covington, LA 70434 | $453,967.99 |
| (10) | Kaiser Permanente<br>1 Kaiser Plaza<br>Oakland, CA 94612<br>Attn: Legal Department<br>(206) 630-2160 | $443,113.65 |
| (11) | Humana<br>500 W. Main Street<br>Louisville, KY 40202<br>Attn: Glicelda Bradford<br>gbradford@humana.com | $408,072.67 |
| (12) | Arizona Care Network Connected Care<br>4222 E. Thomas Road, #400<br>Phoenix, AZ 85018<br>(602) 406-7226 | $277,674.32 |
| (13) | AmeriBen<br>2888 West Excursion Lane<br>Meridian, ID 83642 | $244,199.22 |

| (14) | Qualcare, Inc.<br>30 Knightsbridge Road<br>Piscataway, New Jersey 08854<br>(800) 992-6613 | $105,555.28 |
|---|---|---|
| (15) | Priority Health Ins. Co.<br>1231 East Beltline Ave. NE<br>Grand Rapids, MI 49525-4501 | $28,299.92 |
| (16) | Health New England<br>1414 Main Street<br>One Monarch Place, #1500<br>Springfield, MA 01144<br>(413) 787-4000 | $27,629.29 |
| (17) | Physicians Plus Insurance Corporation | $17,317.64 |
| (18) | Allied Benefit Systems<br>(Corporate Address)<br>200 W. Adams Street, Suite 500<br>Chicago, IL 60606 | $15,297.01 |
| **Total Restitution** | | **$336,996,416.84 plus interest** |

SPA-16

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

MATHEW JAMES,

Defendant.

- - - - - - - - - - - - - - - -X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   FEB 0 2 2024   ★

LONG ISLAND OFFICE

PRELIMINARY ORDER OF FORFEITURE

19-CR-382 (S-1) (JS)

WHEREAS, on or about July 13, 2022, Mathew James (the "defendant"), was

convicted after a jury trial of the offenses charged in Counts One through Eight of the above-

captioned Superseding Indictment, charging violations of 18 U.S.C. §§ 1028A(1), 1028A(b),

1028A(c)(5), 1343, 1347 and 1349; and

WHEREAS, the Court has determined that, pursuant to 18 U.S.C. § 982(a)(7),

the defendant must forfeit the amount of sixty-three million three hundred eighty-two

thousand forty-nine dollars and two cents ($63,382,049.02) (the "Forfeiture Money

Judgment"), in addition to the forfeiture of all right, title and interest in the following assets

(items (a) through (p), collectively, hereinafter the "Subject Property"):

   a.   approximately nine hundred ten thousand two hundred
        seventeen dollars and twenty-one cents in United States
        currency ($910,217.21) seized from JP Morgan Chase account
        number XXXXXX-3698, and all proceeds traceable thereto;

   b.   approximately four million two hundred eighty-two thousand
        eight hundred dollars and twelve cents in United States currency
        ($4,282,800.12) seized from JP Morgan Chase account number
        XXXXXX-2193, and all proceeds traceable thereto;

   c.   approximately one million three hundred twelve thousand seven
        hundred fifty six dollars and eighty-five cents in United States

      currency ($1,312,756.85) seized from JP Morgan Chase account number XXXXXX-6407, and all proceeds traceable thereto;

d.     approximately four million sixty-eight thousand five hundred seven dollars and fourteen cents in United States currency ($4,068,507.14) seized from JP Morgan Chase account number XXXXXX-3855, and all proceeds traceable thereto;

e.     approximately one hundred fifty thousand dollars and zero cents in United States currency ($150,000.00) seized from JP Morgan Chase account number XXXXXX-3028, and all proceeds traceable thereto;

f.     approximately one hundred fifty thousand one hundred twenty-seven dollars and forty-four cents in United States currency ($150,127.44) seized from JP Morgan Chase account number XXXXXX-6411, and all proceeds traceable thereto;

g.     approximately eighty-three thousand fifty-four dollars and seventy-one cents in United States currency ($83,054.71) seized from JP Morgan Chase account number XXXXXX-2085, and all proceeds traceable thereto;

h.     approximately three hundred thousand two hundred seventy-nine dollars and ninety cents in United States currency ($300,279.90) seized from JP Morgan Chase account number XXXXXX-9251, and all proceeds traceable thereto;

i.     approximately one hundred seventy-nine thousand one hundred forty-nine dollars and thirty-two cents in United States currency ($179,149.32) seized from Bank of America account number XXXXXX-6120, and all proceeds traceable thereto;

j.     approximately one million six hundred thousand five hundred fifty-seven dollars and seventy-five cents in United States currency ($1,600,557.75) seized from Bank of America account number XXXXXX-6133, and all proceeds traceable thereto;

k.     approximately two million seventy-seven thousand four hundred twenty-four dollars and forty-three cents ($2,077,424.43) in United States currency seized on or about April 23, 2020 from Investors Bank, formerly Gold Coast Bank, account number XXXXXX-0646, and all proceeds traceable thereto;

l.     approximately two million two hundred twenty-two thousand one hundred sixty dollars and seventy-eight cents ($2,222,160.78) in United States currency, which constitutes proceeds from the sale of Lots 47 and 48, High Point Court Brookville, New York 11545, and all proceeds traceable thereto (See Stipulation and Order, ECF Nos. 234 and 239);[1]

m.    approximately six million nine hundred sixty-seven thousand five hundred twenty-six dollars and zero cents ($6,967,526.00) in United States currency, which constitutes proceeds from the sale of 9 Stoddart Court, Locust Valley, New York 11560, and all proceeds traceable thereto (See Stipulation and Order, ECF Nos. 222 and 225);

n.    approximately three million one hundred ninety thousand eighty-six dollars and ninety-five cents ($3,190,086.95), which constitutes proceeds from the sale of 11 Sandpiper Court, Old Westbury, New York 11568, and all proceeds traceable thereto (See Stipulation and Order, ECF Nos. 66 and 71);

o.    approximately three million four hundred ninety-six thousand one hundred seventy-four dollars and fifteen cents ($3,496,174.15), which constitutes proceeds from the sale of 150 Hicksville Avenue, also known as 4201 Hempstead Turnpike, Bethpage, New York 11714, and all proceeds traceable thereto (See Stipulation and Order, ECF Nos. 90, 106 and 227); and

p.    the real property and premises located at 8 Richards Path, St. James, New York 11780, and all proceeds traceable thereto;

as any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of those offenses as a result of the defendant's violations of 18 U.S.C. §§ 1343, 1347 and 1349, and/or substitute assets, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

---

[1] Pursuant to Stipulations and Orders endorsed by the Court on consent of the Parties, the real property listed in items (l) through (o) were sold by the defendant, and the sales proceeds were remitted to the United States Marshals Service to hold upon further order of the Court.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      Pursuant to 18 U.S.C. § 982(a)(7) and 982(b)(1), and 21 U.S.C. § 853(p), the defendant shall forfeit to the United States the full amount of the Forfeiture Money Judgment and all right, title, and interest in the Subject Property.  The forfeiture of the Subject Property shall be credited towards the Forfeiture Money Judgment.

2.      All payments made towards the Forfeiture Money Judgment shall be made by a money order, or certified and/or official bank check, payable to the U.S. Marshals Service with the criminal docket number noted on the face of the instrument.  The defendant shall cause said payment(s) to be sent by overnight mail delivery to Assistant United States Attorney Tanisha R. Payne, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201.  The Forfeiture Money Judgment shall become due and owing in full upon the sentencing of the defendant (the "Due Date").

3.      Upon entry of this Preliminary Order of Forfeiture ("Preliminary Order"), the United States Attorney General or his designee is authorized to seize the Subject Property, to conduct any proper discovery, in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c), and to commence any applicable proceedings to comply with statutes governing third-party rights, including giving notice of this Preliminary Order.

4.      The United States shall publish notice of this Preliminary Order in accordance with the custom and practice in this district on the government website www.forfeiture.gov, of its intent to dispose of the Subject Property in such a manner as the Attorney General or his designee may direct.  The United States may, to the extent practicable, provide direct written notice to any person known or alleged to have an interest in the Subject Property as a substitute for published notice as to those persons so notified.

SPA-20

5.      Any person, other than the defendant, asserting a legal interest in the Subject Property may, within thirty (30) days of the final publication of notice or receipt of notice or no later than sixty (60) days after the first day of publication on an official government website, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his or her alleged interest in the Subject Property, and for an amendment of the order of forfeiture, pursuant to 21 U.S.C. § 853(n)(6).  Any petition filed in response to the notice of forfeiture of the Subject Property must be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

6.      The defendant shall not file a claim or petition seeking remission or contesting the forfeiture of the Subject Property or any property against which the United States seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial (civil or criminal) proceeding.  The defendant shall fully assist the government in effectuating the surrender and forfeiture of the Subject Property and the payment of the Forfeiture Money Judgment to the United States.  The defendant shall take whatever steps are necessary to ensure that clear title to the Subject Property passes to the United States, including, but not limited to, the execution of any and all documents necessary to effectuate the surrender and forfeiture of the Subject Property to the United States.  If the Subject Property or Forfeiture Money Judgment, or any portion thereof, are not forfeited to the United States, the United States may seek to enforce this Preliminary Order against any other assets of the defendant

up to the value of the Subject Property, and the outstanding balance of the Forfeiture Money

Judgment, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

7.   Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Preliminary

Order shall become final as to the defendant at the time of the defendant's sentencing and

shall be made part of the defendant's sentence and included in his judgment of conviction.  If

no third party files a timely claim, this Preliminary Order, together with Supplemental Orders

of Forfeiture, if any, shall become the Final Order of Forfeiture, as provided by Fed. R. Crim.

P. 32.2(c)(2).  At that time, the monies and/or properties forfeited herein shall be forfeited to

the United States for disposition in accordance with the law.

8.   The United States alone shall hold title to the monies paid by the

defendant to satisfy the Forfeiture Money Judgment following the Court's entry of the

judgment of conviction.  The United States alone shall hold title to the Subject Property

following the Court's disposition of all third-party interests, or, if none, following the

expiration of the period provided in 21 U.S.C. § 853(n)(2).

9.   The forfeiture of the Subject Property and entry and payment of the

Forfeiture Money Judgment shall not be considered a payment of a fine, penalty, restitution

loss amount, or payment of any income taxes that may be due, and shall survive bankruptcy.

10.  This Preliminary Order shall be binding upon the defendant and the

successors, administrators, heirs, assigns and transferees of the defendant, and shall survive

the bankruptcy of any of them.

SPA-22

11.     This Preliminary Order shall be binding only upon the Court's "so ordering" of the order.

12.     The Court shall retain jurisdiction over this action to enforce compliance with the terms of this Preliminary Order and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

13.     The Clerk of the Court is directed to send, by inter-office mail, two (2) certified copies of this executed Order to the United States Attorney's Office, Eastern District of New York, Attn: Yvette Ramos ProMinds Paralegal, 271-A Cadman Plaza East, Brooklyn, New York 11201.

Dated:   Central Islip, New York
         February 2        , 2024

                          SO ORDERED:


                          HONORABLE JOANNA SEYBERT
                          UNITED STATES DISTRICT JUDGE
                          EASTERN DISTRICT OF NEW YORK

§ 982. Criminal forfeiture, 18 USCA § 982

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 46. Forfeiture (Refs & Annos)

18 U.S.C.A. § 982

§ 982. Criminal forfeiture

Effective: June 5, 2012
Currentness

**(a)(1)** The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

**(2)** The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate--

  **(A)** section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of this title, affecting a financial institution, or

  **(B)** section 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 555, 842, 844, 1028, 1029, or 1030 of this title,

shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

**(3)** The court, in imposing a sentence on a person convicted of an offense under--

  **(A)** section 666(a)(1) (relating to Federal program fraud);

  **(B)** section 1001 (relating to fraud and false statements);

§ 982. Criminal forfeiture, 18 USCA § 982

**(C)** section 1031 (relating to major fraud against the United States);

**(D)** section 1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of insured financial institution);

**(E)** section 1341 (relating to mail fraud); or

**(F)** section 1343 (relating to wire fraud),

involving the sale of assets acquired or held by the the[1] Federal Deposit Insurance Corporation, as conservator or receiver for a financial institution or any other conservator for a financial institution appointed by the Office of the Comptroller of the Currency, or the National Credit Union Administration, as conservator or liquidating agent for a financial institution, shall order that the person forfeit to the United States any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such violation.

**(4)** With respect to an offense listed in subsection (a)(3) committed for the purpose of executing or attempting to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent statements, pretenses, representations, or promises, the gross receipts of such an offense shall include any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense.

**(5)** The court, in imposing sentence on a person convicted of a violation or conspiracy to violate--

**(A)** section 511 (altering or removing motor vehicle identification numbers);

**(B)** section 553 (importing or exporting stolen motor vehicles);

**(C)** section 2119 (armed robbery of automobiles);

**(D)** section 2312 (transporting stolen motor vehicles in interstate commerce); or

**(E)** section 2313 (possessing or selling a stolen motor vehicle that has moved in interstate commerce);

shall order that the person forfeit to the United States any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, as a result of such violation.

**(6)(A)** The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 274(a), 274A(a)(1), or 274A(a)(2) of the Immigration and Nationality Act or section 555, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law--

  **(i)** any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted; and

  **(ii)** any property real or personal--

    **(I)** that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or

    **(II)** that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.

**(B)** The court, in imposing sentence on a person described in subparagraph (A), shall order that the person forfeit to the United States all property described in that subparagraph.

**(7)** The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

**(8)** The court, in sentencing a defendant convicted of an offense under section 1028, 1029, 1341, 1342, 1343, or 1344, or of a conspiracy to commit such an offense, if the offense involves telemarketing (as that term is defined in section 2325), shall order that the defendant forfeit to the United States any real or personal property--

    **(A)** used or intended to be used to commit, to facilitate, or to promote the commission of such offense; and

    **(B)** constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

**(b)(1)** The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853).

**(2)** The substitution of assets provisions of subsection 413(p) shall not be used to order a defendant to forfeit assets in place of the actual property laundered where such defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period.

## CREDIT(S)

(Added Pub.L. 99-570, Title I, § 1366(a), Oct. 27, 1986, 100 Stat. 3207-39; amended Pub.L. 100-690, Title VI, §§ 6463(c), 6464, Nov. 18, 1988, 102 Stat. 4374, 4375; Pub.L. 101-73, Title IX, § 963(c), Aug. 9, 1989, 103 Stat. 504; Pub.L. 101-647, Title XIV, §§ 1401, 1403, Title XXV, § 2525(b), Nov. 29, 1990, 104 Stat. 4835, 4874; Pub.L. 102-393, Title VI, § 638(e), Oct. 6, 1992, 106 Stat. 1788; Pub.L. 102-519, Title I, § 104(b), Oct. 25, 1992, 106 Stat. 3385; Pub.L. 102-550, Title XV, § 1512(c), Oct. 28, 1992, 106 Stat. 4058; Pub.L. 103-322, Title XXXIII, § 330011(s) (1), Sept. 13, 1994, 108 Stat. 2145; Pub.L. 104-191, Title II, § 249(a), (b), Aug. 21, 1996, 110 Stat. 2020; Pub.L. 104-208, Div. C, Title II, § 217, Sept. 30, 1996, 110 Stat. 3009-573; Pub.L. 105-184, § 2, June 23, 1998, 112 Stat. 520; Pub.L. 105-318, § 6(a), Oct. 30, 1998, 112 Stat. 3010; Pub.L. 106-185, § 18(b), Apr. 25, 2000, 114 Stat. 223; Pub.L. 107-56, Title III, § 372(b)(2), Oct. 26, 2001, 115 Stat. 339; Pub.L. 107-273, Div. B, Title IV, § 4002(b)(10), Nov. 2, 2002, 116 Stat.

## SPA-27

1808; Pub.L. 109-295, Title V, § 551(c), Oct. 4, 2006, 120 Stat. 1390; Pub.L. 110-161, Div. E, Title V, § 553(b), Dec. 26, 2007, 121 Stat. 2082; Pub.L. 111-203, Title III, § 377(4), July 21, 2010, 124 Stat. 1569; Pub.L. 112-127, § 5, June 5, 2012, 126 Stat. 371.)

Notes of Decisions (146)

Footnotes

1       So in original.

18 U.S.C.A. § 982, 18 USCA § 982
Current through P.L. 118-65. Some statute sections may be more current, see credits for details.

End of Document                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**SPA-28**

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part II. Criminal Procedure
            Chapter 227. Sentences (Refs & Annos)
                Subchapter A. General Provisions (Refs & Annos)

18 U.S.C.A. § 3553

§ 3553. Imposition of a sentence

Effective: December 21, 2018
Currentness

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

    **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    **(B)** to afford adequate deterrence to criminal conduct;

    **(C)** to protect the public from further crimes of the defendant; and

    **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

§ 3553. Imposition of a sentence, 18 USCA § 3553

**(7)** the need to provide restitution to any victims of the offense.

**(b) Application of guidelines in imposing a sentence.--**

**(1) In general.**--Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

**(2) Child crimes and sexual offenses.--**

**(A)** [2] **Sentencing.**--In sentencing a defendant convicted of an offense under section 1201 involving a minor victim, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless--

**(i)** the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;

**(ii)** the court finds that there exists a mitigating circumstance of a kind or to a degree, that--

**(I)** has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under

section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

**(II)** has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

**(III)** should result in a sentence different from that described; or

**(iii)** the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission, together with any amendments thereto by act of Congress. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, together with any amendments to such guidelines or policy statements by act of Congress.

**(c) Statement of reasons for imposing a sentence**.--The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--

**(1)** is of the kind, and within the range, described in subsection (a)(4), and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or

**(2)** is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994(w)(1)(B) of title 28, except to the extent that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32. In the event that the court relies upon statements received in

camera in accordance with Federal Rule of Criminal Procedure 32 the court shall state that such statements were so received and that it relied upon the content of such statements.

If the court does not order restitution, or orders only partial restitution, the court shall include in the statement the reason therefor. The court shall provide a transcription or other appropriate public record of the court's statement of reasons, together with the order of judgment and commitment, to the Probation System and to the Sentencing Commission,,[3] and, if the sentence includes a term of imprisonment, to the Bureau of Prisons.

**(d) Presentence procedure for an order of notice**.--Prior to imposing an order of notice pursuant to section 3555, the court shall give notice to the defendant and the Government that it is considering imposing such an order. Upon motion of the defendant or the Government, or on its own motion, the court shall--

  **(1)** permit the defendant and the Government to submit affidavits and written memoranda addressing matters relevant to the imposition of such an order;

  **(2)** afford counsel an opportunity in open court to address orally the appropriateness of the imposition of such an order; and

  **(3)** include in its statement of reasons pursuant to subsection (c) specific reasons underlying its determinations regarding the nature of such an order.

Upon motion of the defendant or the Government, or on its own motion, the court may in its discretion employ any additional procedures that it concludes will not unduly complicate or prolong the sentencing process.

**(e) Limited authority to impose a sentence below a statutory minimum.**--Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

§ 3553. Imposition of a sentence, 18 USCA § 3553

**(f) Limitation on applicability of statutory minimums in certain cases.**--Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846), section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), or section 70503 or 70506 of title 46, the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that--

**(1)** the defendant does not have--

**(A)** more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;

**(B)** a prior 3-point offense, as determined under the sentencing guidelines; and

**(C)** a prior 2-point violent offense, as determined under the sentencing guidelines;

**(2)** the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

**(3)** the offense did not result in death or serious bodily injury to any person;

**(4)** the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

**(5)** not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

§ 3553. Imposition of a sentence, 18 USCA § 3553

Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense.

**(g) Definition of violent offense.**--As used in this section, the term "violent offense" means a crime of violence, as defined in section 16, that is punishable by imprisonment.

### CREDIT(S)

(Added Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 1989; amended Pub.L. 99-570, Title I, § 1007(a), Oct. 27, 1986, 100 Stat. 3207-7; Pub.L. 99-646, §§ 8(a), 9(a), 80(a), 81(a), Nov. 10, 1986, 100 Stat. 3593, 3619; Pub.L. 100-182, §§ 3, 16(a), 17, Dec. 7, 1987, 101 Stat. 1266, 1269, 1270; Pub.L. 100-690, Title VII, § 7102, Nov. 18, 1988, 102 Stat. 4416; Pub.L. 103-322, Title VIII, § 80001(a), Title XXVIII, § 280001, Sept. 13, 1994, 108 Stat. 1985, 2095; Pub.L. 104-294, Title VI, § 601(b)(5), (6), (h), Oct. 11, 1996, 110 Stat. 3499, 3500; Pub.L. 107-273, Div. B, Title IV, § 4002(a)(8), Nov. 2, 2002, 116 Stat. 1807; Pub.L. 108-21, Title IV, § 401(a), (c), (j)(5), Apr. 30, 2003, 117 Stat. 667, 669, 673; Pub.L. 111-174, § 4, May 27, 2010, 124 Stat. 1216; Pub.L. 115-391, Title IV, § 402(a), Dec. 21, 2018, 132 Stat. 5221.)

### VALIDITY

<U.S. Supreme Court, Oct. Term 2023, Oral Argument - Question Presented: The question presented is whether the "and" in 18 U.S.C. § 3553(f)(1) means "and," so that a defendant satisfies the provision so long as he does not have (A) more than 4 criminal history points, (B) a 3-point offense, and (C) a 2-point offense (as the Ninth Circuit holds), or whether the "and" means "or," so that a defendant satisfies the provision so long as he does not have (A) more than 4 criminal history points, (B) a 3- point offense, or (C) a 2-point violent offense (as the Seventh and Eighth Circuits hold). United States v. Pulsifer, 39 F.4th 1018 (8th Cir. 2022), cert. granted, 143 S. Ct. 978, 215 L. Ed. 2d 104 (2023), 2023 WL 9375532 (U.S.) (U.S.Oral.Arg.,2023). >

<Mandatory aspect of subsec. (b)(1) of this section held unconstitutional by United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). >

Notes of Decisions (3236)

**SPA-35**

Footnotes

1     So in original. The period probably should be a semicolon.

2     So in original. No subpar. (B) has been enacted.

3     So in original. The second comma probably should not appear.

18 U.S.C.A. § 3553, 18 USCA § 3553

Current through P.L. 118-65. Some statute sections may be more current, see credits for details.

End of Document       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part II. Criminal Procedure
           Chapter 229. Postsentence Administration (Refs & Annos)
           Subchapter C. Imprisonment

18 U.S.C.A. § 3624

§ 3624. Release of a prisoner

Effective: July 19, 2019
Currentness

**(a) Date of release.**--A prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence as provided in subsection (b). If the date for a prisoner's release falls on a Saturday, a Sunday, or a legal holiday at the place of confinement, the prisoner may be released by the Bureau on the last preceding weekday.

**(b) Credit toward service of sentence for satisfactory behavior.**--

**(1)** Subject to paragraph (2), a prisoner who is serving a term of imprisonment of more than 1 year[1] other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, of up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations. Subject to paragraph (2), if the Bureau determines that, during that year, the prisoner has not satisfactorily complied with such institutional regulations, the prisoner shall receive no such credit toward service of the prisoner's sentence or shall receive such lesser credit as the Bureau determines to be appropriate. In awarding credit under this section, the Bureau shall consider whether the prisoner, during the relevant period, has earned, or is making satisfactory progress toward earning, a high school diploma or an equivalent degree. Credit that has not been earned may not later be granted. Subject to paragraph (2), credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment.

**(2)** Notwithstanding any other law, credit awarded under this subsection after the date of enactment of the Prison Litigation Reform Act shall vest on the date the prisoner is released from custody.

**(3)** The Attorney General shall ensure that the Bureau of Prisons has in effect an optional General Educational Development program for inmates who have not earned a high school diploma or its equivalent.

**(4)** Exemptions to the General Educational Development requirement may be made as deemed appropriate by the Director of the Federal Bureau of Prisons.

**(c) Prerelease custody.--**

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621.

**(5) Reporting.**--Not later than 1 year after the date of the enactment of the Second Chance Act of 2007 (and every year thereafter), the Director of the Bureau of Prisons shall transmit

to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report describing the Bureau's utilization of community corrections facilities. Each report under this paragraph shall set forth the number and percentage of Federal prisoners placed in community corrections facilities during the preceding year, the average length of such placements, trends in such utilization, the reasons some prisoners are not placed in community corrections facilities, and number of prisoners not being placed in community corrections facilities for each reason set forth, and any other information that may be useful to the committees in determining if the Bureau is utilizing community corrections facilities in an effective manner.

**(6) Issuance of regulations.**--The Director of the Bureau of Prisons shall issue regulations pursuant to this subsection not later than 90 days after the date of the enactment of the Second Chance Reauthorization Act of 2018, which shall ensure that placement in a community correctional facility by the Bureau of Prisons is--

**(A)** conducted in a manner consistent with section 3621(b) of this title;

**(B)** determined on an individual basis; and

**(C)** of sufficient duration to provide the greatest likelihood of successful reintegration into the community.

**(d) Allotment of clothing, funds, and transportation.**--Upon the release of a prisoner on the expiration of the prisoner's term of imprisonment, the Bureau of Prisons shall furnish the prisoner with--

**(1)** suitable clothing;

**(2)** an amount of money, not more than $500, determined by the Director to be consistent with the needs of the offender and the public interest, unless the Director determines that the financial position of the offender is such that no sum should be furnished; and

**(3)** transportation to the place of the prisoner's conviction, to the prisoner's bona fide residence within the United States, or to such other place within the United States as may be authorized by the Director.

**(e) Supervision after release.**--A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court. The term of supervised release commences on the day the person is released from imprisonment and runs concurrently with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during the term of supervised release. A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days. Upon the release of a prisoner by the Bureau of Prisons to supervised release, the Bureau of Prisons shall notify such prisoner, verbally and in writing, of the requirement that the prisoner adhere to an installment schedule, not to exceed 2 years except in special circumstances, to pay for any fine imposed for the offense committed by such prisoner, and of the consequences of failure to pay such fines under sections 3611 through 3614 of this title.

**(f) Mandatory functional literacy requirement.--**

**(1)** The Attorney General shall direct the Bureau of Prisons to have in effect a mandatory functional literacy program for all mentally capable inmates who are not functionally literate in each Federal correctional institution within 6 months from the date of the enactment of this Act.

**(2)** Each mandatory functional literacy program shall include a requirement that each inmate participate in such program for a mandatory period sufficient to provide the inmate with an adequate opportunity to achieve functional literacy, and appropriate incentives which lead to successful completion of such programs shall be developed and implemented.

**(3)** As used in this section, the term "functional literacy" means--

**(A)** an eighth grade equivalence in reading and mathematics on a nationally recognized standardized test;

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** functional competency or literacy on a nationally recognized criterion-referenced test; or

**(C)** a combination of subparagraphs (A) and (B).

**(4)** Non-English speaking inmates shall be required to participate in an English-As-A-Second-Language program until they function at the equivalence of the eighth grade on a nationally recognized educational achievement test.

**(5)** The Chief Executive Officer of each institution shall have authority to grant waivers for good cause as determined and documented on an individual basis.

**(g) Prerelease custody or supervised release for risk and needs assessment system participants.**--

**(1) Eligible prisoners.**--This subsection applies in the case of a prisoner (as such term is defined in section 3635) who--

**(A)** has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

**(B)** has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

**(C)** has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

**(D)(i)** in the case of a prisoner being placed in prerelease custody, the prisoner--

**(I)** has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

**(II)** has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that--

   **(aa)** the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

   **(bb)** the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

   **(cc)** the prisoner is unlikely to recidivate; or

**(ii)** in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner.

**(2) Types of prerelease custody.**--A prisoner shall be placed in prerelease custody as follows:

**(A) Home confinement.**--

   **(i) In general.**--A prisoner placed in prerelease custody pursuant to this subsection who is placed in home confinement shall--

      **(I)** be subject to 24-hour electronic monitoring that enables the prompt identification of the prisoner, location, and time, in the case of any violation of subclause (II);

      **(II)** remain in the prisoner's residence, except that the prisoner may leave the prisoner's home in order to, subject to the approval of the Director of the Bureau of Prisons--

         **(aa)** perform a job or job-related activities, including an apprenticeship, or participate in job-seeking activities;

**(bb)** participate in evidence-based recidivism reduction programming or productive activities assigned by the System, or similar activities;

**(cc)** perform community service;

**(dd)** participate in crime victim restoration activities;

**(ee)** receive medical treatment;

**(ff)** attend religious activities; or

**(gg)** participate in other family-related activities that facilitate the prisoner's successful reentry such as a family funeral, a family wedding, or to visit a family member who is seriously ill; and

**(III)** comply with such other conditions as the Director determines appropriate.

**(ii) Alternate means of monitoring.**--If the electronic monitoring of a prisoner described in clause (i)(I) is infeasible for technical or religious reasons, the Director of the Bureau of Prisons may use alternative means of monitoring a prisoner placed in home confinement that the Director determines are as effective or more effective than the electronic monitoring described in clause (i)(I).

**(iii) Modifications.**--The Director of the Bureau of Prisons may modify the conditions described in clause (i) if the Director determines that a compelling reason exists to do so, and that the prisoner has demonstrated exemplary compliance with such conditions.

**(iv) Duration.**--Except as provided in paragraph (4), a prisoner who is placed in home confinement shall remain in home confinement until the prisoner has served not less than 85 percent of the prisoner's imposed term of imprisonment.

**(B) Residential reentry center.**--A prisoner placed in prerelease custody pursuant to this subsection who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate.

**(3) Supervised release.**--If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment pursuant to section 3583, the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632.

**(4) Determination of conditions.**--In determining appropriate conditions for prisoners placed in prerelease custody pursuant to this subsection, the Director of the Bureau of Prisons shall, to the extent practicable, provide that increasingly less restrictive conditions shall be imposed on prisoners who demonstrate continued compliance with the conditions of such prerelease custody, so as to most effectively prepare such prisoners for reentry.

**(5) Violations of conditions.**--If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the remainder of the term of imprisonment to which the prisoner was sentenced, or any portion thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons shall revoke the prisoner's prerelease custody.

**(6) Issuance of guidelines.**--The Attorney General, in consultation with the Assistant Director for the Office of Probation and Pretrial Services, shall issue guidelines for use by the Bureau of Prisons in determining--

**(A)** the appropriate type of prerelease custody or supervised release and level of supervision for a prisoner placed on prerelease custody pursuant to this subsection; and

**(B)** consequences for a violation of a condition of such prerelease custody by such a prisoner, including a return to prison and a reassessment of evidence-based recidivism risk level under the System.

**(7) Agreements with United States Probation and Pretrial Services.**--The Director of the Bureau of Prisons shall, to the greatest extent practicable, enter into agreements with United States Probation and Pretrial Services to supervise prisoners placed in home confinement under this subsection. Such agreements shall--

   **(A)** authorize United States Probation and Pretrial Services to exercise the authority granted to the Director pursuant to paragraphs (3) and (4); and

   **(B)** take into account the resource requirements of United States Probation and Pretrial Services as a result of the transfer of Bureau of Prisons prisoners to prerelease custody or supervised release.

**(8) Assistance.**--United States Probation and Pretrial Services shall, to the greatest extent practicable, offer assistance to any prisoner not under its supervision during prerelease custody under this subsection.

**(9) Mentoring, reentry, and spiritual services.**--Any prerelease custody into which a prisoner is placed under this subsection may not include a condition prohibiting the prisoner from receiving mentoring, reentry, or spiritual services from a person who provided such services to the prisoner while the prisoner was incarcerated, except that the warden of the facility at which the prisoner was incarcerated may waive the requirement under this paragraph if the warden finds that the provision of such services would pose a significant security risk to the prisoner, persons who provide such services, or any other person. The warden shall provide written notice of any such waiver to the person providing such services and to the prisoner.

**(10) Time limits inapplicable.**--The time limits under subsections (b) and (c) shall not apply to prerelease custody under this subsection.

**(11) Prerelease custody capacity.**--The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners.

**CREDIT(S)**

**SPA-45**

(Added Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2008; amended Pub.L. 99-646, §§ 16(a), 17(a), Nov. 10, 1986, 100 Stat. 3595; Pub.L. 101-647, Title XXIX, §§ 2902(a), 2904, Nov. 29, 1990, 104 Stat. 4913; Pub.L. 103-322, Title II, §§ 20405, 20412, Sept. 13, 1994, 108 Stat. 1825, 1828; Pub.L. 104-66, Title I, § 1091(c), Dec. 21, 1995, 109 Stat. 722; Pub.L. 104-134, Title I, § 101[(a)][Title VIII, § 809(c)], Apr. 26, 1996, 110 Stat.1321-76; renumbered Title I, Pub.L. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327; Pub.L. 110-177, Title V, § 505, Jan. 7, 2008, 121 Stat. 2542; Pub.L. 110-199, Title II, § 251(a), Apr. 9, 2008, 122 Stat. 692; Pub.L. 115-391, Title I, § 102(b)(1), Title V, § 504(c), Title VI, § 602, Dec. 21, 2018, 132 Stat. 5210, 5233, 5238.)

Notes of Decisions (142)

Footnotes

1    So in original. Probably should be followed by a comma.

18 U.S.C.A. § 3624, 18 USCA § 3624

Current through P.L. 118-65. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-46

---

> United States Code Annotated
> > Title 18. Crimes and Criminal Procedure (Refs & Annos)
> > > Part II. Criminal Procedure
> > > > Chapter 232. Miscellaneous Sentencing Provisions

18 U.S.C.A. § 3663A

§ 3663A. Mandatory restitution to victims of certain crimes

Effective: December 4, 2020
Currentness

**(a)(1)** Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

**(2)** For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

**(3)** The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense.

**(b)** The order of restitution shall require that such defendant--

**(1)** in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--

**(A)** return the property to the owner of the property or someone designated by the owner; or

**(B)** if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to--

    **(i)** the greater of--

        **(I)** the value of the property on the date of the damage, loss, or destruction; or

        **(II)** the value of the property on the date of sentencing, less

    **(ii)** the value (as of the date the property is returned) of any part of the property that is returned;

**(2)** in the case of an offense resulting in bodily injury to a victim--

    **(A)** pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

    **(B)** pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

    **(C)** reimburse the victim for income lost by such victim as a result of such offense;

**(3)** in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

**(4)** in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

**(c)(1)** This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense--

**(A)** that is--

**(i)** a crime of violence, as defined in section 16;

**(ii)** an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;

**(iii)** an offense described in section 3 of the Rodchenkov Anti-Doping Act of 2019;

**(iv)** an offense described in section 1365 (relating to tampering with consumer products); or

**(v)** an offense under section 670 (relating to theft of medical products); and

**(B)** in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

**(2)** In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

**(3)** This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) or (iii) if the court finds, from facts on the record, that--

**(A)** the number of identifiable victims is so large as to make restitution impracticable; or

§ 3663A. Mandatory restitution to victims of certain crimes, 18 USCA § 3663A

**(B)** determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

**(d)** An order of restitution under this section shall be issued and enforced in accordance with section 3664.

## CREDIT(S)

(Added Pub.L. 104-132, Title II, § 204(a), Apr. 24, 1996, 110 Stat. 1227; amended Pub.L. 106-310, Div. B, Title XXXVI, § 3613(d), Oct. 17, 2000, 114 Stat. 1230; Pub.L. 112-186, § 6, Oct. 5, 2012, 126 Stat. 1430; Pub.L. 116-206, § 5, Dec. 4, 2020, 134 Stat. 1000.)

Notes of Decisions (474)

18 U.S.C.A. § 3663A, 18 USCA § 3663A
Current through P.L. 118-65. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

> United States Code Annotated
>    Title 18. Crimes and Criminal Procedure (Refs & Annos)
>       Part II. Criminal Procedure
>          Chapter 232. Miscellaneous Sentencing Provisions

18 U.S.C.A. § 3664

§ 3664. Procedure for issuance and enforcement of order of restitution

Effective: November 2, 2002
Currentness

**(a)** For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

**(b)** The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

**(c)** The provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to proceedings under this section.

**(d)(1)** Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

**(2)** The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable--

**(A)** provide notice to all identified victims of--

**(i)** the offense or offenses of which the defendant was convicted;

**(ii)** the amounts subject to restitution submitted to the probation officer;

**(iii)** the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;

**(iv)** the scheduled date, time, and place of the sentencing hearing;

**(v)** the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and

**(vi)** the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

**(B)** provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

**(3)** Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

**(4)** After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

**(5)** If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall

set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

**(6)** The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

**(e)** Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

**(f)(1)(A)** In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

**(B)** In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

**(2)** Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--

  **(A)** the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

  **(B)** projected earnings and other income of the defendant; and

§ 3664. Procedure for issuance and enforcement of order of restitution, 18 USCA § 3664

**(C)** any financial obligations of the defendant; including obligations to dependents.

**(3)(A)** A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

**(B)** A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

**(4)** An in-kind payment described in paragraph (3) may be in the form of--

**(A)** return of property;

**(B)** replacement of property; or

**(C)** if the victim agrees, services rendered to the victim or a person or organization other than the victim.

**(g)(1)** No victim shall be required to participate in any phase of a restitution order.

**(2)** A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments.

**(h)** If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

# SPA-54

**(i)** If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.

**(j)(1)** If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

**(2)** Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in--

   **(A)** any Federal civil proceeding; and

   **(B)** any State civil proceeding, to the extent provided by the law of the State.

**(k)** A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

**(l)** A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.

**(m)(1)(A)(i)** An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or

**(ii)** by all other available and reasonable means.

**(B)** At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order. Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the district court is located, the abstract of judgment shall be a lien on the property of the defendant located in such State in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

**(2)** An order of in-kind restitution in the form of services shall be enforced by the probation officer.

**(n)** If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.

**(o)** A sentence that imposes an order of restitution is a final judgment notwithstanding the fact that--

  **(1)** such a sentence can subsequently be--

    **(A)** corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;

    **(B)** appealed and modified under section 3742;

    **(C)** amended under subsection (d)(5); or

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 3664. Procedure for issuance and enforcement of order of restitution, 18 USCA § 3664

    **(D)** adjusted under section 3664(k), 3572, or 3613A; or

    **(2)** the defendant may be resentenced under section 3565 or 3614.

**(p)** Nothing in this section or sections 2248, 2259, 2264, 2327, 3663, and 3663A and arising out of the application of such sections, shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or employee of the United States.

## CREDIT(S)

(Added Pub.L. 97-291, § 5(a), Oct. 12, 1982, 96 Stat. 1255, § 3580; renumbered § 3664, Pub.L. 98-473, Title II, § 212(a)(1), Oct. 12, 1984, 98 Stat. 1987; amended Pub.L. 101-647, Title XXXV, § 3596, Nov. 29, 1990, 104 Stat. 4931; Pub.L. 104-132, Title II, § 206(a), Apr. 24, 1996, 110 Stat. 1232; Pub.L. 107-273, Div. B, Title IV, § 4002(e)(1), Nov. 2, 2002, 116 Stat. 1810.)

Notes of Decisions (486)

18 U.S.C.A. § 3664, 18 USCA § 3664
Current through P.L. 118-65. Some statute sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-57

---

Code of Federal Regulations
 Title 28. Judicial Administration
  Chapter V. Bureau of Prisons, Department of Justice
   Subchapter B. Inmate Admission, Classification, and Transfer
    Part 523. Computation of Sentence (Refs & Annos)
     Subpart E. First Step Act Time Credits (Refs & Annos)

28 C.F.R. § 523.41

§ 523.41 Definitions.

Effective: January 19, 2022
Currentness

(a) Evidence–Based Recidivism Reduction (EBRR) Program. An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:

(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

(2) Family relationship building, structured parent-child interaction, and parenting skills;

(3) Classes on morals or ethics;

(4) Academic classes;

(5) Cognitive behavioral treatment;

(6) Mentoring;

(7) Substance abuse treatment;

(8) Vocational training;

(9) Faith-based classes or services;

(10) Civic engagement and reintegrative community services;

(11) Inmate work and employment opportunities;

(12) Victim impact classes or other restorative justice programs; and

(13) Trauma counseling and trauma-informed support programs.

(b) Productive Activity (PA). A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.

(c) Successful participation.

(1) An eligible inmate must be "successfully participating" in EBRR Programs or PAs to earn FSA Time Credits for those EBRR Programs or PAs.

(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.

(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:

(i) Placement in a Special Housing Unit;

(ii) Designation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);

(iii) Temporary transfer to the custody of another Federal or non–Federal government agency (e.g., on state or Federal writ, transfer to state custody for service of sentence, etc.);

(iv) Placement in mental health/psychiatric holds; or

(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.

(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation (see this part).

(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA, until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).

(d) Eligible inmate—

## SPA-60

(1) Eligible to earn FSA Time Credits. An inmate who is eligible to earn FSA Time Credits is an eligible inmate for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is eligible to earn FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.

(2) Exception. If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not eligible to earn FSA Time Credits.

SOURCE: 54 FR 32028, Aug. 3, 1989; 62 FR 50787, Sept. 26, 1997; 70 FR 66754, Nov. 3, 2005; 87 FR 2717, Jan. 19, 2022, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

Current through June 28, 2024, 89 FR 54327. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-61

---

United States Code Annotated
  Federal Sentencing Guidelines (Refs & Annos)
    Chapter Three. Adjustments (Refs & Annos)
      Part B. Role in the Offense (Refs & Annos)

USSG, § 3B1.1, 18 U.S.C.A.

§ 3B1.1. Aggravating Role

Currentness

Based on the defendant's role in the offense, increase the offense level as follows:

**(a)** If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

**(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

**(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

## CREDIT(S)

(Effective November 1, 1987; amended effective November 1, 1991; November 1, 1993.)

## COMMENTARY

*<Application Notes:>*

<**1.** A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.>

<**2.** To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.>

<**3.** In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.>

<**4.** In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.>

<***Background:*** *This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.*>

<In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).>

**SPA-63**

Notes of Decisions (1079)

Federal Sentencing Guidelines, § 3B1.1, 18 U.S.C.A., FSG § 3B1.1
As amended to 3-15-22.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Federal Sentencing Guidelines (Refs & Annos)
        Chapter Three. Adjustments (Refs & Annos)
            Part B. Role in the Offense (Refs & Annos)

USSG, § 3B1.3, 18 U.S.C.A.

§ 3B1.3. Abuse of Position of Trust or Use of Special Skill

Currentness

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

**CREDIT(S)**

(Effective November 1, 1987; amended effective November 1, 1990; November 1, 1993; November 1, 1998; November 1, 2001; November 1, 2005; November 1, 2009.)

**COMMENTARY**

*<Application Notes:>*

<**1. Definition of "Public or Private Trust".--**"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement

of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.>

<**2. Application of Adjustment in Certain Circumstances.**--Notwithstanding Application Note 1, or any other provision of this guideline, an adjustment under this guideline shall apply to the following:>

   <**(A)** An employee of the United States Postal Service who engages in the theft or destruction of undelivered United States mail.>

   <**(B)** A defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification. "Means of identification" has the meaning given that term in 18 U.S.C. § 1028(d)(7). The following are examples to which this subdivision would apply: (i) An employee of a state motor vehicle department who exceeds or abuses the authority of his or her position by knowingly issuing a driver's license based on false, incomplete, or misleading information; (ii) a hospital orderly who exceeds or abuses the authority of his or her position by obtaining or misusing patient identification information from a patient chart; and (iii) a volunteer at a charitable organization who exceeds or abuses the authority of his or her position by obtaining or misusing identification information from a donor's file.>

<**3.** This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who (A) perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker; or (B) perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician. In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately.>

<**4.** "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.>

<**5.** The following additional illustrations of an abuse of a position of trust pertain to theft or embezzlement from employee pension or welfare benefit plans or labor unions:>

<**(A)** If the offense involved theft or embezzlement from an employee pension or welfare benefit plan and the defendant was a fiduciary of the benefit plan, an adjustment under this section for abuse of a position of trust will apply. "Fiduciary of the benefit plan" is defined in 29 U.S.C. § 1002(21)(A) to mean a person who exercises any discretionary authority or control in respect to the management of such plan or exercises authority or control in respect to management or disposition of its assets, or who renders investment advice for a fee or other direct or indirect compensation with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or who has any discretionary authority or responsibility in the administration of such plan.>

<**(B)** If the offense involved theft or embezzlement from a labor union and the defendant was a union officer or occupied a position of trust in the union (as set forth in 29 U.S.C. § 501(a)), an adjustment under this section for an abuse of a position of trust will apply.>

<***Background:*** *This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime. The adjustment also applies to persons who provide sufficient indicia to the victim that they legitimately hold a position of public or private trust when, in fact, they do not. Such persons generally are viewed as more culpable.*>

Notes of Decisions (408)

Federal Sentencing Guidelines, § 3B1.3, 18 U.S.C.A., FSG § 3B1.3
As amended to 3-15-22.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          3