# 24-849

*To Be Argued By*:
CATHERINE M. MIRABILE

---

# United States Court of Appeals

### For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

MATHEW JAMES,

*Defendant-Appellant.*

---

**On Appeal From The United States District Court
For The Eastern District of New York**

---

## BRIEF FOR THE UNITED STATES

---

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

DAVID C. JAMES,
AMY BUSA,
ANTOINETTE N. RANGEL,
CATHERINE M. MIRABILE,
 *Assistant United States Attorneys,*
MIRIAM L. GLASER DAUERMANN,
 *Trial Attorney,*
  *Of Counsel*

i

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................... iv

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ........................................................................ 3

    I.    The Indictment ..................................................................... 3

    II.    The Trial ............................................................................. 3

    III.    The Evidence ...................................................................... 4

        A.    James's Medical Billing Businesses ............................. 4

        B.    The Falsification of Insurance Claims ........................... 6

            1.    Falsified Claim Forms ......................................... 6

            2.    Falsified Operative Reports ................................. 9

            3.    Falsely Billing Cosmetic Procedures as Medically Necessary ....................................... 9

            4.    Unnecessary Emergency Room Visits ............... 10

        C.    The Impersonations ..................................................... 11

        D.    James's Attempts to Conceal his Conduct ................. 14

            1.    Use of Rotating Telephone Numbers ................. 14

            2.    Destruction of Evidence ..................................... 14

            3.    Use of a False Name .......................................... 15

        E.    James's Profits from the Scheme ................................. 16

    IV.    The Jury Deliberations and Conviction ............................... 16

V.    The Sentencing.......................................................17

ARGUMENT ..............................................................19

POINT ONE - THE DISTRICT COURT DID NOT ERR IN HANDLING THE JURY'S POTENTIAL EXPOSURE TO UNADMITTED TRANSCRIPTS ...................................19

I.    Applicable Law................................................19

II.    Discussion.......................................................21

POINT TWO - THE DISTRICT COURT PROPERLY CALCULATED THE SENTENCING GUIDELINES................................................28

I.    THE DISTRICT COURT PROPERLY APPLIED THE FOUR-LEVEL ROLE ENHANCEMENT ...................30

    A.    Applicable Law................................................30

    B.    Discussion.......................................................32

II.    THE DISTRICT COURT PROPERLY APPLIED THE ABUSE-OF-TRUST ENHANCEMENT......................39

    A.    Applicable Law................................................39

    B.    Discussion.......................................................40

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION DURING SENTENCING IN ITS CONSIDERATION OF THE FSA AND RDAP ...................45

    A.    Applicable Law................................................45

    B.    Discussion.......................................................46

POINT THREE - THE DISTRICT COURT PROPERLY CALCULATED FORFEITURE ................................52

I.    Applicable Law ........................................................ 52

II.   Discussion .............................................................. 53

POINT FOUR - THE DISTRICT COURT CONSERVATIVELY
          CALCULATED RESTITUTION .................................. 60

I.    Applicable Law ........................................................ 60

II.   Discussion .............................................................. 62

POINT FIVE - REASSIGNMENT IN THE EVENT OF
          REMAND IS UNWARRANTED .................................. 74

CONCLUSION ..................................................................... 77

iv

## TABLE OF AUTHORITIES

Page

### CASES

Bibbins v. Dalsheim,
  21 F.3d 13 (2d Cir. 1994) ....................................................... 19

Gonzales v. Hasty,
  802 F.3d 212 (2d Cir. 2015) .................................................. 74

Honeycutt v. United States,
  581 U.S. 443 (2017) ............................................................... 52

Pepper v. United States,
  562 U.S. 476 (2011) ........................................................ 45, 46

United States ex rel. Owen v. McMann,
  435 F.2d 813 (2d Cir. 1970) ................................................. 19

United States v. Abdelshafi,
  592 F.3d 602 (4th Cir. 2010) ............................................... 44

United States v. Abrams,
  137 F.3d 704 (2d Cir. 1998) ................................................. 23

United States v. Allen,
  201 F.3d 163 (2d Cir. 2000) .......................................... 40, 43

United States v. Alston,
  899 F.3d 135 (2d Cir. 2018) ................................................. 39

United States v. Archer,
  671 F.3d 149 (2d Cir. 2011) ................................................. 31

United States v. Awadallah,
  436 F.3d 125 (2d Cir. 2006) .......................................... 74, 76

United States v. Bikundi,
  926 F.3d 761 (D.C. Cir. 2019) ............................................. 55

v

United States v. Boccagna,
    450 F.3d 107 (2d Cir. 2006) ................................................................ 60

United States v. Castagnet,
    936 F.2d 57 (2d Cir. 1991) .................................................................. 40

United States v. Chang An-Lo,
    851 F.2d 547 (2d Cir. 1988) .......................................................... 19-20

United States v. Cramer,
    777 F.3d 597 (2d Cir. 2015) ................................................................ 30

United States v. Cuevas,
    496 F.3d 256 (2d Cir. 2007) ................................................................ 62

United States v. Elfgeeh,
    515 F.3d 100 (2d Cir. 2008) ................................................................ 75

United States v. Farhane,
    634 F.3d 127 (2d Cir. 2011) .................................................... 23, 24, 25

United States v. Fowler,
    948 F.3d 663 (4th Cir. 2020) .................................................. 46, 47, 50

United States v. Fruchter,
    411 F.3d 377 (2d Cir. 2005) ................................................................ 52

United States v. Greer,
    285 F.3d 158 (2d Cir. 2002) ........................................................ 20, 23

United States v. Gushlak,
    728 F.3d 184 (2d Cir. 2013) ........................................................ 60, 61

United States v. Hirsch,
    239 F.3d 221 (2d Cir. 2001) ........................................................ 40, 44

United States v. Jafari,
    663 F. App'x 18 (2d Cir. 2016) .................................................... 58, 73

United States v. Katsman,
    551 F. App'x 601 (2d Cir. 2014) ........................................................ 32

United States v. Martin,
  100 F.3d 46 (7th Cir. 1996) ...................................................... 49, 50 n.8

United States v. Mi Sun Cho,
  713 F.3d 716 (2d Cir. 2013) ................................................................ 31

United States v. Napoli,
  179 F.3d 1 (2d Cir. 1999) ................................................................... 38

United States v. Norman,
  776 F.3d 67 (2d Cir. 2015) ................................................................ 31

United States v. Ntshona,
  156 F.3d 318 (2d Cir. 1998) .............................................................. 43

United States v. Pearson,
  570 F.3d 480 (2d Cir. 2009) .............................................................. 61

United States v. Peterson,
  385 F.3d 127 (2d Cir. 2004) .................................................... 23, 24, 25

United States v. Porter,
  90 F.3d 64 (2d Cir. 1996) .................................................................. 61

United States v. Rainford,
  110 F.4th 455 (2d Cir. 2024) ............................................................. 38

United States v. Roberts,
  660 F.3d 149 (2d Cir. 2011) ........................................................ 52, 53

United States v. Roberts,
  919 F.3d 980 (6th Cir. 2019) ...................................................... 46, 50

United States v. Robin,
  553 F.2d 8 (2d Cir. 1977) .................................................................. 74

United States v. Rossi,
  592 F.3d 372 (2d Cir. 2010) .............................................................. 61

United States v. Salameh,
  152 F.3d 88 (2d Cir. 1998) ................................................................ 22

United States v. Salazar,
    489 F.3d 555 (2d Cir. 2007) ..............................................30

United States v. Schwarz,
    283 F.3d 76 (2d Cir. 2002) ...............................................20

United States v. Thomas,
    116 F.3d 606 (2d Cir. 1997) ..............................................23

United States v. Thorn,
    317 F.3d 107 (2d Cir. 2003) ............................................. 40

United States v. Tocco,
    135 F.3d 116 (2d Cir. 1998) ..............................46-47, 50 n.8

United States v. Treacy,
    639 F.3d 32 (2d Cir. 2011) ..........................................53, 58

United States v. Tucker,
    404 U.S. 443 (1972)........................................................45

United States v. Uddin,
    551 F.3d 176 (2d Cir. 2009) ..............................................61

United States v. Warshak,
    631 F.3d 266 (6th Cir. 2010)..............................................55

United States v. Weiss,
    752 F.2d 777 (2d Cir. 1985) .........................................19, 20

United States v. Williams,
    441 F. App'x 52 (2d Cir. 2011) ..........................................44

Wisconsin v. Mitchell,
    508 U.S. 476 (1993).........................................................45

Witte v. United States,
    515 U.S. 389 (1995).........................................................46

## STATUTES

18 U.S.C. § 34 .................................................................50 n.8

18 U.S.C. § 982(a)(7).............................................................51

18 U.S.C. § 982(b)(1).............................................................51

18 U.S.C. § 3553(a) ......................................................... passim

18 U.S.C. § 3553(a)(2)(A).........................................................47

18 U.S.C. § 3553(a)(2)(B).........................................................47

18 U.S.C. § 3553(a)(2)(C).........................................................47

18 U.S.C. § 3661 ................................................................45

18 U.S.C. § 3663A(a)(1)..........................................................60

18 U.S.C. § 3664(e) .............................................................60

21 U.S.C. § 853(p)...............................................................52

28 U.S.C. § 2461(c) .............................................................52

## U.S. SENTENCING GUIDELINES

U.S.S.G. § 1B1.4 ................................................................45

U.S.S.G. § 2B1.1 ................................................................28

U.S.S.G. § 2B1.1(b)(10)(C).......................................................28

U.S.S.G. § 3B1.1(a)......................................................28, 30, 31

U.S.S.G. § 3B1.1, comment. (n.1)..................................................31

U.S.S.G. § 3B1.1, comment. (n.3)..................................................31

U.S.S.G. § 3B1.1, comment. (n.4)..............................................32, 36

U.S.S.G. § 3B1.3 ........................................................28, 39, 44, 45

U.S.S.G. § 3B1.3, comment. (n.1) ....................................................... 39, 42

U.S.S.G. § 3B1.3, comment. (n.2(B)) ...................................................... 44

U.S.S.G. § 3C1.1 .......................................................................... 28

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 24-849

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

MATHEW JAMES,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Defendant-Appellant Mathew James appeals from a judgment entered on March 20, 2024, in the United States District Court for the Eastern District of New York (Seybert, J.), convicting him, after a jury trial, of conspiracy to commit health care fraud, health care fraud, wire fraud, and aggravated identity theft and sentencing him principally to 12 years' imprisonment and two years' supervised release; and

2

ordering him to pay $336,996,416.85 in restitution and forfeiture of $63,382,049.02.

On appeal, James contends that the district court (1) mishandled the jury's potential exposure to unadmitted transcripts; (2) miscalculated his Sentencing Guidelines range; (3) erroneously added two years to James's sentence to account for potential reductions in prison time; (4) miscalculated forfeiture; and (5) miscalculated restitution. James also seeks reassignment to a different judge on remand.

As we show below, James's arguments lack merit.

3

## STATEMENT OF FACTS

### I. The Indictment

On December 12, 2019, a grand jury sitting in the Eastern District of New York returned a superseding indictment against James, charging him with conspiracy to commit health care fraud and a related substantive count, in violation of 18 U.S.C. §§ 1347 and 1349; wire fraud, in violation of 18 U.S.C. § 1343; aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 1028A(c)(5); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

### II. The Trial

At trial, the government called 26 witnesses and introduced extensive documentary evidence. On July 13, 2022, the jury convicted James of conspiracy to commit health care fraud, health care fraud, wire fraud, and aggravated identity theft (Counts One through Eight). (A:18). James subsequently moved pursuant to Fed. R. Crim. P. 29 for a judgment of acquittal, which the court denied. (GA:1-37).[1]

---

[1] " A," "Br.," "GA," "SA," and "DE" refer to James's appendix, James's brief, the government's appendix, the government's sealed appendix, and entries on the district court's docket, respectively. "T" and "GX" refer to the trial transcript and government's exhibits at trial.

III.  The Evidence

James perpetrated a large-scale scheme to defraud insurance companies that involved: (1) falsifying claims sent to insurance companies; (2) falsifying operative reports by which his co-conspirator doctor-clients documented the medical procedures he billed; (3) directing patients to use the emergency room for pre-planned surgeries; and (4) impersonating patients and their family members in calls to insurance companies. James concealed his crimes by purchasing hundreds of telephone lines to disguise his call activity, deleting text and email messages, and using a false identity. James earned over $63 million through his fraud, which he spent on mansions, vehicles, and luxury goods, and caused over $600 million in losses to his victims.

A.  James's Medical Billing Businesses

James, a trained medical biller and former nurse, owned and operated a medical billing company, Leale Inc. ("Leale"),[2] located in his basement in East Northport, New York. (A:207, 356). Doctors retained James to submit their high-dollar value, out-of-network claims to

---

[2]  Leale underwent several name changes during the investigation. (A:25). "Leale" refers to all iterations of James's company.

5

insurance companies. (E.g., A:208). James's doctor-clients provided him with patient and insurance information and operative reports that reflected the treatment they had purportedly performed. (T:1513-16). In exchange, James's doctor-clients paid him approximately 10-12% of the insurance reimbursements from claims he had submitted. (A:231, 269-70).

Through Leale, James employed two to three employees at a time—usually young women with little to no medical billing experience—and an older woman who worked off-site. James operated Leale as its sole owner, directing and controlling the company. (A:123, 153). He trained employees to review operative reports, identify key terms and procedures, and translate that information into Current Procedural Terminology ("CPT") coding on the insurance claim forms. He reviewed and approved every line of every claim submitted to insurance companies. (A:121-22, 209, 213).

At James's direction and under his close supervision, his employees reviewed the doctor-clients' operative reports; translated the information contained therein into CPT codes for the medical procedures performed; drafted insurance claim forms ("Forms 1500") using the CPT

codes; mailed claims to insurance companies; called insurance companies about the status of claims; and logged adjudicated claims into the company's claim tracking system. (GA:164, 179, 212-21; A:210). When insurance companies denied all or part of the claims, his employees prepared appeals packages, which James then used to impersonate patients. (GA:169-73, 183-85).

James retained the profits from Leale's billing activities. (GA:420-22). Thereafter, James used the proceeds to purchase real estate and luxury goods. (GA:358-60, 423-41).

B.    The Falsification of Insurance Claims

1.    Falsified Claim Forms

The core of James's scheme was his falsification of insurance claims so that they reflected more serious (and therefore more expensive) procedures than had occurred—a fraud known as "upcoding." (GA:6-7). For example, James directed his employees to add certain codes to the claim forms when the procedures to which the codes referred had either not happened or not occurred as they were coded. (GA:10-11). Had they been aware of these inaccuracies, the insurance companies would have denied the claims (GA:124-26, 264-66)—in part because these codes

permitted James to justify significantly higher reimbursement demands than would have applied to the performed procedures (GA:238, 258).

Testifying patients described the same conduct as James's employees. For example, Andrew Sperber testified that James billed for the repair of a small laceration for his daughter using the code for debridement of an open fracture. (GA:33). Similarly, Denise Baker testified that she had sustained a minor cut to her finger, but that the doctor who tended her wound had not removed anything; James billed for the removal of a foreign body from her cut. (GA:11). Other patients testified that their procedures had been billed as far more complex than they were—Susan Breidenbach sustained a cut to her finger that required 11 stitches, but James billed for hand reconstructive surgery and continued to pursue the bill even after receiving emails stating that no surgery had occurred. (GA:21). Marcus Smart testified that he injured his hand and his surgeon had informed him that there was no damage to his tendons; James nonetheless billed codes reflecting the repair of injured tendons. (GA:36).

To ensure that his employees used the upcoded codes rather than the correct ones, James trained them to look for key terms in the

operative reports, such as "debridement" or "fracture," and to bill an upcoded CPT code whenever those appeared. (GA:10). When his employees did not use those codes, James revised the relevant form (known as the Form 1500) so that it reflected the codes he wanted. (GA:168, 181, 234-37). When necessary, James overruled his doctor-clients' instructions as to the appropriate codes for the procedures, directing his employees to use the more lucrative codes despite the doctors' instructions. (GA:226, 513).

James also directed his employees to "unbundle" claims by affixing CPT modifier code 59 ("Modifier 59") to claim lines. (GA:15-17). Insurance companies typically have automated claim evaluation ("auto-adjudication") systems that detect and re-bundle codes that should be listed together; the existence and function of the auto-adjudication system is well-known within medical billing. (Id.). These systems can be bypassed by affixing Modifier 59, which falsely tells the insurance company that the component procedures in the bundle were each performed separately, and that it should therefore pay for each component procedure. (Id.).

9

### 2. Falsified Operative Reports

James conspired with his doctor-clients to falsify operative reports to justify the codes James wanted to bill. James repeatedly instructed doctor-clients to change their reports to justify higher-paying CPT codes. (GA:25-26). For example, James directed one doctor-client to increase the reported size of a wound and another to add procedures to the operative report. (GA:26). As James explained to his doctor-clients, with the larger wound size he could bill more lucrative codes. (GA:542). James revised operative reports to ensure that they contained the key words that he had trained his employees to find in upcoding claims, such as "debridement." (GA:27).

### 3. Falsely Billing Cosmetic Procedures as Medically Necessary

James further falsified his doctor-clients' operative reports by conspiring with them to bill non-covered elective cosmetic procedures as covered, medically necessary procedures. Victoria Motley testified that she had received tummy-tuck surgery from James's doctor-client, Dr. Charlotte Rhee. (GA:243-56). Rhee's notes from her initial consult with Motley, found on James's billing server, reflected that Motley requested a tummy-tuck. (GA:270, 322-28, 487). Nonetheless, James

submitted a bill to the insurer reporting that Motley had received an emergency hernia repair, a medical procedure covered by insurance. (A:300, 315-16). James exchanged text messages and emails with other doctor-clients regarding manipulation of operative reports to fraudulently render cosmetic procedures reimbursable by insurance. (E.g., GX:706).

### 4. Unnecessary Emergency Room Visits

Another way James executed his scheme was by having his doctor-clients send patients to the emergency room to check in for pre-planned surgeries, resulting in lucrative reimbursements. (A:211, 229-31; GX:751, 754, 756). Heather Quinlivan testified that James asked her to use the emergency room before she was even evaluated for surgery. (GA:55-58). Although Quinlivan told James that her medical condition was not an emergency, he said the emergency room was the "only way" to obtain the surgery that she required. (GA:55, 59-60, 65-67).

Several witnesses testified that their surgeries, done through the emergency room and billed by James as emergencies, had been elective. (E.g., GA:83-88, 92-95, 245-48, 250). For example, Motley was instructed to report to the emergency room for her surgery. (GA:243-45,

11

252). James billed her "hernia repair" as emergency surgery even though her surgery was pre-planned and elective, as reflected in Motley's records from days before her surgery that James possessed. (GA:482-86).

Deja Guzman was similarly directed by her physician, Dr. Amir Tahernia, to report to the emergency room for pre-planned surgery, even though Tahernia wrote Guzman a letter about her operation weeks before, which she submitted to her workplace in anticipation of medical leave. Guzman flew from Florida to California to attend a pre-operative meeting with Tahernia, and his staff directed her to check in for her surgery days later at the emergency room. Guzman's surgery occurred in two pre-planned phases, between which she remained in the hospital. Still, James billed for two emergency surgeries. (GA:28-30).

C.     The Impersonations

Frequently, insurance companies balked at paying a patient's fraudulently inflated claim. James then called the insurance companies and pretended to be the patient or a relative of the patient (the "Impersonation Calls"). (E.g., GA:99-101, 103, 133, 190-91, 193; A:222-23). James stipulated that he had made the Impersonation Calls

(GA:409, 414-17, 568-72), in which he falsely asserted that he was being billed by a doctor for a claim that the insurance companies were unwilling to pay. (GA:62-64, 74-79; GX:6). Impersonating the patient, James pressed insurance companies to pay the full amount that allegedly was being demanded by the physician so that the unpaid medical bills would not be referred to debt collection. (GA:74-79; GX:6). Following James's calls, insurance companies frequently paid large amounts on the previously denied or written-down claims. (E.g., A:281).

James often needed a woman to impersonate a female patient. James employed two women for this purpose: Dolores Persky and Eileen Nash. (GA:97, 128). Persky and Nash testified that James hired them to impersonate female patients, provided them with the patients' personal identifying information, and instructed them to make the same false statements to the insurance companies. (GA:98-99, 105, 130, 132; A:51). Persky and Nash made hundreds, if not thousands, of Impersonation Calls at James's direction. (GA:109-10, 133).

Sometimes, when James was impersonating a female patient's relative, insurance companies requested to speak to the patient to obtain authorization to speak to him. (E.g., GA:200). James then

13

directed employee Christie Cutrone to impersonate that patient and provide authorization for James to continue the conversation. (GA:200-05, 459-62; GX:20, 41).

In making the Impersonation Calls, James used the patients' personal identifying information such as name, date of birth, address, and insurance information. (E.g., GA:202-03, 206). He also provided that information to Persky, Nash, and Cutrone to impersonate patients. (GA:104-06, 131, 202-03, 206). The evidence reflected that, prior to his Impersonation Calls, James was given documents by his employees, which included a fake balance bill reflecting the unpaid amount of the claim, a copy of the Form 1500 containing the patient's information, and any relevant paperwork. (GA:183-85). For patients who were not policy holders, James's employees wrote on the fake balance bill the name of the policy holder and the policy holder's relationship to the patient. (GA:187-89, 195, 198). James received "probably thousands" of such appeal packages of information from Cutrone during her employment. (GA:190).

D.    <u>James's Attempts to Conceal his Conduct</u>

1.    <u>Use of Rotating Telephone Numbers</u>

James prevented insurance companies from learning that he was impersonating patients, including by directing his employees to hang up if their voice was recognized and using hundreds of telephone numbers to call from area codes of the patients or their relatives. (GA:23-24). Beginning around 2014, James contracted with Compu-Phone to obtain phone numbers bearing area codes from across the United States. James arranged with Compu-Phone that the caller ID on the phone numbers would be blocked, would not be sequential, and would be replaced every few months. James and his female impersonators used those phone numbers as their call-back numbers when they contacted insurance companies, ensuring that patients did not receive calls from insurance. (GA:23-24; A:320-22).

2.    <u>Destruction of Evidence</u>

In March 2019, Aetna sued James for his Impersonation Calls. After James learned of the lawsuit, he destroyed evidence to prevent his conduct from being traced to him. James called Compu-Phone, demanded to know how Aetna had "found" him, and cancelled his

15

account. (A:322). James demanded that Nash "get rid of" the computer she used for her work with him. (A:324). At some point between April and October 2019, James deleted his emails with Nash. (Id.).

### 3. Use of a False Name

Although James sought to conceal evidence of his involvement in the scheme after the Aetna lawsuit, his fraudulent conduct against the insurance companies continued. James changed his business model: he stopped making the Impersonation Calls himself, adopted the false name "John Andrews," and began pressuring patients to call the insurance companies and lie about being balance billed. For example, Samuel Brenner testified that he had received calls from his doctor's biller, "John Andrews," in which "Andrews" directed Brenner to call his insurance company and complain about balance billing. Brenner confirmed that "Andrews" told him that no balance bill would be issued, and he was never concerned about an outstanding bill—that the threat of a balance bill was solely a negotiating tactic and that "Andrews" used it all the time. (T:1122-32). Text messages and emails confirmed that "John Andrews" communicated similarly with multiple patients, providing

16

James's cellphone number and once calling himself "Mat."  (GA:24; A:327-29; GX:1241, 1247)).

E.    James's Profits from the Scheme

James received over $63 million in fraudulent proceeds, which were traced into his bank account by a forensic accountant.  (A:269). James's doctor-clients paid him approximately 10-12% of the claims that were paid, meaning that the total amount James's doctor-clients received from the insurance companies during the scheme was between $528,138,742.00 and $633,820,490.20.  (A:269-70).

IV.   The Jury Deliberations and Conviction

On July 12, 2022, the jury began deliberations and was provided with a binder containing the transcripts of the admitted Impersonation Calls.  (A:373).  On the second day of deliberations, the jury sent a note requesting a transcript of a call "between [James] and an employee."  (A:380).  After the court requested clarification (A:391), a further note explained that the jury wished to review the transcript of a call "between [James], as himself, and...an employee – during the FBI raid [of James's office]."  (A:392-93).  After determining that the calls in

question had not been introduced in evidence,[3] the court delivered a limiting instruction ordering the jury to disregard the transcripts. (A:409-10). Shortly thereafter, the jury returned a guilty verdict.[4] (A:411-16).

## V.   The Sentencing

On January 23, 2024 and February 2, 2024, the court conducted the sentencing hearing. During the first day, the court held oral argument as to James's objections to the Pre-Sentence Report ("PSR"), the application of the United States Sentencing Guidelines

---

[3]    There were two proposed government exhibits to which the jury's description applied: GX:1 and GX:2, which were calls that occurred between James and Jennifer Flanagan around the time of the execution of a search warrant at James's office. James did not object to the calls' admission; however, the government did not introduce the calls. Nonetheless, those transcripts were in the jury's transcript binder throughout the trial prior to deliberations, as were all transcripts that the government marked as potential exhibits to which James had no objection. GX:3, which James speculates was also referenced in the jury's note, was a recording of a call made by a former employee, Stephanie Brunner, to an insurance company, not between James and the employee. Moreover, that call occurred years prior to the FBI's search of James's office. GX:3 was never in the jury's transcript binders. (A:395, 401, 404; accord GA:137-38 (government sought permission to add to the jury's binders previously objected-to exhibit that court ruled admissible)).

[4]    James was acquitted on the money laundering conspiracy count.

18

("U.S.S.G." or "Guidelines"), including the applicable loss enhancement and various proposed enhancements, and restitution and forfeiture. (A:558-95, 706-11). The court resolved outstanding objections to the PSR, granting some of James's requested amendments (see A:575), and denying others (e.g., A:580).

On February 2, 2024, the court imposed a sentence of 120 months' imprisonment on Counts 1 through 5, to run consecutively to the mandatory 24-month sentence imposed on Counts 6 through 8, for a total of 144 months. The court ordered payments of $336,996,416.85 in restitution and $63,382,049 in forfeiture. In imposing sentence, the court addressed the § 3553(a) factors and explained that it was not basing its sentence solely on the probable reduction for rehabilitation under the First Step Act ("FSA") (A:723, 725, 733-35, 743), but on "all the factors" courts are required to consider at sentencing (A:725).

ARGUMENT

POINT ONE

THE DISTRICT COURT DID NOT ERR IN HANDLING THE
JURY'S POTENTIAL EXPOSURE TO UNADMITTED TRANSCRIPTS

James argues that the jury was prejudiced by having been exposed to transcripts of calls not in evidence prior to deliberations and the court insufficiently addressed or cured that prejudice.  He is wrong.

I.    Applicable Law

Exposure of the jury to information outside of the trial record is subject to harmless-error analysis.  See Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994); United States v. Weiss, 752 F.2d 777, 782-83 (2d Cir. 1985).   "The touchstone of decision...is...not the mere fact of infiltration of some molecules of extra-record matter...but the nature of what has been infiltrated and the probability of prejudice."  United States ex rel. Owen v. McMann, 435 F.2d 813, 818 (2d Cir. 1970).[5]   A court has wide discretion in determining how to address the intrusion of extra-record information.  See, e.g., United States v. Chang An-Lo, 851 F.2d

---

[5]    When quoting cases, unless otherwise noted, internal citations, quotation marks, and footnotes are omitted and all alterations are adopted.

20

547, 558 (2d Cir. 1988); Weiss, 752 F.2d at 783. The court should "assess the possibility of prejudice by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." Weiss, 752 F.2d at 783.

Although extra-record materials used in jury deliberations are presumptively prejudicial, "not every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial." United States v. Schwarz, 283 F.3d 76, 99 (2d Cir. 2002). When a new trial is sought based on the introduction of extra-record evidence during jury deliberations, the court has broad discretion to deny the motion if it finds, in light of "the nature of the matter and its probable effect on a hypothetical average jury," id., that the impropriety has not had a prejudicial effect, see, e.g., Weiss, 752 F.2d at 783. While in making this determination a court may question jurors about what they learned, after deliberations have begun it "may not inquire into the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." United States v. Greer, 285 F.3d 158, 173 (2d Cir. 2002).

II.   <u>Discussion</u>

The court did not err in its handling of the jury's potential exposure to the transcripts of GX:1 and GX:2. Here, the jury was *not* exposed to evidence that would prejudice the average juror. At the beginning of trial, the jury was provided with binders containing transcripts to which James confirmed he had no objection, including GX:1 and GX:2. Before jury deliberations began, the government removed transcripts, including GX:1 and GX:2, that were not admitted. (A:364, 393-94, 510).

This Court's inquiry must focus on any potential prejudice from the jury's exposure to the extraneous evidence: the transcripts for GX:1 and GX:2.[6] (A:422-57). No such prejudice existed. First, the court

---

[6]   Because GX:3 was subject to objection, its transcript was never in the jury's binders. (A:401; <u>accord</u> A:395 (defense counsel agreed that transcript was never in the binder)). James nonetheless speculates that the jury "may have been exposed" to that transcript (Br.14), based solely upon the following jury note: "Has there been any materials or transcripts removed from the call transcript binders, such as call exhibits 1, 2 and 3, or any others?" (Br.16 (quoting A:509)). This question is merely a reference to tab numbers in the jury's binders of admitted transcripts which began with the tab for GX:4, as GX:1 through GX:3 were not admitted. (A:401). Further, the jury later clarified it sought calls between James and his employee (Flanagan) during the FBI search,

instructed the jurors to disregard any transcripts they may have seen for unadmitted calls. It is well settled that "juries are presumed to follow [the court's] instructions" and, ordinarily, "limiting instructions...will suffice to cure any risk of prejudice." United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998) (per curiam). The instruction stated:

> I am telling you now that transcripts one and two, which I think you referred to, and three, are not in evidence. If anyone thinks they have seen something, you are mistaken. They are not in evidence. Please continue your deliberations. This is the court's ruling. You will treat this statement as you would any other item of evidence that I have told you is not in evidence, is not for your consideration. If you have any questions with regard to this issue, please write back to me and let me know.

(A:409-10). This instruction both informed the jurors that any transcripts of unadmitted calls that they may have seen were to be disregarded and invited the jurors to contact the court if they were unable to do so.

The instruction thus struck the delicate balance of reminding the jury to disregard the unadmitted transcripts while not inquiring into

___

which description only fits GX:1 and GX:2. There is no evidence that the jurors ever saw or heard GX:3.

23

"the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." Greer, 285 F.3d at 173. As this Court has counseled, a court must avoid "creat[ing] prejudice by exaggerating the importance and impact" of extra-record information. United States v. Abrams, 137 F.3d 704, 708 (2d Cir. 1998). James offers no evidence that the jury was unable to follow the court's instruction regarding the transcripts of GX:1 and GX:2. To the contrary: shortly after receiving this instruction, the jury reached its verdict without sending an additional note on this topic.

James suggests that exposure to the transcripts for GX:1 and GX:2 "demands an inquiry" of the jurors (Br.20), citing United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011), and United States v. Peterson, 385 F.3d 127, 131-37 (2d Cir. 2004). The court committed no error when it rejected James's request, as such an inquiry was unnecessary and would have infringed on the integrity of jury deliberations. See United States v. Thomas, 116 F.3d 606, 618-19 (2d Cir. 1997) ("courts...recognize that the secrecy of deliberations is essential to the proper functioning of juries").

In Farhane, a juror learned of a co-defendant's guilty plea and communicated that information to other jurors. This Court concluded that the court did not abuse its discretion in denying a motion for a new trial where it concluded that because the defendant conceded his co-defendant's guilt in his summation, he was unlikely to be harmed by the extrinsic information. Id. at 169. The court issued a broad instruction to the jurors about basing their verdict solely on the trial evidence and asked if they would be unable or unwilling to follow its instruction. This Court concluded that, because no juror indicated an inability to follow the court's instruction, the totality of the circumstances showed that the misconduct did not warrant a new trial. Id. at 170.

Similarly in Peterson, this Court found no abuse of discretion in the court's handling of a juror's submission of a note, after deliberations had begun, indicating that she knew the defendants and expressing discomfort about continuing to deliberate. 385 F.3d at 131. After questioning the juror and excusing her, the court addressed the remaining jurors, telling them it had dismissed the juror and there was no basis for her allegations, and offering them the opportunity to speak to the court privately if their experience with the tainted juror impacted

their ability to be impartial.  Id. at 132-34.  This Court again found that the court's response to the juror misconduct was adequate.  Id. at 136-37.

Farhane and Peterson offer little guidance to this Court on evaluating how the court handled the jury's potential exposure to unadmitted transcripts, as both cases involve instances of juror misconduct that is absent here.  Here, the court advised the jury to disregard the unadmitted transcripts and invited the jurors to contact it if they had any questions regarding the issue.  (A:409-10).  Given the lack of prejudice from GX:1 and GX:2 (discussed below), the court did not abuse its discretion in declining to conduct a more detailed inquiry.  In sum, after hearing extensive arguments from both parties, the court appropriately balanced the need to remind the jurors that the cited transcripts were not evidence while maintaining the secrecy of jury deliberations.  It did not err in its handling of the jury's potential exposure to this extrinsic evidence.

Second, even if the jury disregarded the court's instruction, no prejudice existed because the transcripts were duplicative of evidence admitted at trial and were in fact helpful to James.  In GX:1 and GX:2, James repeatedly asked Flanagan if she had "told the truth" and insisted

that she had "nothing to worry about" because he ran a "legitimate business." (A:426-27, 431-32, 435). On both calls James comforted Flanagan, stated that he retained lawyers to represent the company, and discussed logistics of continuing to run the business. There is no prejudice from James's emphasizing to Flanagan that she should tell the truth or attempting to assuage her concerns regarding the FBI's search and the fate of her employment. James argues that his recorded statement, which acknowledged that the "one thing [he] did wrong was impersonating patients" (A:441), served to "obliterate an inference of lawful intent." (Br.23-24). But James stipulated at trial to impersonating patients (GA:414-17, 568-72), in furtherance of his argument that he was endeavoring to help his doctor-clients be paid for their legitimate services and trying to expedite insurance payments to benefit the patients (GA:443-45). Moreover, the jury could consider the same evidence in other admitted exhibits. Beyond James's admission, several of James's employees, including Flanagan, confirmed that he impersonated patients and their relatives. (E.g., GA:161-62, 190, 193, 198-99, 240). Given that the jury could properly consider James's stipulation, his Impersonation Calls and his employees' testimony, there

27

was no prejudice from the jury's potential exposure to the transcripts of GX:1 and GX:2.

Third, any prejudice from the jury's potential access to the transcripts for GX:1 and GX:2 was alleviated by the court's frequent reminders that the recordings, <u>not</u> the transcripts, were evidence. The court explained to the jurors that they "have a transcript, but that's not what counts. What counts is what you hear. If you hear something that differs from the transcript then you go with what you have heard. The transcript is simply an aid. It is not evidence." (GA:45-46). The court issued similar instructions throughout trial. (GA:74, 271). Given that the jury never heard GX:1 and GX:2, its fleeting potential exposure to the transcripts for these calls cannot amount to prejudice sufficient to warrant a new trial.

## POINT TWO

### THE DISTRICT COURT PROPERLY
### CALCULATED THE SENTENCING GUIDELINES

James seeks to vacate his sentence and remand the case for resentencing on the grounds that the court incorrectly applied a four-level role enhancement, pursuant to U.S.S.G. § 3B1.1(a), and a two-level enhancement for abuse of trust, pursuant to U.S.S.G. § 3B1.3. (Br.27-38). James's arguments lack merit.

Contrary to James's claim that the court's sentencing "was clearly driven by the guidelines calculation" (Br.27), the court did not rely on the Guidelines range in sentencing because it concluded that—even with multiple, purposeful reductions to the calculation—the range was still excessive. Specifically, the court reduced the applicable Guidelines range by: (1) using a 22-level enhancement based on James's monetary gain instead of the applicable 28- or 30-level enhancement for actual or intended loss pursuant to § 2B1.1 (A:611-15); (2) not applying a two-level enhancement for sophisticated means pursuant to § 2B1.1(b)(10)(C) (A:557-58, 615); and (3) not applying a two-level obstruction-of-justice enhancement pursuant to § 3C1.1, even though the court conceded that

29

the government had proven obstruction by preponderant evidence
(A:558-65, 618). (A:612, 733 (providing James "multiple reductions in
terms of the amount of monies that he's being charged with, and...proven
at trial")). Rather, the court crafted James's sentence based on the
Section 3553(a) factors and imposed a sentence that was outside—and
well below—the Guidelines framework.[7] (A:734-36 (court considered all
sentencing factors, including multiple reductions in Guidelines
calculation), 719 (basing its sentence, in part, on enormity of fraudulent
scheme, the impact on the insurance companies and self-funded plans,

---

[7]   Despite the court's reductions in its calculation of the
Guidelines range to James's benefit, the court's sentence was drastically
below its adopted range. In fact, the court's sentence falls below or within
the Guidelines range in almost all other possible scenarios; e.g., (1) four-
level role enhancement and no abuse-of-trust enhancement (135 to 168
months); (2) three-level role enhancement and abuse-of-trust
enhancement (151 to 188 months); (3) three-level role enhancement and
no abuse-of-trust enhancement (121 to 151 months); and (4) two-level role
enhancement and abuse-of-trust enhancement (135 to 168 months).

There are only three scenarios in which the court's sentence would
fall above its Guidelines range: (1) with an abuse-of-trust enhancement
but no role enhancement, which would trigger a two-level reduction for
being a zero-point offender (87 to 108 months); (2) without either the
abuse-of-trust enhancement or any role enhancement, plus the zero-point
offender reduction (70 to 87 months); and (3) with a two-level role
enhancement and no abuse-of-trust enhancement (108 to 135 months).
However, none of these scenarios are supported by the facts.

and James's brazen conduct in carrying out the fraud), 724-25 (James's history and characteristics and ability to recover monies for forfeiture and restitution)).

In any event, as discussed below, the court correctly applied the sentencing enhancements.

## I. THE DISTRICT COURT PROPERLY APPLIED THE FOUR-LEVEL ROLE ENHANCEMENT

### A. Applicable Law

The government must prove by a "preponderance of the evidence" that a sentencing enhancement applies. E.g., United States v. Salazar, 489 F.3d 555, 557-58 (2d Cir. 2007) (per curiam). "This Court reviews a district court's application of the Guidelines *de novo*, while factual determinations underlying a district court's Guidelines are reviewed for clear error." United States v. Cramer, 777 F.3d 597, 601 (2d Cir. 2015).

Section 3B1.1(a) provides for a four-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Guidelines define "participant" as a person "criminally responsible for the commission of the offense," regardless of whether the person has been

31

charged or convicted.  U.S.S.G. § 3B1.1, comment. (n.1).  "For a defendant to qualify for the enhancement on the five-or-more ground, the government must show four people other than [him] who were criminally responsible for the commission of the offense."  United States v. Archer, 671 F.3d 149, 165 (2d Cir. 2011); accord United States v. Norman, 776 F.3d 67, 82 (2d Cir. 2015).  However, because the enhancement also applies for the organizer or leader of criminal activity that "was otherwise extensive," "[a] defendant may be subject to a four-level enhancement even if the defendant managed only one other participant."  United States v. Mi Sun Cho, 713 F.3d 716, 722 (2d Cir. 2013) (per curiam).  In considering whether a scheme is "otherwise extensive" under § 3B1.1(a), "all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1, comment. (n.3).

To determine whether a defendant is an "organizer or leader," as opposed to a "manager or supervisor,"

> [f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal

activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4); <u>United States v. Katsman</u>, 551 F. App'x 601, 603 (2d Cir. 2014).

    B.   <u>Discussion</u>

James unquestionably played a leadership role in defrauding the insurance companies. He was indisputably the organizer or leader of criminal activity that involved five or more participants. In addition, his criminal activity was "otherwise extensive" regardless of the number of participants. The criminal activity spanned years, involved multiple employees, impersonations, an alias, and the submission of hundreds of thousands of fabricated claims to insurance companies, all leading to the theft of hundreds of millions of dollars.

In particular, the evidence showed that James was the sole owner and operator of his medical billing companies. He managed the daily affairs and controlled all aspects of those companies. He hired and fired employees. (GA:97, 129, 163, 178; A:153-74, 205-06). He reviewed every claim form that his employees drafted and approved every line of every claim. (GA:168, 225-26, 233-34; A:213).

James personally managed and supervised several employee participants in the criminal activity—including Flanagan, Cutrone, Martinelli, Brunner, Persky, and Nash—over whom he exerted control and authority and whom he trusted to execute his criminal directives. James trained and directed his employees to falsify insurance claim forms and bill for procedures not performed. At his direction and under his close supervision, his employees reviewed the doctor-clients' operative reports, translated the information in the reports into the most complex and lucrative CPT codes, and upcoded wherever possible; drafted Forms 1500 using the CPT codes for modifiers to bypass the auto-adjudication system; and called insurance companies to follow up on the status of claims that he was attempting to appeal. (GA:164, 179, 212-21; A:210).

In addition to making Impersonation Calls, James hired several women who impersonated patients or patients' female relatives who he, as a man, was unable to impersonate. (GA:99-100, 130-31). Both Persky and Nash testified that James hired them solely to impersonate patients, provided them with the patients' information, and instructed them to make false statements to insurance companies. (GA:98-99, 105,

130, 132; A:51). Persky and Nash made hundreds, if not thousands, of Impersonation Calls at James's direction. (GA:109-10, 133, 446-49; accord GA:199, 200-04 (similar for Cutrone)).

Further, the evidence overwhelmingly established that James's fraudulent scheme did not begin and end with James and his employees. Although he attempts to downplay his role, James instructed numerous doctor-clients on what to include in operative reports to deceive the insurance companies into paying significantly greater reimbursements. For example, James directed his co-conspirator doctors to falsify and manipulate their operative reports and to stage non-emergent elective procedures as emergency surgeries, which allowed him to bill for more complex procedures or procedures that were not performed. (GA:25; e.g., GA:333, 335, 337-38, 480-81, 542-43; GX:706, 716, 749, 766, 944).

James's claim that the doctors were more culpable than he and that "[he] regularly deferred to their coding decisions" (Br.36) is not only irrelevant but completely distorts the facts. Indeed, James routinely directed his doctor-clients on how to manipulate operative reports to yield higher payouts from insurance companies and ignored his doctor-clients'

requests to use different CPT codes. (GA:328-403, 407-08, 470-74, 494-512, 522-31, 544-51, 553-67; GX:700-83, 785, 1005, 1022, 1103, 1131). The jury saw numerous text messages and emails in which James did just that:

- GX:754, in which Dr. Tahernia texted James and said, "Matt, GM, understood some cash flow, my man, shake down Aetna, please." (GA:330);

- GX:709, in which Dr. Cohen Kashi texted James about how James refers to himself as the "Robin Hood of doctors"; James responded, "Robin Hood for patients, rob the insurance company and give to the doctors." (GA:330-31);

- GX:782, in response to a request by Dr. Calma to speak to a patient who was complaining about a bill, James responded, "when this lady from Cigna calls, please ask her to call me. FYI, we don't bill [patients], only pretend, [thank you]." (GA:331);

- GX:750, in which Dr. Schultz asked James whether Schultz should plate or pin the fracture of a patient admitted through the emergency room; in response, James instructed the doctor to plate the fracture (a more invasive procedure that reimburses at a higher rate than pinning the fracture) and directed the doctor to bill for "exploration of open FX, debridement [of] skin, muscle and bone, bone graft, et cetera." (GA:331);

- GX:766, in which Dr. Sayeed told James "I usually don't add debridement with complex closure since it's inclusive, but if you tell me it's standard to bill

it I will.  Going forth, not on any of these claims."
(GA:332);

- GX:704, 709, 716, 749, 753, 757, 1013-15, 1074,
  1087, 1091, 1103, 1111, 1120, 1143, text messages
  and/or emails between James and his doctor-
  clients, in which James instructed doctor-clients to
  add codes to or change their operative reports
  (GA:332-33, 336-40, 348-49,379-80, 382-387); and

- GX:706, 751-52, 754, 756, 775, 1127-31, 1140,
  instances in which James discussed and, at times,
  instructed his doctor-clients to send patients
  through the emergency room for non-emergent
  procedures (GA:340-41, 344-48, 387-90 (e.g.,
  GX:751 (doctor-client asked "[w]ill they get
  suspicious if I keep getting them through the ER?"
  (GA:340-41)))).

The Guidelines provide that "[i]n distinguishing a leadership

and organizational role from one of mere management or supervision,

titles such as 'kingpin' or 'boss' are not controlling" and that "[t]here can,

of course, be more than one person who qualifies as a leader or organizer

of a criminal association or conspiracy."   U.S.S.G. § 3B1.1, comment.

(n.4).   Whether James exercised control over the doctors is not the

question.   The question posed by the Guidelines is whether James

organized or led this scheme.  On that question, the record fully supports

application of the enhancement.

Consistent with the trial evidence, the PSR determined that James was subject to the four-level role enhancement for being the organizer and leader of the offense. (PSR ¶ 40; PSR Second Addendum). The PSR outlined James's fraudulent billing practice including (1) impersonating patients; (2) submitting bills to insurance companies for procedures that were different or more complex than the procedures performed; (3) instructing his employees to upcode and use the most expensive CPT codes for claims; and (4) conspiring with collusive doctor-clients to stage emergency room visits for non-emergent procedures and falsify operating reports. (PSR ¶¶ 19-20, 22-24). In response to James's objection to the role enhancement, Probation again concluded that James was subject to it, finding:

> The defendant organized and led the fraudulent scheme which involved at least five criminally responsible participants. Although no other individuals were charged in connection with the instant offense, it is clear that at least five participants, including the defendant, his employees, and the collusive physicians, were knowingly engaging in the defendant's scheme to defraud insurance companies.

(PSR Second Addendum).

Following robust argument by the parties and discussion of the trial evidence, the court found that James played a leadership role and declined to strike those facts from the PSR. (A:589-91). At the sentencing, the court repeatedly stated that it had reviewed all parties' arguments, determined that its Guidelines calculation—including the four-level role enhancement—was appropriate, and stated that "[a]ll your other objections are noted and my findings have been made on those." (A:618, 620-21). Given how apparent the specific facts supporting the four-level role enhancement are in the record, the court was justified in applying this enhancement. See United States v. Rainford, 110 F.4th 455, 481 (2d Cir. 2024); United States v. Napoli, 179 F.3d 1, 14-15 (2d Cir. 1999).

Fraud touched every aspect of James's operation and he was the mastermind behind it all. He qualifies as an organizer/leader and correctly received the four-level aggravating role enhancement.

## II. THE DISTRICT COURT PROPERLY APPLIED THE ABUSE-OF-TRUST ENHANCEMENT

### A. Applicable Law

Under U.S.S.G. § 3B1.3, a two-level enhancement is appropriate "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Id.

A position of "public or private trust" refers to positions in which an individual has "professional or managerial discretion" and "ordinarily [is] subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3, comment. (n.1). In addition, for the enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense. Id.

This Court has applied a two-pronged test to determine whether this enhancement applies: "(1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust significantly facilitated the commission or concealment of the offense." United States v. Alston, 899 F.3d 135, 151 (2d Cir. 2018).

As this Court has explained, whether the defendant occupied a position of trust "turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong." United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (per curiam); United States v. Castagnet, 936 F.2d 57, 61-62 (2d Cir. 1991) ("If one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first."). Moreover, it does not require "a legally defined duty such as fiduciary duty." United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003); United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001) (enhancement applies if "the defendant's position must involve discretionary authority" and "this discretion must have been entrusted to the defendant by the victim").

B.   Discussion

The totality of the circumstances makes clear that the district court properly determined that James abused a position of trust.  Thus, the court did not err in applying the enhancement.

As established at trial, insurance claims were generally approved and paid based solely on claim forms signed by the provider and

41

submitted by the biller without any further inquiry by the insurance companies. (GA:111-17). Because insurance companies received far more claims per day than they could review, incoming claims were auto-adjudicated by a computerized process designed to ensure that all information needed for the reimbursement had been provided. (GA:122). For most claims, there was no further review and payment was made automatically based on information provided by the medical biller. (GA:116, 123). In a small number of cases, the insurance companies conducted an audit for accuracy. In such cases, the insurance companies requested medical records and made payment decisions based on those records. (GA:115). Insurance companies thus relied upon medical billers, as well as the providers on whose behalf they submitted the claims, to be truthful and accurate in their claims and supporting medical records. (GA:115-17, 124).

James, however, argues that the abuse-of-trust enhancement does not apply because he did not abuse a fiduciary or quasi-fiduciary duty, had no discretion as a medical biller, and had no special skill. (Br.28-32). James is wrong. As he did throughout the sentencing, James continues to blame his doctor-clients, in complete disregard of the

evidence and guilty verdict. (Br.30 (arguing that the doctors certified the forms, not him)). None of the cases he cites supports the contention that the abuse-of-trust enhancement was improperly applied.

Medical billers, like James, have a relationship of trust "characterized by professional…discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" that is "subject to significantly less supervision" than others. U.S.S.G. § 3B1.3, comment. (n.1). Insurance companies relied upon James's expertise and representations in allowing him to use the auto-adjudication system, which permitted him largely unfettered access to reimbursement funds. He used his training and knowledge of the medical billing field to intentionally bypass controls built into the auto-adjudication systems that were meant to protect against unbundling through his prolific use of Modifier 59. (GA:119-23, 259-62, 268-69). He conspired with his doctor-clients to falsify the medical records the insurance companies used to evaluate the accuracy of the claims during the audit. (PSR ¶¶ 22, 24; compare, GX:713 with 714; GX:944 with GA:480-81; GA:532-38 with 539-41). James had the discretion and lack of supervision that provided him

"the freedom to commit a difficult-to-detect wrong," and he took full advantage of that freedom to defraud his victims. <u>Allen</u>, 201 F.3d at 166.

Individuals who submit false claims abuse the trust that the insurers place in those who they permit to certify and submit those claims, and courts have not hesitated to apply the abuse-of-trust enhancement in such cases. <u>See, e.g.</u>, <u>United States v. Hussnain</u>, 20-cr-280 (RPK), DE:54 & order entered 5/27/2021 (E.D.N.Y.) (applying abuse-of-trust enhancement to layperson owner of pharmacy who submitted claims to insurance); <u>see also</u> <u>United States v. Ntshona</u>, 156 F.3d 318, 321 (2d Cir. 1998) (per curiam) (upholding enhancement where physician defrauded Medicare by signing false claims). James is no different from any other medical biller or provider who has been found to abuse a position of trust when submitting false claims to insurers—particularly where he conspired with his doctor-clients to falsify many of the medical records that were submitted to insurers to support those claims.

James's role as a medical biller enabled him to submit millions of dollars of fraudulent claims in ways that the insurance companies, which relied upon his representations in allowing him to use their auto-adjudication system, lacked the resources to catch. <u>See</u>

44

Hirsch, 239 F.3d at 227.  Put simply, James's conduct here is exactly what is encompassed by U.S.S.G. § 3B1.3.

In applying the enhancement, the court specifically stated that it had discussed the enhancement in detail with the probation officer and determined that James was in a position of trust as a medical biller because he used his access to individuals' personal information, including their health statuses, to carry out his fraud (A:619), a finding which provides an independent basis to affirm this enhancement. U.S.S.G. § 3B1.3, comment. (n.2(B)); United States v. Abdelshafi, 592 F.3d 602, 611 (4th Cir. 2010) (applying application note 2(B) to health care vendor who used Medicaid patients' identification information to file fraudulent claims for payment); accord United States v. Williams, 441 F. App'x 52, 55 (2d Cir. 2011) (enhancement applied to sales coordinator at phone company who provided to a known drug trafficker call records showing phone numbers in contact with a law enforcement agent's phone).  As established at trial, James exceeded the authority of his position to unlawfully use the identifying information of patients to further his fraudulent scheme.  (PSR ¶¶ 13-30, 41).

45

Accordingly, the court did not err, much less clearly err, in applying the § 3B1.3 enhancement.

III. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION DURING SENTENCING IN ITS CONSIDERATION OF THE FSA AND RDAP**

A. Applicable Law

Trial courts have broad discretion to consider many types of information at sentencing. 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4; United States v. Tucker, 404 U.S. 443, 446 (1972). A court may "consider the widest possible breadth of information about a defendant [to] ensure[] that the punishment will suit not merely the offense but [also] the individual defendant." Pepper v. United States, 562 U.S. 476, 488 (2011); Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) (court may consider a "wide variety of factors in addition to evidence bearing on guilt"). The court likewise has "wide discretion" to determine "the sources and types of evidence" relevant to

46

the sentencing analysis.  Pepper, 562 U.S. at 488; Witte v. United States, 515 U.S. 389, 398 (1995).

   B.   Discussion

        The district court did not abuse its discretion when it considered the effect of the FSA and the Residential Drug Treatment Program ("RDAP") in imposing James's sentence.   The court's consideration of potential Earned Time Credit under the FSA and RDAP reductions is proper because such consideration comported with the court's need to evaluate the § 3553(a) factors and long-standing precedent that it is "largely unlimited…to the kind of information" it may consider at sentencing.  Witte, 515 U.S. at 398.  As dictated by § 3553(a), here the court imposed a sentence that, in its view, was "sufficient, but not greater than necessary, to comply with" the purposes of sentencing, as well as "the kinds of sentences available."  The court's consideration of the total actual time that James would spend incarcerated was relevant to its determination of how to achieve the goals of sentencing.  See United States v. Fowler, 948 F.3d 663, 670 (4th Cir. 2020) (sentencing court may properly consider availability of good-time credit); United States v. Roberts, 919 F.3d 980, 992 (6th Cir. 2019) (same); cf. United States v.

<u>Tocco</u>, 135 F.3d 116, 132 (2d Cir. 1998) (holding that a court may consider "maximum good-time credit in its calculation of a defendant's sentence").

Moreover, the court's sentence appropriately assessed how "to provide just punishment for the offense," how "to afford adequate deterrence to criminal conduct," and how "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A), (B), (C). The court's consideration of the actual time James would spend in prison was relevant to its evaluation of these factors and determining an appropriate sentence. <u>Fowler</u>, 948 F.3d at 670 (consideration of future good-time credit related to "protection of the public and deterrence"). Indeed, it would have been contrary to § 3553(a)'s mandate for the court to ignore the possibility that James would qualify for significantly early release when balancing the need to achieve just punishment for a massive health care fraud scheme that he masterminded.

James does not cite a controlling case that stands for the proposition that it is improper for a court to consider the implications of the FSA in determining a sentence. Instead, as the case law clarifies, courts across this country have considered good-time credits in fashioning a sentence consistent with § 3553(a) factors. This Court

48

should affirm James's sentence because the court considered these additional time credits as merely <u>one</u> of the many factors it analyzed to arrive at its ultimate sentence. (A:724-25).

James mischaracterizes the court's reasoning for the imposition of 144 months' imprisonment by suggesting that the court added two years' imprisonment to his sentence solely because of potential FSA and RDAP time credits. (Br.38). A review of the sentencing proceedings demonstrates that is incorrect. The court clearly articulated the plethora of factors that it considered in fashioning an appropriate sentence:

> THE COURT: But there is also an additional time on RDAP in addition to the year that comes off. And there is also placement and a home detention and a residential center. I mean, there are a variety of ways that you may come up with half the sentence. But that isn't my sole consideration. And to take it and insist that it is, is wrong, Mr. Krieger. There are a lot of things that go into evaluating a sentence. And this defendant, unlike other defendants that come before me, has exemplary life experiences, and I don't discount that, but he also stole a huge amount of money and he abused people to do it…
>
> MR. KRIEGER: And I appreciate your articulating the basis for why you may go above 10 years based on the First Step Act.

49

> THE COURT: No, not solely on that. On all of the factors.

(A:724-25). Later, in the second sentencing proceeding, the court again explained its reasoning for the imposition of a 12-year sentence, which it emphasized it had intended to impose after the first sentencing proceeding:

> THE COURT: …I have gone over all of the factors involved in sentence. I have given the defendant multiple reductions in terms of the amount of monies that he's being charged with, and it's been proven at trial...There is a whole variety of reasons that the defendant is going to be sentenced to a term of 10 years plus two years on the mandatory consecutive counts for a total of 12 years. The arguments have been made multiple times, and I have looked at all of the various factors, including mentioning, I understand, even at the time on the 23rd, when I was going to sentence the defendant to the term of 12 years. It's not based solely on the defendant's being eligible for the First Step Act. There is a variety of reductions that I was aware of. But I find that the Government has presented the more cogent arguments with regard to a possibility of the First Step Act. Even putting that aside, the defendant has committed a massive fraud for seven years that has impacted – maybe not on the patient's credit ratings or caused them to directly have to pay for these charges, but we all pay as we're aware of.

(A:733-34).

50

James cites three out-of-circuit cases, <u>Roberts</u>, <u>Fowler</u>, and <u>United States v. Martin</u>, 199 F.3d 46 (7th Cir. 1996), to support the proposition that a court may not lengthen a sentence to reverse the effect of credits a defendant may earn while incarcerated. (Br.40). However, two of those cases hold that a court may not consider good-time credit "as a stand-alone factor" in fashioning a sentence but, as was done here, may consider it along with other factors. <u>Roberts</u>, 919 F.3d at 992; <u>Fowler</u>, 948 F.3d at 669.[8] As demonstrated above, the court here did not impose a sentence of 12 years' imprisonment based on James's possible FSA/RDAP credit as a "stand-alone factor," and repeatedly corrected the record when James's attorney attempted to claim otherwise. Instead, during two extensive sentencing proceedings, the court carefully considered the parties' arguments, balanced the § 3553(a) factors, and

---

[8] The third, <u>Martin</u>, holds that a court may not use an estimate of how much time an inmate may actually serve to comply with the pre-1994 version of 18 U.S.C. § 34 to determine whether the sentence imposed exceeds the defendant's life expectancy. 100 F.3d at 48. <u>Martin</u> is contrary to this Court's decision in <u>Tocco</u>, which held that a court can consider good-time credits to comply with the former Section 34. <u>Tocco</u>, 135 F.3d at 132.

determined that a sentence of 144 months' imprisonment was sufficient, but not greater than necessary, to achieve the goals of sentencing.

POINT THREE

THE DISTRICT COURT PROPERLY CALCULATED FORFEITURE

I.   Applicable Law

"Criminal forfeiture statutes," including, as applicable here, 18 U.S.C. §§ 982(a)(7) and 982(b)(1), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), "empower the [g]overnment to confiscate property derived from or used to facilitate criminal activity." Honeycutt v. United States, 581 U.S. 443, 447 (2017). "Such statutes serve important governmental interests such as separating a criminal from his ill-gotten gains[.]" Id. Unlike restitution, a defendant's forfeiture money judgment may include only the amount of proceeds he personally acquired. Id. at 454. Under § 982(a)(7), a court may order the forfeiture of gross proceeds traceable to the commission of the offense. Because forfeiture's purpose is "punitive rather than restitutive,...district courts are not required to conduct an investigative audit to ensure that a defendant is not deprived of a single farthing more than his criminal acts produced." United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011). The government is merely required to establish the forfeitability of property or money by a preponderance of evidence. United States v. Fruchter, 411 F.3d 377, 383

(2d Cir. 2005). Sentencing courts "may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations" therefrom. <u>Roberts</u>, 660 F.3d at 166.

On appeal from a forfeiture order, "this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error." <u>United States v. Treacy</u>, 639 F.3d 32, 47 (2d Cir. 2011).

II.    <u>Discussion</u>

The district court's forfeiture order was properly calculated, supported by extensive evidence, and should be affirmed. In challenging the forfeiture order, James argues that the court erroneously included all of James's business revenues without excluding revenues allegedly untainted by misconduct. (Br.44-50). James is wrong.

First, the government proved that James's *entire* business model was built on fraud. Nearly every claim submitted to the insurance companies contained false information. (<u>See, e.g.</u>, GA:124-26, 164-65, 167-68, 175-76, 180-82, 226-31, 234-38, 241-42, 258, 264-67, A:210-11 (falsified claim forms – upcoding and unbundling); GA:68-73, 221-23, 273-92, 466, 480-81, 532-43, 552, GX:713-14, 944 (falsified operative reports); GA:243-56, 270, 322-28, 475, 482-84, 487-93, GX:706 (falsely

billing cosmetic procedures as medically necessary procedures); GA:55-56, 83-92, 243-48, 250, 252, 467-68, 476-79, 482-86, A:211, 229-31, GX:109-10, 751, 754, 756 (unnecessary emergency room visits); GA:61-64, 74-81, 97, 99-101, 103, 109-10, 128, 133, 139-48, 150-62, 190-91, 193, 446-49 (impersonations), A:222-23; GA:177, 187-88, 196-97, 239, A:222-23 (patients not balanced billed)).  Bank records introduced at trial showed that James received $63,382,049.02 in illegal proceeds for himself, which were traced into James's bank accounts by a forensic accountant.  (PSR ¶ 27; GA:420, 583).

James's claim that he earned any discernable revenue untainted by misconduct, which should offset the forfeiture money judgment, is not supported by the evidence.  For example, at trial, James attempted to cross-examine a case agent about James's allegedly "untainted" claims.  (A:249-65).  As the agent testified, however, there was no way to establish that the claims in question were legitimate in light of the fact that *James's entire business model was based on fraud*.[9]

---

[9]    Moreover, the payment amounts in relation to the allegedly "untainted" claims were dwarfed in comparison to the provably false claims.  (Compare GA:586-87 ($1,000) and 588-89 ($2,500 and $750) with

(Id.; see A:249-53 (James was running a fraudulent business and his compensation of $63 million from fraudulent billing was not overstated), 262 (explaining that he cannot confirm proper billings without seeing discussions between James and doctor); 2531 (James routinely used fraudulent billing records)).  See United States v. Bikundi, 926 F.3d 761, 793 (D.C. Cir. 2019) (per curiam) (upholding forfeiture order in health care fraud case to all Medicaid proceeds received even though some went to legitimate services, where court found that the company would not have operated but for fraud and "pervasive fraud was integral to each" Medicaid payment); United States v. Warshak, 631 F.3d 266, 332-33 (6th Cir. 2010) (affirming forfeiture order of company's revenues because "entire operation was permeated with fraud").

At sentencing, and in his brief, James failed to identify any allegedly legitimate claims or evidence thereof.[10]  Rather, he relies on a

---

GA:457-58 (total charge of $247,050), 463 (total charge of $40,500), and 482-84 (total charge of $182,250); GA:404-05).

[10]    Importantly, the government did not concede at sentencing that James made some legitimate claims.  (A:584 ("if he had a legitimate claim here or…there, it's minimal in the scope of this fraud")).  Nor did the case agent say that his fraudulent billing coding was a subset of his

report by an "expert," who did not testify (GA:419), but claimed that under 20% of James's revenue was tainted by fraud. (Br.45-49). The government objected to James's "expert" on several grounds, including her lack of experience and failure to include in her analysis the evidence presented at trial, a failing that rendered her opinion unreliable. (GA:590-95). Indeed, James failed to provide his "expert" with critical trial testimony regarding: (1) falsified operative reports; (2) James's instructions to upcode; (3) staged emergency room visits; and (4) James's Impersonation Calls. (Id.; A:595-602).

When addressing the "expert" report and loss amount for purposes of calculating a Guidelines range, the court was hesitant to determine a loss amount *in excess of $600 million* for Guidelines purposes and remarked that there were "some legitimate claims in there," despite the lack of evidence that James submitted any legitimate claims. (A:604-05). Further, contrary to James's repeated claims that, on the first day of sentencing, the court determined that it would cut his gain in half for

---

billing practices; rather, he said that this was his routine practice. (GA:406).

purposes of forfeiture (Br.44-49), the court first stated "I'm not giving a precise amount right now. There's a $63 million gain that the defendant had." (A:613, A:612 (noting the government proved $63 million in gain and had conservatively reduced the intended loss)). Critically, the court's $33 million reference was to the reduction it would give James in his custodial sentence. (A:613). At the conclusion of the first sentencing hearing, the court stated that it would order forfeiture in the amount of $63 million. (A:708).

During the second sentencing hearing, the court rejected James's unsupported "expert" report and found that the government's proof of loss did not overstate James's fraud. The court reasoned, in pertinent part:

> I don't find that [the government's proof] overstates the fraud. And I find that [the defendant's expert] report to be, on further refection and the Government's analysis, I really find that the Government put in the work in their submission on January 31 to demonstrate that this fraud was much higher than they're asking for.

(A:747). Accordingly, the court found that "the gain to [James] was a minimum of 63 million." (A:752). The court correctly rejected James's

continued attempt to halve the forfeiture amount based on the government's proposed restitution figures and found that "there are many [claims] that [the government] didn't even include [in its proposed restitution figure]. The FBI went through, analyzed each and every one of them. And your premise that it should be halved or even less is not what I find to be accurate." (A:748). Moreover, the government's proposed restitution figure, which was adopted by the court, was extremely conservative and did not encompass the entirety of the intended or actual loss suffered by the victims from James's fraud. Thus, the court correctly concluded that the forfeiture amount should not be based on such a conservative restitution figure. (A:752-53).

The court acted well within its discretion in concluding that James's total gain—i.e., revenue he made from his business that was permeated by fraud—was subject to forfeiture. Because the court's forfeiture finding was not clearly erroneous, it should not be disturbed on appeal. See Treacy, 639 F.3d at 48 (court needs to make "reasonable estimate of loss, given the available information" and "may make reasonable extrapolations from the evidence"); United States v. Jafari, 663 F. App'x 18, 24 (2d Cir. 2016) (summary order) (sentencing court

59

made reasonable estimate of gain for forfeiture when it reasoned if doctors submitting improper insurance codes for half of their patients, half of the payments to the doctors were fraudulent).

## POINT FOUR

### THE DISTRICT COURT CONSERVATIVELY CALCULATED RESTITUTION

I.    Applicable Law

Under the Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A(a)(1), a sentencing court "shall order" defendants convicted of specified crimes to "make restitution to the victim of the offense."  United States v. Gushlak, 728 F.3d 184, 190 (2d Cir. 2013).  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).

The MVRA leaves to the sentencing court the determination of "how" to value lost property when restitution is sought.  United States v. Boccagna, 450 F.3d 107, 114 (2d Cir. 2006).  "[T]he law appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case," and this Court construes value "to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose."  Id. at 114-15.  It is well-established that a sentencing court may impose restitution based upon a "reasonable

approximation" of losses incurred by the victims. <u>Gushlak</u>, 728 F.3d at 195-96. "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." <u>Id.</u> at 196; <u>United States v. Uddin</u>, 551 F.3d 176, 180 (2d Cir. 2009) (district court's loss estimate, based in part on extrapolation from known data, was reasonable).

This Court reviews a sentencing court's restitution order "deferentially" and "will reverse only for abuse of discretion." <u>Gushlak</u>, 728 F.3d at 190. This level of deference is warranted because ordering restitution "requires a delicate balancing of diverse, sometimes incomparable factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch." <u>United States v. Rossi</u>, 592 F.3d 372, 376 (2d Cir. 2010). A district court is in the "best position to engage in such balancing," <u>id.</u>, and therefore "it makes little sense for an appellate court" "to scrutinize the decision closely," <u>United States v. Porter</u>, 90 F.3d 64, 68 (2d Cir. 1996).

To identify such abuse, this Court "must conclude that a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible

62

decisions." <u>United States v. Pearson</u>, 570 F.3d 480, 486 (2d Cir. 2009) (per curiam). The clear error standard is satisfied only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>United States v. Cuevas</u>, 496 F.3d 256, 267 (2d Cir. 2007).

## II. <u>Discussion</u>

James challenges the restitution order by claiming that it is not based on reliable information, in that it failed to account for allegedly properly billed claims.[11]  In particular, James challenges the sufficiency of the government's evidence, focuses on his allegedly proper use of Modifier 59, and claims that the insurance companies paid on claims before he impersonated patients. (Br.50-58).  James is wrong.  The

---

[11]     James's citation to the court's statement that "[t]here are some legitimate claims in there, and...at this point, I think [the loss is] somewhat less than [what the government is] seeking in [its] papers[,]" (Br.51), is misplaced in the context of restitution.  In the prior sentencing proceeding, the court stated, in pertinent part, "[the government] did review thousands of claims...and [] found that they were fraudulent. But thousands of claims don't amount to over $600 million." (A:604).  It is thus clear from that statement that the court was referring to the government's loss calculations for Guidelines purposes, which included the position that James was responsible for more than $621 million in intended loss, and was not made with respect to restitution.

court's restitution order was properly and conservatively calculated, supported by extensive evidence, and should be affirmed.

In connection with James's sentencing, the government submitted three spreadsheets prepared by FBI agents: (i) one for claims associated with impersonations (the "Impersonations Spreadsheet"); (ii) one for total explanation of benefits ("EOB") minus the impersonations (the "EOB Spreadsheet"); and (iii) one for those EOBs (minus impersonations) that used Modifier 59 (the "Modifier 59 Spreadsheet"). (GA:49-53; SA:1-2).

To create the Impersonations Spreadsheet, agents identified patients impersonated by James or his employees.[12] (GA:50). Once those people were identified, the agents found the billing documents related to each patient.[13] (Id.). The agents compiled this information into a spreadsheet and removed duplicative information. (Id.). The agents then

---

[12]    This information was gathered from numerous sources, including insurance companies' recordings, documents recovered from James's office and computer, emails and text messages between James and his employees and his employee's spreadsheet. (GA:50).

[13]    This information was sourced from (i) the EOBs on James's computer, (ii) the medical billing software data on James's computer and/or (iii) the subpoena returns from insurance companies. (GA:50).

64

calculated the claim amounts billed for each impersonated patient as well as the amounts paid by the insurance companies on those claims.[14] Relevant to restitution, the amount paid by the insurance companies on the Impersonations Spreadsheet was $127,373,512.51. (DE:245 at 13).

The agents then catalogued the total EOBs found on James's computer that were submitted by James's medical companies to various insurance companies.[15] They identified and removed any duplicate information, and, to avoid duplicating the loss amounts related to the impersonations, removed the EOBs related to the impersonated patients, leaving a list of EOBs minus the impersonations as the EOB Spreadsheet. (GA:50-51).

Using the EOB Spreadsheet, the agents identified the subset of those claims that used Modifier 59, resulting in the Modifier 59 Spreadsheet. They then calculated the claim amounts billed using

---

[14] When the agents were unable to identify the amount billed or paid on a claim with respect to a particular patient, they did not include any loss amount for that patient, despite evidence that the patient was impersonated, thereby underscoring the government's conservative calculation.

[15] James saved only EOBs that paid $10,000 or more. (GA:455).

Modifier 59 and the amounts paid by the insurance companies on those claims. Relevant to restitution, the amount paid by the insurance companies on EOB claims that used Modifier 59 was $213,992,813.90. (GA:51). When combined, the amount paid on the Impersonations and Modifier 59 claims totaled $341,336,326.41. (GA:14).

Following the first sentencing hearing and James's objections that the government's spreadsheets contained duplicative information, the agents reviewed the spreadsheets. Specifically, the agents ran the names of those patients on the Impersonations Spreadsheet against the patient names on the total EOB Spreadsheet. The government then provided James and the court with the new EOB Spreadsheet with the duplicates removed.[16] (GA:50). Thus, from identifying duplicates that also had Modifier 59 affixed to the claim, the government removed

---

[16] The agents identified 112 (out of 17,546) claim lines for 28 patients that were duplicative for the same day of service by the same doctor and removed those entries from the EOB Spreadsheet. As the government noted, however, not all "duplicates" could be considered "double counted" because not all of them had Modifier 59 affixed to the claim; the government focused only on the Impersonations Spreadsheet and the Modifier 59 Spreadsheet for purposes of calculating restitution. (GA:50).

66

$1,456,636.52 in double-counted claims from the Modifier 59 Spreadsheet. (Id.).

While an approximate $1.4 million may seem like a significant amount, in the context of the magnitude of James's fraud, it was not. In fact, it amounted to an error rate of 0.427%, *less than one percent*. For purposes of calculating restitution, the government invited the court to triple the error rate—which would be an error rate of 1.28%. (Id.).

Thus, using the figures for only the impersonations and James's prolific use of Modifier 59, and using triple the error rate, the amount paid by the victim insurance companies on the Impersonations plus Modifier 59 claims was $336,996,416.85, which the government requested in restitution. (Id.).

This restitution figure was conservative for several reasons. First, although the government proved that James's entire business model was based on fraud, it did not calculate restitution owed to the victim insurance companies for James's upcoding, staged emergency

room visits or manipulated operative reports.[17]  Instead, the government focused on the Impersonations and Modifier 59 Spreadsheets because both were vital to James's fraud scheme.  James used, and taught his staff to use, Modifier 59 on all procedure-related claim lines.  (E.g., GA:167, 180, 182, 230-31, 267, 518).  James used Modifier 59 to bypass the auto-adjudication system to get *something* paid on each claim line.  Once a payment was made, regardless of the amount, James and others then made the Impersonation Calls, with material misrepresentations, to attempt to collect the balance.

Second, using the restitution amount from the Impersonations and Modifier 59 Spreadsheets conservatively accounted for the true amount of James's crimes and victim insurance companies' losses because: (i) the agents used only the EOBs found on James's computer even though James saved only EOBs valued over $10,000; (ii) not all EOBs provided the modifiers for each CPT code (based on

---

[17]    The claims on the EOB Spreadsheet that did not include Modifier 59 or that the agents were unable to determine whether the claims included Modifier 59 totaled over $89 million.  The government did not include these in calculating restitution.

James's billing practice and history, it is extremely likely that at least some of these codes had Modifier 59 attached to them, but the agents would not include a claim in the loss calculation if unable to find supporting data); (iii) the agents did not include those EOBs lacking CPT codes (amounting to $562,779.27 of paid claims) even though it is likely that some claims had Modifier 59 affixed to them; and (iv) the government obtained only a subset of recorded calls from the insurance companies, meaning that the number of Impersonation Calls was underinclusive.

The court adopted the government's analysis. In fact, it found that James's fraud exceeded the $336 million in restitution that the government requested. (A:747-48). The court explained that the government's spreadsheets did not include every claim that the government proved was fraudulent, the government repeatedly gave James "the benefit of the doubt" in calculating a restitution amount, and James's "premise that it should be halved or even less is not what I find to be accurate." (Id.).

As he did at sentencing, James argues that the government's restitution figures are speculative and unreliable, and that the insurance

69

companies paid on claims *before* James impersonated patients. (Br.51-58). First, any argument that the insurance companies paid the claims in full before the Impersonation Calls is nonsensical. If that were the case, there would be no need for James to make Impersonation Calls demanding payment. The fact that James made the Impersonation Calls is preponderant evidence that payments were made after those calls.

Nevertheless, in his continued attempt to undermine the government's analysis, James now claims that six patients who appear on the government's Impersonations Spreadsheet—Guzman, Smart, Patricia Rhodes, Sonia Hawkins, Sherice McDavison, and Rebekah Perkins—were paid on their insurance claims before the impersonations. (Br.52-54). James's arguments are unfaithful to the record.

With respect to Guzman, Smart, and Rhodes, while the insurance companies made some payments before the impersonations, the amounts paid were miniscule. For example, on the claims James submitted for Guzman, the insurance company paid $37,500 of the $437,500 billed; James impersonated Guzman to obtain the balance. (SA:1, lines 296-306, 2670-72). The insurance company paid $96,468.50 out of $265,800 billed in claims for Smart; James impersonated Smart to

collect the balance. (SA:2, lines 10480-90). And on the claims James submitted for Rhodes, the insurance company paid $2,292.54 out of $78,500 billed; James impersonated Rhodes to collect the balance. (SA:1, lines 4391-94). These small amounts paid certainly fall within the government's 1.28% error rate and, in any event, do not meaningfully change the restitution amount, given its conservative nature.

As for the remaining three patients James highlights, his representations are untrue. With respect to the Hawkins claims, James claims that "he posed as patient Sonia Hawkins's husband in March 2018 (A-471), but several of the counted claims were paid in September 2016 (A-923)." (Br.53). This statement is misleading. The September 2016 payments were related to claims for a June 2016 date of service in which the insurance company paid a minor $16,521.24. (SA:1, lines 3893-96). However, James impersonated Hawkins's husband in March 2018 for services that had been provided in May 2017. (A:471-75). In April 2018, *after* James's impersonation of Hawkins's husband, the insurance company paid $234,000. (SA:1-2, lines 7610-15).

With respect to McDavison, James's claims are false. James does not give a date when he impersonated her; rather, he states "James

posed as patient Sherice McDavison (A-870), but every single claim with associated date information—over $436,000 worth—was paid in 2017 (A-923)." (Br.53). Contrary to James's claims, the insurance company paid on these claims *after* James or an accomplice impersonated McDavison. James impersonated McDavison on December 16, 2017 for a claim with a date of service of June 19, 2017. (See SA:3-6). That claim was paid in full in the amount of $192,000 on December 27, 2017, *after* James impersonated McDavison. (SA:1, lines 403-07). Moreover, according to the spreadsheet prepared by employee Nash, on September 15, 2017, James instructed her to impersonate McDavison for a June 9, 2017 date of service. (GA:449, line 139). In October 2017, that claim was paid in the amount of $244,318.35. (SA:1, lines 384-90).

James's representations about patient Perkins are, again, false. James claims he "impersonated patient [] Perkins in May 2018 (A-877), but again, $252,000 of those claims were paid in 2017 (A-923)." (Br.53). This is incorrect. James impersonated Perkins for a December 5, 2016 date of service with a false appeals letter bearing a forged signature, dated April 5, 2017, that was in the "scans" folder on his computer; and, thus, included in the Impersonations Spreadsheet. (SA:1,

72

lines 3950-55; SA:7-15; see also SA:16-18).  This claim was paid in full in June 2017 for $252,000.  (SA:1).  James impersonated Perkins again in connection with the same December 5, 2016 date of service for a different provider using forged letters dated March 9, 2017, April 5, 2017 and May 15, 2017.  (SA:1, lines 7632-39; SA:19-57).  In June 2017, the insurance company paid an additional $132,610.89.  (SA:2, lines 7632-7639).  James impersonated Perkins in the same manner for a March 21, 2017 date of service with a forged letter dated October 12, 2017.  (Id. at lines 7647-48).  That claim was paid in full for $52,000 on November 17, 2017.  (Id.).  All these payments were made *after* James impersonated Perkins.

Like the district court, this Court should reject James's baseless attempts to undermine the conservative restitution calculation used below.

James's claim that the government's restitution figures for Aetna and Cigna do not match the victim impact statements submitted by those companies should also be rejected.  (Br.56).  As the government and Daniel Lyons, Aetna's in-house counsel who spoke at the sentencing proceedings, both noted, the insurance companies had limited information when completing the victim impact statements and did not

have access to the extensive evidence from trial establishing the restitution amounts. Thus, the estimated loss amounts in the victim impact statements were a *minimum*—that is a floor, not a ceiling—of what James stole from Aetna and the other insurance companies. (A:654-58, 709-11). In issuing its restitution order, the court correctly rejected James's attempt to unreasonably limit the restitution owed to his victims.

After hearing extensive evidence of James's fraud at trial and listening to all arguments, the court acted within its authority in issuing a restitution order of $336,996,416.85—a conservative figure based on the evidence. The restitution order was not based on clearly erroneous factual findings. Rather, it was well-supported and documented, did not exceed the losses to the victims, and should be affirmed. See, e.g., Jafari, 663 F. App'x at 24-25 (2d Cir. 2016) (affirming restitution amount where court chose conservative estimate).

POINT FIVE

REASSIGNMENT IN THE EVENT
OF REMAND IS UNWARRANTED

Finally, James argues that if this Court grants relief requiring a remand, the case should be reassigned to a different judge. This Court

> consider[s] three factors to determine whether reassignment is warranted: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of…her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

Gonzales v. Hasty, 802 F.3d 212, 225 (2d Cir. 2015). Reassignment is a "serious request rarely made and rarely granted." United States v. Awadallah, 436 F.3d 125, 135 (2d Cir. 2006). This is true, at least in part, because the district judge has gained familiarity with the facts of the case so that "assignment to a different judge would only entail wasteful delay or duplicated effort." United States v. Robin, 553 F.2d 8, 11 (2d Cir. 1977). Thus, reassignment is warranted "only in the rare instance in

75

which the judge's fairness or the appearance of the judge's fairness is seriously in doubt." United States v. Elfgeeh, 515 F.3d 100, 137 (2d Cir. 2008).

James has raised no factual or legal basis to justify the extraordinary remedy he seeks. James asserts that the court's alleged errors in calculating various sentencing factors suggest an appearance of partiality and require reassignment if the case is remanded. (Br.58-59). That is not the law. To the contrary, mere legal error (of which there was none here) typically merits only a remand for correction of the error, rather than reassignment to a different judge.

Moreover, the idea that the court "barely acknowledged defense arguments" or that the court was somehow biased against James (Br.59) is baseless. To the contrary, the transcripts reflect extensive argument by defense counsel on numerous sentencing matters. (E.g., A:558-90 (PSR amendments and Guidelines enhancements), 602-04 ("expert" report), 621-36 (Section 3553(a) factors)). The court ruled in James's favor on multiple contested sentencing issues, including declining to impose enhancements for obstruction of justice and the use of sophisticated means in committing the offense (A:615-16, 619), and

partially crediting the report of his purported "expert" over the government's objection (A:604).

Because none of the three factors applied by this Court in determining whether to reassign a case on remand is met, and because the purported errors cited by James do not merit the "serious" and "rare[]" remedy of reassignment, <u>Awadallah</u>, 436 F.3d at 135, this Court should deny James's request for reassignment.

77

CONCLUSION

For the reasons stated above, the Court should affirm James's

conviction and sentence.

Dated:        Brooklyn, New York
              October 10, 2024

                              Respectfully submitted,

                              BREON PEACE,
                              United States Attorney,
                              Eastern District of New York.

                 By:    _____/s/_____
                              CATHERINE M. MIRABILE
                              Assistant U.S. Attorney

DAVID C. JAMES,
AMY BUSA,
ANTOINETTE N. RANGEL,
CATHERINE M. MIRABILE,
Assistant United States Attorneys,
MIRIAM L. GLASER DAUERMANN,
Trial Attorney,
     (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 13,750 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:   Brooklyn, New York
         October 10, 2024

                              /s/ DAVID C. JAMES
                              DAVID C. JAMES
                              Assistant U.S. Attorney